Samuel A. Schwartz, Esq.
Nevada Bar No. 10985
saschwartz@nvfirm.com
SCHWARTZ LAW, PLLC
601 East Bridger Avenue
Las Vegas, NV  89101
Telephone:  702.385.5544
Facsimile:  702.385.2741
Attorneys for the Debtor

**UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF NEVADA**

| | | |
|---|---|---|
| In re: | ) | Case No.:  19-13366-MKN |
| | ) | |
| Islet Sciences, Inc., a Nevada corporation, | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | Hearing Date:  February 17, 2021 |
| | ) | Hearing Time:  9:30 a.m. |
| | ) | |
| _____ | ) | |

**DISCLOSURE STATEMENT FOR THE PLAN OF REORGANIZATION
OF ISLET SCIENCES, INC., UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

**THIS IS NOT A SOLICITATION OF AN ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE COURT. THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES**

THE VOTING DEADLINE IS 5:00 P.M. PREVAILING PACIFIC TIME ON _____, 2020 (UNLESS THE DEBTOR EXTENDS THE VOTING DEADLINE).

TO BE COUNTED AS A VOTE TO ACCEPT OR REJECT THE PLAN, THE DEBTOR'S COUNSEL, SCHWARTZ LAW, PLLC, 601 EAST BRIDGER AVENUELAS VEGAS, NEVADA, 89101, ATTN: SAMUEL A. SCHWARTZ, ESQ. MUST <u>ACTUALLY</u> RECEIVE YOUR BALLOT ON OR BEFORE THE VOTING DEADLINE.

---

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, THE PLAN AND ANY EXHIBITS ATTACHED HERETO IS <u>HIGHLY SPECULATIVE</u>, AND SUCH DOCUMENTS SHOULD NOT BE RELIED UPON IN MAKING INVESTMENT DECISIONS WITH RESPECT TO THE DEBTOR OR ANY OTHER ENTITIES THAT MAY BE AFFECTED BY THIS CHAPTER 11 CASE.

---

<u>PRESERVATION OF AVOIDANCE ACTIONS UNDER THE PLAN:</u>

IN REVIEWING THIS DISCLOSURE STATEMENT AND THE PLAN, AND IN DETERMINING WHETHER TO VOTE IN FAVOR OF OR AGAINST THE PLAN, CREDITORS AND INTEREST HOLDERS (INCLUDING PARTIES THAT RECEIVED PAYMENTS FROM THE DEBTOR WITHIN NINETY (90) DAYS PRIOR TO THE PETITION DATE) SHOULD CONSIDER THAT A CAUSE OF ACTION MAY EXIST AGAINST THEM, THAT THE PLAN PRESERVES ALL CAUSES OF ACTION AND THAT THE PLAN AUTHORIZES THE REORGANIZED DEBTOR TO PROSECUTE THE SAME.

---

IMPORTANT INFORMATION FOR YOU TO READ

THE DEBTOR IS PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS AND INTERESTS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE DEBTOR'S PLAN OF REORGANIZATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE. BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE X HEREIN.

HOLDERS OF CLAIMS OR INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE. THE DEBTOR URGES EACH HOLDER OF A CLAIM OR INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY. FURTHERMORE, THE COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE COURT'S APPROVAL OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN ANTICIPATED EVENTS IN THE DEBTOR'S CHAPTER 11 CASE. ALTHOUGH THE DEBTOR BELIEVES THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH ANTICIPATED EVENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL

2

GOVERN FOR ALL PURPOSES. THE DEBTOR'S MANAGEMENT, EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED, HAS PROVIDED THE FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTOR DOES NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTOR RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTOR'S BOOKS AND RECORDS AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTOR'S BUSINESS. WHILE THE DEBTOR BELIEVES THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTOR AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTOR'S BUSINESS AND ITS FUTURE RESULTS AND OPERATIONS. THE DEBTOR EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD LOOKING STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER. THE DEBTOR MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THE DEBTOR IS MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED. ALTHOUGH THE DEBTOR MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTOR HAS NO AFFIRMATIVE DUTY TO DO SO, AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE. HOLDERS OF CLAIMS OR INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED. INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT. THE DEBTOR RESERVES THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN.

THE DEBTOR HAS NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTOR HAS NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTOR OR THE VALUE OF ITS PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

IF THE PLAN IS CONFIRMED BY THE COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AND INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS AND INTERESTS WHO MAY BE ELIGIBLE TO SUBMIT BALLOTS BUT DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B) AND IS NOT NECESSARILY PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS.

THIS DISCLOSURE STATEMENT WAS NOT FILED WITH THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE AUTHORITY AND NEITHER THE SECURITIES AND EXCHANGE

**COMMISSION NOR ANY STATE AUTHORITY HAVE PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN.**

**THE SECURITIES DESCRIBED HEREIN WILL BE ISSUED WITHOUT REGISTRATION UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED, (THE "SECURITIES ACT") OR ANY SIMILAR FEDERAL, STATE OR LOCAL LAW, IN RELIANCE ON THE EXEMPTIONS SET FORTH IN SECTION 1145 OF THE BANKRUPTCY CODE TO THE MAXIMUM EXTENT PERMITTED AND APPLICABLE AND TO THE EXTENT THAT SECTION 1145 IS EITHER NOT PERMITTED OR NOT APPLICABLE, THE EXEMPTION SET FORTH IN SECTION 4(A)(2) OF THE SECURITIES ACT, THE EXEMPTION SET FORTH IN SECTION 701 PROMULGATED UNDER THE SECURITIES ACT OR ANOTHER EXEMPTION THEREUNDER. IN ACCORDANCE WITH SECTION 1125(E) OF THE BANKRUPTCY CODE, A DEBTOR OR ANY OF ITS AGENTS THAT PARTICIPATES, IN GOOD FAITH AND IN COMPLIANCE WITH THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE, IN THE OFFER, ISSUANCE, SALE, OR PURCHASE OF A SECURITY, OFFERED OR SOLD UNDER THE PLAN, OF THE DEBTOR, OF AN AFFILIATE PARTICIPATING IN A PLAN WITH THE DEBTOR, OR OF A NEWLY ORGANIZED SUCCESSOR TO THE DEBTOR UNDER THE PLAN, IS NOT LIABLE, ON ACCOUNT OF SUCH PARTICIPATION, FOR VIOLATION OF ANY APPLICABLE LAW, RULE, OR REGULATION GOVERNING THE OFFER, ISSUANCE, SALE, OR PURCHASE OF SECURITIES.**

# TABLE OF CONTENTS

I.  EVENTS LEADING TO THE CHAPTER 11 CASE ......................................................................... 8

A.    THE DEBTOR'S BUSINESS ............................................................................................................ 8

B. SUCCESSES AND CONTINUED GROWTH ........................................................................................ 8

C. BHV PARTNERSHIP AND DECLINE ................................................................................................ 8

D. THE INVOLUNTARY CASE AND BANKRUPTCY ........................................................................... 10

E.    CONVERSION OF THE CHAPTER 7 INVOLUNTARY CASE TO CHAPTER 11 ............................ 10

II. EVENTS DURING THE CHAPTER 11 CASE ................................................................................ 10

A.    FIRST DAY MOTIONS AND EMPLOYMENT OF PROFESSIONALS ........................................... 10
   1.    Miscellaneous First Day Motions Not Otherwise Provided for in This Section ................... 10
   2.    Employment of Professionals ....................................................................................................... 11
   a.    Professionals Related to the Debtor's Ongoing Operation and Bankruptcy Administration ........... 11
   b.    Professionals Related to the North Carolina Litigation .......................................................... 11
   3.    Appointment of Committee of Unsecured Creditors its Professionals ................................ 12
   4.    Debtor-in-Possession Financing and Use of Cash Collateral ................................................ 12
B.    OTHER EVENTS DURING THE CHAPTER 11 CASE ..................................................................... 13
   1.    Establishment of the Claims Bar Date ......................................................................................... 13
   2.    Plan Support Agreement ................................................................................................................ 13
   3.    Valuation of the Debtor ................................................................................................................. 13
C.    REORGANIZATION STRATEGY – DEBT FOR EQUITY EXCHANGE ......................................... 14

III.................SUMMARY OF THE PLAN OF REORGANIZATION AND TREATMENT OF CLAIMS AND EQUITY
INTERESTS ................................................................................................................................................... 14

A.    PURPOSE OF THE PLAN OF REORGANIZATION ......................................................................... 14
B.    ADMINISTRATIVE CLAIMS ............................................................................................................ 15
   1.    Priority Wage/Commission Claim ............................................................................................... 15
   2.    DIP Facility Claims ......................................................................................................................... 15
   3.    Priority Tax Claims ......................................................................................................................... 16
C.    SECURED CLAIMS ........................................................................................................................... 16
D.    UNSECURED CLAIMS ...................................................................................................................... 16
1.    PETITIONING CREDITORS CLAIMS ..................................................................................................... 16
2.    GENERAL UNSECURED CLAIMS .......................................................................................................... 17
   3.    Equity Interest of the Debtor ....................................................................................................... 17

E. MEANS FOR IMPLEMENTATION OF THE PLAN ............................................................................ 18
   1.    General Settlement of Claims ....................................................................................................... 18
   2.    Restructuring Transactions ........................................................................................................... 18
   3.    New Corporate Existence and Management ................................................................................ 19
   4.    Vesting of Assets in the Reorganized Debtor ............................................................................ 20
   5.    New Equity Interests ...................................................................................................................... 20
   6.    Securities Registration Exemption and Registration Rights Agreement .............................. 20
F.    TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ................................ 21
   1.    Assumption and Rejection of Executory Contracts and Unexpired Leases ........................ 21
   2.    Claims on Account of the Rejection of Executory Contracts or Unexpired Leases ........... 21
   3.    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases ...................... 22
   4.    Contracts and Leases Entered into After the Commencement Date ..................................... 23
G.    EXCULPATION .................................................................................................................................. 23
   1.    Discharge of Claims and Termination of Interests .................................................................... 23
   2.    Releases of Liens ............................................................................................................................. 24

| | | | |
|---|---|---|---|
| **3.** | **Exculpation** | | 24 |
| **4.** | **Injunction** | | 25 |
| **H.** | **PROVISIONS GOVERNING DISTRIBUTIONS** | | 26 |
| **1.** | **Distributions for Claims Allowed as of the Effective Date** | | 26 |
| **2.** | **Distributions on Account of Claims Allowed After the Effective Date** | | 26 |
| | (a) | Payments and Distributions on Disputed Claims | 26 |
| | (b) | Special Rules for Distributions to Holders of Disputed Claims | 26 |
| **3.** | **Delivery and Distributions and Undeliverable or Unclaimed Distributions** | | 26 |
| | (a) | Record Date for Distributions | 26 |
| | (b) | Delivery of Distributions in General | 26 |
| | (c) | Distributions by Distribution Agent | 26 |
| | (d) | Minimum Distributions | 27 |
| | (e) | Undeliverable Distributions | 27 |
| **4.** | **Compliance with Tax Requirements/Allocations** | | 28 |
| **5.** | **Timing and Calculation of Amounts to be Distributed** | | 28 |
| **6.** | **Setoffs** | | 29 |
| **I.** | **PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED AND DISPUTED CLAIMS** | | 29 |
| **1.** | **Resolution of Disputed Claims** | | 29 |
| | (a) | Allowance of Claims | 29 |
| | (b) | Prosecution of Objection to Claims | 29 |
| | (c) | Claims Estimation | 29 |
| | (d) | Expungement or Adjustment of Claims Without Objection | 30 |
| | (e) | Deadline to File Objections to Claims | 30 |
| **2.** | **Disallowance of Claims** | | 30 |
| **3.** | **Amendment to Claims** | | 30 |
| **J.** | **CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN** | | 30 |
| **1.** | **Conditions Precedent to Confirmation** | | 30 |
| **2.** | **Conditions Precedent to Consummation** | | 31 |
| **3.** | **Waiver of Conditions** | | 31 |
| **4.** | **Effect of Non-Occurrence of Conditions to Consummation** | | 31 |
| **K.** | **SETTLEMENT, RELEASE AND RELATED PROVISIONS** | | 31 |
| **1.** | **Compromise and Settlement** | | 31 |
| **2.** | **Preservation of Rights of Action** | | 32 |
| | (a) | Maintenance of Causes of Action | 32 |
| | (b) | Preservation of All Causes of Action Not Expressly Settled or Released | 32 |
| **L.** | **BINDING NATURE OF THE PLAN** | | 32 |
| **IV.** | **CONFIRMATION AND CONSUMMATION PROCEDURES** | | **32** |
| **A.** | SOLICITATION OF VOTES | | 32 |
| **B.** | CONFIRMATION PROCEDURES | | 33 |
| **1.** | **Confirmation Hearing** | | 33 |
| **2.** | **Confirmation Hearing Notice** | | 33 |
| **3.** | **Filing Objections to the Plan** | | 33 |
| **C.** | STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN | | 33 |
| **1.** | **Best Interests of Creditors Test/Liquidation Analysis** | | 34 |
| **2.** | **Feasibility** | | 35 |
| **3.** | **Acceptance by Impaired Classes** | | 35 |
| **4.** | **Confirmation Without Acceptance by All Impaired Classes** | | 36 |
| **5.** | **No Unfair Discrimination** | | 36 |
| **6.** | **Fair and Equitable Test** | | 36 |
| **D.** | **CONSUMMATION OF THE PLAN** | | 36 |
| **V.** | **CERTAIN SECURITIES LAW MATTERS** | | **37** |
| **A.** | **PLAN SECURITIES** | | 37 |

**B.**    **ISSUANCE AND RESALE OF SECURITIES** ................................................................................. 37
   **1.**    **Exemptions from Registration Requirements of the Securities Act and Applicable State Securities Laws** ..... 37
   **2.**    **Resale of Certain New Equity; Definition of Underwriter** .......................................................... 37

**VI.**    **PLAN-RELATED RISK FACTORS** .................................................................................... **38**

**A.**    **CERTAIN BANKRUPTCY LAW CONSIDERATIONS** .................................................................... 38
   **1.**    **Parties in Interest May Object to the Debtor's Classification of Claims and Equity Interests.** ............... 38
   **2.**    **The Debtor May Fail to Satisfy the Vote Requirement** ............................................................... 38
   **3.**    **The Debtor May Not Be Able to Secure Confirmation of the Plan** ................................................ 39
   **4.**    **Nonconsensual Confirmation of the Plan May be Necessary** ....................................................... 39
   **5.**    **The Debtor May Object to the Amount or Classification of a Claim** .............................................. 39
   **6.**    **Risk of Non-Occurrence of the Effective Date** ....................................................................... 39
   **7.**    **Contingencies Will Not Affect Votes of Impaired Classes to Accept or Reject the Plan** ..................... 40
**B.**    **RISK FACTORS THAT MAY AFFECT RECOVERIES UNDER THE PLAN** ......................................... 40
   **1.**    **The Valuation of the Reorganized Debtor May Not Be Adopted by the Bankruptcy Court** ............... 40
   **2.**    **The Reorganized Debtor May Not Be Able to Achieve Projected Financial Results or Finance All Operating Expenses, Working Capital Needs and Capital Expenditures** ................................................................ 40
**C.**    **RISK FACTORS THAT COULD NEGATIVELY IMPACT THE DEBTOR'S BUSINESS** .......................... 40
   **1.**    **Prolonged Continuation of the Chapter 11 Case is Likely to Harm the Debtor's Asset Values** ........... 40
   **2.**    **Certain Tax Implications of the Debtor's Bankruptcy and Reorganization May Increase the Tax Liability of the Reorganized Debtor** ......................................................................................................... 41
   **3.**    **The Debtor May Be Controlled by Significant Holders** ............................................................. 41
   **4.**    **The New Equity Is Subject to Dilution.** ............................................................................... 41
   **5.**    **Islet's or Its Reorganized Successor's New Equity is Not Certain to be Publicly Traded.** .................. 41
**D.**    **DISCLOSURE STATEMENT DISCLAIMERS** ............................................................................ 41
   **1.**    **The Information Contained Herein Is for Soliciting Votes Only** ................................................... 41
   **2.**    **This Disclosure Statement Was Not Approved by the Securities and Exchange Commission** ............. 41
   **3.**    **The Disclosure Statement Contains Forward Looking Statements** ............................................... 42
   **4.**    **No Legal or Tax Advice is Provided to You by this Disclosure Statement** ..................................... 42
   **5.**    **No Admissions Are Made by this Disclosure Statement** ........................................................... 42
   **6.**    **No Reliance Should be Placed on any Failure to Identify Litigation Claims or Projected Objections** ............ 42
   **7.**    **Nothing Herein Constitutes a Waiver of any Rights to Object to Claims or Recover Transfers and Assets** ..... 42
   **8.**    **The Information Used Herein Was Provided to the Debtor and Was Relied Upon by the Debtor's Advisors** . 42
   **9.**    **The Potential Exists for Inaccuracies, and the Debtor has no Duty to Update** ................................. 43
   **10.**    **No Representations Made Outside of the Disclosure Statement Are Authorized** ............................... 43

**VII.**    **ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN** .................................... **43**

**C.**    LIQUIDATION UNDER CHAPTER 7 OF THE BANKRUPTCY CODE ...................................................... 43
**D.**    FILING OF AN ALTERNATIVE PLAN OF REORGANIZATION .......................................................... 43

**VIII.**    **RETENTION OF JURISDICTION** ...................................................................................... **44**

**IX.**    **CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN** ........................................ **45**

**A.**    **CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN** ............................................. 45
**B.**    **IN GENERAL** ............................................................................................................... 45
**C.**    **U.S. HOLDERS OF CLAIMS** ............................................................................................ 46
**D.**    **NON-U.S. HOLDERS OF CLAIMS** ...................................................................................... 46
**E.**    **IMPORTANCE OF OBTAINING PROFESSIONAL TAX ASSISTANCE** ............................................. 46

**X. GLOSSARY OF DEFINED TERMS** ........................................................................................ **47**

**XI. RECOMMENDATION** ........................................................................................................ **54**

## I.      EVENTS LEADING TO THE CHAPTER 11 CASE

Islet Sciences, Inc. ("**Islet**" or the "**Debtor**") was formed under the name One E-Commerce Corporation on September 14, 1994 in the State of Nevada. Effective February 23, 2012, the Company changed its name to Islet Sciences, Inc. Background pertinent to this Chapter 11 Case is best presented through examination of: (A) The Debtor's Business; (B) Success and Continued Growth; (C) The BHV Relationship and Decline; and (D) The Involuntary Case and Bankruptcy.

### A.      THE DEBTOR'S BUSINESS[1]

Islet is a clinical stage biotechnology company focused on the research, development, and commercialization of new medicines and technologies for the treatment and diagnosis of metabolic disease and related indications. Currently, Islet focuses its efforts on the development of a robust intellectual property portfolio to facilitate fundamental advances in diabetes therapies. To that end, Islet develops new and innovative solutions, enabled by Islet's proprietary intellectual property for the early detection and treatment of diabetes. The company addresses a critical scientific and economic need. In fact, the Harvard School of Public Health estimates that the world-wide economic burden of diabetes is approximately $1.3 trillion dollars. Islet's products, which are devoted to early detection, immunotherapy, and islet encapsulation and transplantation, seek to ameliorate the broad-ranging effects of the disease.

### B.      SUCCESSES AND CONTINUED GROWTH

Islet's innovative approach served it well. Islet grew to become a publicly traded entity, with the company's shares trading on NASDAQ-OTC public market under the ticker symbol ISLT. The Company currently boasts over 1,300 investors, including the public market shareholders. In March of 2012, Islet successfully acquired DiaKine Therapeutics, Inc., a well-renowned biopharmaceutical company focused on diabetes drugs. Dr. Christian Mende, a Clinical Professor of Medicine at the University of California, San Diego, who is extensively published and cited in the fields of metabolic disease, joined Islet's Scientific Advisory Board in the Spring of 2012. In May of 2012, Islet earned a valuable agreement with Yale University, and acquired an exclusive license to a technology patented by the ivy-league university. Islet also entered into a license for patented technology with the Winthrop University Hospital, and another with University of California, Los Angeles for an alternative diabetes-related invention. All told, Islet's focused effort to develop new therapies for metabolic related diseases cemented it as a recognized leader in a large and growing market sector.

### C.      BHV PARTNERSHIP AND DECLINE

The company's anticipated cashflows are generated through a combination of licensing agreements and partnerships with research institutions, pharmaceutical companies, and product developers. Historically, Islet Sciences has generated substantial value by partnering with promising companies in the field of metabolic disease.

For example, William Wilkison ("**Wilkison**") and James Green ("**Green**") formed Brighthaven Ventures, LLC ("**BHV**") for the purpose of developing and marketing a diabetes treatment using the molecule Remogliflozin ("**Remo**"), its salt carrier Remo Etabonate, and related bi-phaisc formulation patent applications (the molecule, its salt carrier, and patent rights are referred to herein as the "**Remo Technology**"). BHV had obtained the rights to Remo and Remo Etabonate through an exclusive license with Kissei Pharmaceuticals ("**Kissei**"). The licensed rights, however, required BHV to achieve several milestones on a well-defined timeline. As to the patent rights, they required perfection through a strictly timed and expensive worldwide filing process. Before meeting Islet, BHV's biphasic patents and license with Kissei were both at risk because BHV faced a looming unextendable patent deadline and had failed to achieve license milestones. BHV was also saddled with business expenses. It needed to either raise capital or find a business partner.

Upon information and belief, BHV engaged a banker, Stifel Financial Corp. ("**Stifel**"), to assist with BHV's increasingly desperate search for capital. Though Stifel approached Eli Lilly and Co. and made other efforts on behalf

---

[1]      All capitalized terms used but not otherwise defined herein shall have the meanings set forth in Article IX herein, titled "Glossary of Key Terms." To the extent that a definition of a term in the text of this Disclosure Statement and the definition of such term in the "Glossary of Key Terms" is inconsistent, the definition in the "Glossary of Key Terms" shall control.

of BHV, it failed to raise any capital for BHV. Ultimately, Stifel was unable to gain the interest of any biotechnology or pharmaceutical company in a business venture, or otherwise find any solution to BHV's dual (and urgent) needs for money and a commercialization partner. By this point, with less than a year remaining to enter the national phase stage for the pertinent Remo patent applications, BHV's need for funding reached the point of desperation. For BHV, Islet Sciences appeared to be a perfect match to solve BHV's quandary. Islet Sciences had demonstrated the capacity to raise money and provide commercialization expertise in the field of diabetes drug development.

In August 2012, Islet and BHV agreed on a joint venture to develop and commercialize Remo and Remo Etabonate. BHV was to contribute the exclusive license that BHV held from Kissei to a limited liability company that would be created to carry out the business of the venture, the purpose of which was to jointly develop this drug. Islet was to contribute capital and project management as well as other development and commercialization support. The limited liability company was also to assume BHV's milestone payments and royalty obligations to Kissei as well as BHV's debt to the North Carolina Biotechnology Center. In exchange for capital and project management, Islet Sciences was to receive an 80 percent ownership interest in the new venture and would consequently receive 80 percent of all membership distributions.

The joint venture term sheet also provided that Islet would offer executive positions to Green and Wilkison. By October 2012, Islet began performing its obligations and took steps for the benefit of the joint venture. Islet committed substantial resources to the new business in reliance on Defendants' agreement to participate in it. Islet provided experienced advisors to help develop the Remo Technology, including patent counsel, and a world-renowned expert in diabetes, and incurred the expenses for the global patent prosecution of the bi-phasic patents. Islet's contributions were made despite the risk of loss if Remo could not be commercialized, in reliance on the possibility of sharing profits according to the business terms to which BHV had committed.

Furthermore, Islet contributed its goodwill to the joint venture, which helped Defendants both keep their license with Kissei (even though Defendants had not achieved the requisite milestones), and convince Kissei to forgive $100,000 of BHV's debt (and let BHV repay the rest of its debt over an extended period).

In January 2013, mere days after BHV secured its patent rights using Islet's resources, BHV sought to unreasonably make the deal more beneficial to itself. The venture subsequently ended.

Around late summer of 2013, new discussions started on a different transaction involving the Remo Technology. At the end of October 2013, Islet gave Green and Wilkison executive roles at the company: Green and Wilkison were made Chief Executive Officer and Chief Scientific Officer, respectively, and Green joined the Debtor's board.[2] Remo Technology business discussions now had a different tone. In contrast to the 80/20 business terms on which Islet had agreed in 2012 in order to bail out BHV, these new proposed deals shared the common characteristic of being far more favorable to BHV.

For example, one proposed merger structure was so biased in favor of BHV that the terms triggered the scrutiny of the Securities and Exchange Commission, and Islet's shareholders refused to approve the merger (resulting in termination of the transaction). In another proposal, BHV offered Islet a sub-license to the Kissei technology – but now BHV demanded that Islet pay $5 million up front, and raise an additional $10 million in outside capital, before BHV would effectuate the sub-license.

In December 2015, Islet commenced an action against Green, Wilkison, and BHV in the State of North Carolina, Superior Division, seeking relief for acts committed by Green and Wilkison during the course of their employment as directors and officers of Islet from October 2013 onward including: aiding and abetting breach of fiduciary duty and unjust against Green and Wilkison, fiduciary duty and constructive trust against Green and Wilkison, and against the pair and BHV for constructive trust as to any assets transferred to it by Green and Wilkison while officers and directors of Islet (the "**North Carolina State Court Litigation**"). The gravamen of the North Carolina Litigation was that Green and Wilkison breached their fiduciary duties to Islet by serving as managers of Islet and BHV at the same time and using their positions at Islet to benefit BHV and themselves personally at Islet's expense. Islet also asserted that BHV assisted in these breaches.

---

[2]        Wilkison would join the board at a later time.

Approximately one year after the North Carolina State Court Litigation was filed, Islet was unable to financially pursue the litigation, and its counsel withdrew. By December 2017, with its financial resources depleted, and its remaining state court claims dismissed, the court entered default against Islet on counterclaims filed by Defendants.  In February 2018, the court granted BHV, Green, and Wilkison's motions for default judgment and entered judgments of $443,342.63, $754,271.20, and $758,607.51, plus interest, for the Defendants, respectively.

On January 11, 2019, Islet commenced a different action in the United States District Court for the Southern District of New York against Wilkison, Green, BHV and Avolynt, for breach of contract, breach of fiduciary duty, unjust enrichment, fraud and constructive trust concerning critical assistance that Islet provided to BHV in 2012 and early 2013 to enable BHV to preserve the Remo Technology. These claims concern different facts and seek different relief from those in the North Carolina State Court Litigation. The New York case was subsequently transferred by agreement to the Eastern District of North Carolina (the "**North Carolina Litigation**"),[3] and is currently pending.

### D.    THE INVOLUNTARY CASE AND BANKRUPTCY

On May 29, 2019, Green, Wilkison, BHV, Kevin M. Long, VACO Raleigh, LLC, Steve Delmar, and Apex Biostatistics, Inc. (the "**Petitioning Creditors**"), filed an involuntary petition (the "**Involuntary Petition**") against Islet, requesting an order for relief under Chapter 7 (the "**Chapter 7 Case**") of the Bankruptcy Code.[4]

Debtor believes that the Petitioning Creditors filed the Involuntary Petition to circumvent their liability in the North Carolina Litigation by liquidating the Debtor.  On May 30, 2019, the Court issued an involuntary summons.[5] On June 3, 2019, the Petitioning Creditors served the involuntary summons on the Debtor.[6]

### E.    CONVERSION OF THE CHAPTER 7 INVOLUNTARY CASE TO CHAPTER 11

In response to the foregoing circumstances, the Debtor took the necessary step of seeking to convert and control this Chapter 11 Case to preserve the value of its assets for the benefit of the Debtor's estate, creditors, and other stakeholders. On July 19, 2019, the Debtor filed a motion to convert (the "Motion to Convert") the Chapter 7 Case to a case under Chapter 11 pursuant to Section 706(a) of the Bankruptcy Code.[7] On September 3, 2019, the Petitioning Creditors filed an opposition to the Motion to Convert.[8] On September 9, 2020, the Debtor filed a reply to the opposition.[9] On September 18, 2019, the Bankruptcy Court entered the Order granting the Motion to Convert.[10]

## II.    EVENTS DURING THE CHAPTER 11 CASE

### A.    FIRST DAY MOTIONS AND EMPLOYMENT OF PROFESSIONALS

On or around the Petition Date, in addition to filing its voluntary petition for relief, the Debtor also filed various motions (collectively, the "**First Day Motions**") with the Bankruptcy Court set forth below.[11]  The Bankruptcy Court entered several orders to, among other things, ease the strain on the Debtor's relationships with certain essential constituents, and allow the Debtor to retain professionals, including bankruptcy counsel to assist it with the administration of the Chapter 11 Case (each, a "**First Day Order**").

#### 1.    Miscellaneous First Day Motions Not Otherwise Provided for in This Section

On July 19, 2019, the Debtor filed a: (a) motion for extension of the deadlines to filed schedules;[12] (b) for approval of procedures for compensation of professionals;[13] (c) motion for designation of responsible person;[14] and

---

[3]        The North Carolina Litigation is case number 5:19-cv-00145-D.
[4]        Docket No. 1.
[5]        Docket No. 3.
[6]        Docket No. 5.
[7]        Docket No. 9.
[8]        Docket No. 89 (styled as an omnibus objection to first day motions).
[9]        Docket No. 93.
[10]       Docket No. 116.
[11]       *See* Docket Nos. 11; 12; 13; 15; 23.
[12]       Docket No. 12.
[13]       Docket No . 23.
[14]       Docket No. 15.

(d) motions to shorten the time for hearing the First Day Motions.[15] On September 3, 2019, the Petitioning Creditors filed an opposition to the above First Day Motions.[16] On September 18, 2019, the Court entered multiple First Day Orders including the Orders on motions for extension of deadline for filing schedules, procedures of for professional compensation, and designation of responsible person.[17]

**2.    Employment of Professionals**

*a.    Professionals Related to the Debtor's Ongoing Operation and Bankruptcy Administration*

Schwartz Law, PLLC ("Schwartz Law") serves as the Debtor's general bankruptcy counsel. Immediately following the Petitioning Creditors' filing of the Involuntary Petition, the Debtor retained Samuel A. Schwartz, Esq. formerly of Brownstein Hyatt Farber Schreck, LLP ("BHFS"), as its general bankruptcy counsel to represent it in the Chapter 7 Case and further aide in its conversion to the Chapter 11 Case. On September 18, 2019, the Bankruptcy Court entered the Order employing the BHFS.18 On March 1, 2020, Mr. Schwartz departed BHFS to form Schwartz Law. On March 13, 2020, the Debtor filed an application to employ Schwartz Law as the Debtor's bankruptcy counsel.[19]  On April 16, 2020, the Court entered the Order employing Schwartz Law as the Debtor's general bankruptcy counsel.[20]

JPF Securities Law, LLC ("JPF") serves as the Debtor's special securities counsel. JPF represents the Debtor for the purpose of maintaining Debtor's ongoing reporting and other requirements, in compliance with mandatory securities law. On July 22, 2019, Debtor filed an application to employ JPF as its special securities counsel.[21] On October 17, 2019, the Court entered the Order employing JPF as the Debtor's special securities counsel.[22]

Signature Analytics ("**Signature**") serves as accountant to the Debtor, maintaining its financial books and records and providing bookkeeping services. On July 26, 2019, the Debtor filed an application to employ Signature.[23] On October 22, 2019, the Court entered the Order employing Signature as the Debtor's accountant.[24]

PKF San Diego ("**PKF**") serves as accountant to the Debtor, tasked with advising the Debtor on taxation matters including preparation and filing of the Debtor's tax documents.  On July 26, 2019, the Debtor filed an application to employ PKF.[25] On October 22, 2019, the Court entered the Order employing PKF as the Debtor's accountant.[26]

Portage Point Partners, LLC ("**PPP**") serve as the Debtor's financial advisor and performed a valuation analysis of the Debtor for the purpose of confirming a plan of reorganization in the Chapter 11 Case. On January 7, 2020, the Debtor filed an application to employ PPP as financial advisor.[27] On February 20, 2020, the Court entered the Order employing PPP.[28]

*b.    Professionals Related to the North Carolina Litigation*

Armstrong Teasdale, LLP ("AT") and Williams Mullen ("WM") serve as the Debtor's special litigation counsel in the North Carolina Litigation and the North Carolina State Court Litigation. On September 11, 2019, the Debtor filed an application for employment of AT.[29]  On October 17, 2020, the Court entered the Order employing

---

[15]    Docket Nos. 13; 16; 18; 20
[16]    Docket No. 89.
[17]    Docket Nos. 117; 118; 120.
[18]    Docket No. 119.
[19]    Docket No. 254.
[20]    Docket No. 271.
[21]    Docket No. 27.
[22]    Docket No. 161.
[23]    Docket No. 42.
[24]    Docket No. 168.
[25]    Docket No. 41.
[26]    Docket No. 168.
[27]    Docket No. 214.
[28]    Docket No. 244.
[29]    Docket No. 102.

AT as lead special litigation counsel.[30] On September 10, 2020, the Court entered the Order granting AT's amended employment application.[31]  On July 22, 2019, Debtor filed an application to employ WM as its local counsel in North Carolina Litigation.[32] On October 22, 2019, the Court entered the Order employing WM as special litigation counsel, serving as local counsel to AT in the North Carolina Litigation.[33]

National Economic Research Associates, Inc. ("NERA") serves as the Debtor's expert witness with respect to the North Carolina Litigation. On January 30, 2020, the Debtor filed an application to employ NERA.[34] On September 3, 2020, the Court entered the Order employing NERA as expert witness.[35]

### 3. Appointment of Committee of Unsecured Creditors its Professionals

On November 26, 2019, the Office of the United States Trustee for Region 17, which includes the District of Nevada (the "UST"), filed notice of appointment of committee of unsecured creditors (the "UCC").[36] The UCC was initially comprised of (a) BHV; (b) Spring Point Project; (d) Wilkison.[37] On December 16, 2019, the Anderson Law Firm, Ltd. ("**Anderson Law**") filed an application for its employment as counsel for the UCC.[38] On December 18, 2019, the Debtor filed a motion to disband the UCC.[39] On February 19, 2020, the Court entered the Order employing Anderson Law as counsel to the UCC.[40] On January 21, 2020, the UST filed an amended notice of appointment of the UCC. Following the UST's amended notice, the UCC included as members: (a) BHV; (b) Spring Point Project; (c) Wilkison; (d) PCG Advisory, Inc; and (e) COVA Capital Partners, LLC.[41]

### 4. Debtor-in-Possession Financing and Use of Cash Collateral

On July 19, 2019, the Debtor filed a motion (the "DIP Facility Motion") seeking the Court's approval of postpetition debtor-in-possession financing (the "DIP Facility") from Western States Funding, LLC ("WSF") along with a request for approval of a budget.[42] Under the terms of the DIP Facility, WSF would provide the Debtor a $1,000,000 credit facility at an interest rate of four-percent (4%) per year.[43] The DIP Facility would allow WSF a superpriority administrative claim in the Chapter 11 Case which would roll up a prepetition $100,000 debt into the postpetition DIP Facility.[44] The DIP Facility is to mature twenty-four (24) months from funding. Finally, the DIP Facility would allow the Debtor to repay WSF in equity at a rate of $0.04 per share.

On July 22, 2019, the Petitioning Creditors filed a joint opposition to the DIP Facility Motion.[45] On September 12, 2019, the Court convened a hearing on the DIP Facility Motion.[46] At its conclusion, the Court continued the hearing on the DIP Facility Motion to September 26, 2019.[47] On October 1, 2019, the Court granted the DIP Facility Motion.[48]

---

[30] Docket No. 162.
[31] Docket No. 336; *see* Docket No. 288.
[32] Docket No. 26.
[33] Docket No. 167.
[34] Docket No. 234.
[35] Docket No. 329.
[36] Docket No. 184; *see* Docket No. 228 (later amendment to notice by the UST).
[37] Id.
[38] Docket No. 188
[39] Docket No. 205.
[40] Docket No. 243.
[41] Docket No. 228.
[42] Docket Nos. 11; 40 (Debtor's supplemental DIP Facility Motion).
[43] Docket No. 11 at 4–5.
[44] Id. at 5.
[45] Docket No. 25; *see*; Docket No. 135 (Petitioning Creditor's supplemental opposition to the DIP Facility Motion); Docket No. 140 (Debtor's supplemental reply); Docket No. 93 (Petition Creditors' Omnibus Objection to first day motions); Docket No. 101 (Debtor's Reply to Omnibus Objection).
[46] *See* Docket Nos. 56; 58.
[47] Docket No. 109.
[48] Docket No. 148.

On September 10, 2019, the Debtor filed motion a seeking the Court's approval of to continue under the terms of prepetition financing (the "**Litigation Financing**") from Curiam Investments 2 LLC ("**Curiam**") for postpetition debt obligations related to as they comes due.[49] Under the terms of the Litigation Financing, Curiam provided the Debtor a $3,500,000 credit facility which the Debtor would be able to draw down on as needed for expenses related to the North Carolina Litigation. In consideration, the Debtor granted Curiam a first position security interest the net proceeds of the North Carolina Litigation in an amount not to exceed $3,500,000 plus fifteen-percent (15%).[50] On October 17, 2019, the Court entered the Order granting the Debtor's motion for approval of the Litigation Financing.[51]

On December 3, 2020, the Debtor filed it motion to amend the DIP Facility to increase the credit facility to $2,000,000 (the "Amended DIP Facility").[52] WSF agreed to extend the additional financing to the Debtor on the same terms as the DIP Facility, with the exception of the Debtor's repayment rate, which WSF increased from $0.04 per share to $0.06 per share. The Debtor anticipates the Amended DIP Facility and its accompanying budget will provide it with sufficient liquidity to pay the administrative claims if this Chapter 11 Case, and provide adequate working capital post-confirmation.

### B.    OTHER EVENTS DURING THE CHAPTER 11 CASE

#### 1.    Establishment of the Claims Bar Date

On September 18, 2019, the Court issued the noticed the meeting of creditors and deadlines, establishing: (a) January 22, 2020, as the Claims Bar Date; and (b) March 16, 2020, as the Governmental Bar Date.[53]

#### 2.    Plan Support Agreement

On November 17, 2020, The Debtor and Curiam entered into an Amendment (the "**Litigation Financing Amendment**") to the agreement underlying the Litigation Financing to account for certain the defaults of the Debtor under the Litigation Financing and the current costs of the District Court Case.[54] The Litigation Financing Amendment and the terms therein are subject to the Protective Order entered by the Court in connection with the original approval of the Litigation Financing.[55] The Litgation Fianncing Amendment was necessary to to allow the Debtor further access to capital necessary for ongoing litigation in the Distrct Court Case. As part of the Litigation Financing Amendment, Curiam's agreed to support the Plan, provided the Debtor complies with Sections 1125 and 1126 of the Bankruptcy Code, and the Plan properly incorporates the Litigation Financing Amendment.

#### 3.    Valuation of the Debtor

In February of 2020, the Court entered the Order employing PPP, on the Debtor's motion, for purposes of providing a valuation of the Debtor's assets in the Chapter 11 Case.[56] On August 30, 2020, PPP completed its analysis and submitted its finding to the Debtor.[57] The Valuation provided an analysis of the value of the Debtor's two key assets in the current biotechnology market: (a) Lisofylline combination therapy with GLP-1 ("**Combo Treatment**"); and (b) Beta Cell Death Diagnostic Test ("**Beta-Cell Test**").[58]

The Valuation is focused on the raw value of the Combo Treatment and Beta-Cell Test when the intellectual property underlying both treatments is licensed out major third-party biotechnology enterprises. This

---

[49]     Docket No. 96.
[50]     Id. at 5–6.
[51]     Docket No. 160
[52]     Docket No. 361.
[53]     Docket No. 127.
[54]     The Litigation Financing Amended is subject to the Protective Order. Parties who seek to review the Litigation Fiancing Agreement must sign onto and agreed to be bound by the Protective Order.
[55]     Docket No. 78.
[56]     Docket No. 214.
[57]     The Valuation is not attached hereto and is redacted because it is subject to the Protective Order. Parties who wish to review the Valuation must sign onto and agreed to be bound by the Protective Order.
[58]     Valuation at 6.

allows for a conservative valuation of the Debtor's assets as it does away with the calculation of operational and marketing costs, doing away with overly speculative considerations. As of August 30, 2020, PPP values the Combo Treatment at **$61,772,000** and the Beta-Cell Test at **$380,626,000**.[59]

The combined value of the Debtor is **$442,398,000**. The Reorganized Debtor intends to issue shares of New Equity, which will in turn allow for Holders of Allowed Unsecured Claims to receive payment based on their pro rata share of the New Equity as described below.

## C.    REORGANIZATION STRATEGY – DEBT FOR EQUITY EXCHANGE

As of the Petition Date, the Debtor has anticipates it will have outstanding obligations in the principal amounts of approximately (i) $2,000,000 of postpetition financing, (ii) $1,955,221.34 of claims arising from litigation with the Petitioning Creditors, and (iii) $6,723,569.37 of general unsecured debt. The Plan provides for the reorganization of the Debtor as a going concern and will signifantly reduce the Debtor's debt, while preserving liquidity, which in turn will result in a stronger and delevered balance sheet. As set forth above, the Debtor intents to:

- issue shares of the New Equity to WSF in accordance with the lender's DIP Facility, as amended, which result in WSF owning approximately 11% of the Reorganized Debtor;
- issue shares to unsecured creditors, with a reserve for the Petitioning Creditors, which reserve is subject to the outcome of the North Carolina Litigaiton, which result in the Petitioning Creditors owning up to approximately 0.4% of the Reorganized Debtor and General Unsecured Creditors owning 1.6%; and
- existing Equity Interests shall be issued their Pro Rata share of the New Equity Interests, subject to dilution based on the equity issues to WSF and unsecured creditors, leaving current Equity Interest Holders owning 87% of the Reorganized Debtor.

In summary, the Debtor's reorganization strategy is to: (a) utilize the bankruptcy process to liquidate Claims against the Estate; (b) maximize the going concern value of the Estate for the Creditors and Equity Interests of the Debtor; and (c) issuing the Holders of Allowed Claims and Equity Interests the Pro Rata value of their Claims and Equity Interests in stock in the Reorganized Debtor in full satisfaction of their Allowed Claims and Equity Interests. The issuance of the New Equity will also dilute the value of the current Equity Interest Holders on a Pro Rata basis.

The total amount of the claims of WSF is estimated to be $1,700,000, plus interest, fees and expenses.

The total amount of the General Unsecured Claims in the case is estimated to be $6,723,569.37.

The total amount of the Petitioning Creditors Claims in the case is estimated to be $1,955,221.34.

## III.    SUMMARY OF THE PLAN OF REORGANIZATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS

> THIS SECTION III IS INTENDED ONLY TO PROVIDE A SUMMARY OF THE <u>MATERIAL TERMS</u> OF THE PLAN AND IS QUALIFIED BY REFERENCE TO THE ENTIRE DISCLOSURE STATEMENT AND THE PLAN, AND SHOULD <u>NOT</u> BE RELIED ON FOR A COMPREHENSIVE DISCUSSION OF THE PLAN. TO THE EXTENT THERE ARE ANY INCONSISTENCIES BETWEEN THIS SECTION III AND THE PLAN, THE TERMS AND CONDITIONS SET FORTH IN THE PLAN SHALL GOVERN.

### A.    PURPOSE OF THE PLAN OF REORGANIZATION

The Plan provides for the reorganization of the Debtor as a going concern and will address the Debtor's capital structure, while preserving the Debtor's existing liquidity. Specifically, the Plan contemplates a restructuring

---

[59]    Id. at 22, 26.

of the Debtor through a debt-for-equity conversion. As required by the Bankruptcy Code, the Plan, a copy of which is attached hereto as **Exhibit A**, places Holders of Claims and Equity Interests in separate Classes and describes the treatment each Class will receive. The Plan also states whether each Class of Claims or Equity Interests is impaired or unimpaired. If the Plan is confirmed, your recovery will be limited to the amount provided by the Plan. The key terms of the Plan are as follows:

B.    ADMINISTRATIVE CLAIMS

Administrative Claims are Claims for the costs or expenses of administering the Debtor's Chapter 11 Case which are Allowed under section 507(a)(2) of the Bankruptcy Code. Administrative Claims also include the expenses for the value of any goods or services sold to the Debtor in the ordinary course of business. The Bankruptcy Code requires that all Administrative Claims be paid on the Effective Date of the Plan, unless a particular claimant agrees to a different treatment.

The following chart lists the Debtor's estimated Administrative Claims, and their proposed treatment under the Plan:

| TYPE | ESTIMATED AMOUNT OWED | PROPOSED TREATMENT |
|---|---|---|
| Section 507(a)(4) Wage Claims | $13,650 | Paid in full on the Effective Date of the Plan, or according to terms of obligation if later. |
| DIP Facility Claims | $1,700,000 | Paid in full on the Effective Date of the Plan in accordance with the Terms of the DIP Facility. |
| Priority Tax Claims | $0.00 | Paid in full on or before the Effective Date of the Plan. |
| Professional Compensation | $500,000.00 | Paid in full or as otherwise agreed between the parties. |
| **TOTAL** | $2,213,650.00 | |

1.    **Priority Wage/Commission Claim**

Priority Wage/Commission claims are unsecured employee wage or sales commissions described by section 507(a)(4) of the Bankruptcy Code, which allows priority treatment, but only to the extent of $13,650.00 for each individual or corporation, as the case may be, earned within 180 days of the petition date. Unless the Holder of such section 507(a)(4) claim agrees otherwise, such holders with receive payment of their claim amount entitled to priority on the Effective Date of the Plan. It is estimated that the Debtor's priority wage/commission claims total approximately $13,650.

2.    **DIP Facility Claims**

Pursuant to the DIP Facility Order and in accordance with Sections 364(c)(1), 503(b) and 507(b) of the Bankruptcy Code, WSF holds a superpriority administrative claim against the Debtor's estate arising out of the DIP Facility.[60] The DIP Facility Claim shall be deemed Allowed as of the Effective Date in an amount equal to (a) the principal amount outstanding under the DIP Faciltiy on such date, (b) all accrued and unpaid interest thereon to the date of payment, and (c) all accrued and unpaid fees, expenses, and noncontingent indemnification obligations payable under the DIP Facility and the DIP Facility Order.

Except to the extent that a holder of an Allowed DIP Facility Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of each Allowed DIP Facility Claim, on the Effective Date, each Holder of an Allowed DIP Facility Claim shall be Paid in Full. As used in this paragraph, "Paid in Full" shall mean each holder of an Allowed DIP Facility Claim shall receive the indefeasible repayment in full in New Equity

---

[60]    *See* Docket Nos. 11 (DIP Facility Motion); 148 (DIP Facility Order).

Interests—as set forth in Section 5 of the DIP Facility—of all obligations (including principal, interests, fees, expenses, indemnities) under the DIP Facility.[61]

      **3.**        **Priority Tax Claims**

      Priority Tax Claims are unsecured income, employment and other taxes described by section 507(a)(8) of the Bankruptcy Code. Unless the Holder of such a section 507(a)(8) Priority Tax Claim agrees otherwise, it must receive the present value of such Claim, in regular installments paid over a period not exceeding 5 years from the Petition Date. The Debtor does not have any Priority Tax Claims to be paid pursuant to the Plan. The Debtors do not currently estimate any Priority Tax Claims are due or owing as of the Petition Date or the date hereof.

      **C.**        **SECURED CLAIMS**

      Class 1 shall be the secured Claim of the Curiam, which shall be Impaired, and paid as set forth in the chart below.

| Class # | Description | Impairment | Amount Owed/Interest | Treatment |
|---------|-------------|------------|----------------------|-----------|
| Class 1 | Secured Claim of Curiam | Impaired | $ _____ | Paid in Accordance with the Terms of the the Litigaiton Financing Agreements, as amended. Notwithstanding Article X.B. of the Plan, any prepetition security interest vested in the Holder of Class 1 claim shall remain in effect on the Effective Date. |

      **D.**        **UNSECURED CLAIMS**

      **1.**        **Petitioning Creditors Claims**

      Class 2 shall consist of Petitioning Creditors Claims, which are not secured by property of the Estate and are not entitled to priority under section 507(a) of the Bankruptcy Code, but are entitled in this case to separate classification in accordance with Section 1122(b) of the Bankruptcy Code due to the pending North Carolina Litigation. The Debtor estimates that the Petitioning Creditors Claims against the estate total approximately $1,955,221.34, which is a value of approximately 0.4% of the Reorganized Debtor.

      The Debtor proposes to pay Holders of Allowed Petitioning Creditors Claims a pro rata distribution from the New Equity, after the payment of allowed administrative claims and priority claims, equal to 1.5% of the value of the Reorganized Debtor, subject to the provisions described below. The Debtor believes the amount available to be distributed to Holders of Petitioning Creditors Claims will be the full amount of the Holders' Allowed Claims from the New Equity.

      The New Equity allocated to the Petitioning Creditors shall be held in reserve by the Reorganized Debtor pending the outcome of the North Carolina Litigation for the satisfaction of any Judgment arising out of North Carolina Litigation, if any, and the North Carolina State Court Litigation (the "**Petitioning Creditors Equity Pool**"), and all rights, distributions and benefits of the Petitioning Creditors New Equity shall inure to the Petitioning Creditors Equity Pool during the pendency of the North Carolina Litigation. The Debtor anticipates the potential outcomes of the North

---

[61]      *See* Docket No. 11 at 13 (Section 5 of the DIP Facility provides: "**Conversion of Debt to Equity.** During the term of this Note, and pursuant to section 1145 of the Bankruptcy Code provided the Bankruptcy Case is not dismissed or converted, the Borrower may elect to issue securities in exchange for the principal balance owed hereunder at an exercise price of $.04 cents per share, including any accrued and unpaid interest, fees and costs. The class of stock to be issued hereunder, if any, is the Borrower's common stock and the number of shares to be issued is up to 25,000,000, plus the number of shares of common stock to repay unpaid interest, fees and costs.").

Carolina Litigation are the following, all of which are subject to the entry of a final, non-appealable order, resolving the North Carolina Litigation:

- The Petitioning Creditors are successful in the North Carolina Litigation, after which the Petitioning Creditors Equity Pool shall be transferred to the Holders of the Allowed Petitioning Creditors Claims on a Pro Rata basis;
- The Reorganized Debtor is successful in the North Carolina Litigation and the Petitioning Creditors Claims are reduced to zero, after which, the Petitioning Creditors Equity Pool shall be distributed to the Debtor's then existing Equity Holders on a Pro Rata basis; or
- The result of the North Carolina Litigation leaves the Petitioning Creditors with reduced Claims against the Estate, in which case the Petitioning Creditors Equity Pool shall be reduced in the corresponding amount of the reduced Claims, and:
  - the Petitioning Creditors shall receive a Pro Rata distribution of reduced Petitioning Creditors Equity Pool; and
  - the remaining New Equity held in the Petitioning Creditors Equity Pool will be distributed to the Debtor's then existing Equity Holders on a Pro Rata basis.

Distributions of the New Equity shall be made in accordance with the Provisions Governing Distributions set forth herein in Section __.

### 2.    General Unsecured Claims

Class 3 shall consist of General Unsecured Claims, which are not secured by property of the Estate and are not entitled to priority under section 507(a) of the Bankruptcy Code, but are entitled in this case to separate classification in accordance with Section 1122(b) of the Bankruptcy Code. The Debtor estimates that the General Unsecured Claims against the estate total approximately $6,723,569.37, which is a value of approximately 1.5% of the Reorganized Debtor.

The Debtor proposes to pay Holders of Allowed General Unsecured Claims a pro rata distribution from the New Equity equal to 1.5% of the value of the Reorganized Debtor, after the payment of allowed administrative claims and priority claims. The Debtor believes the amount available to be distributed to Holders Allowed General Unsecured Claims will be the full amount of each Holders' Allowed Claims.

The following chart identifies the Plan's proposed treatment of unsecured Claims in Classes 2 and 3, which contains the General Unsecured Claims against the Debtor:

| Class # | Description | Impairment | Total General Unsecured | Treatment |
|---------|-------------|------------|-------------------------|-----------|
| Class 2 | Petitioning Creditors Claims | Impaired | $6,723,569.37 | Subject to the outcome of the North Carolina Litigaiton, the Holders of Allowed Petitioning Creditors Claims shall receive their Pro Rata distribution of the New Equity in the full amount of their Allowed Claims, which equates to __% of the New Equity of the Reorganized Debtor. |
| Class 3 | General Unsecured Claims | Impaired | $6,723,569.37 | |

### 3.    Equity Interest of the Debtor

Holders of Equity Interest are parties who hold an ownership interest (i.e., equity interest) in the Debtor and are classified here in Class 4. In a corporation, entities holding preferred or common stock are equity interest holders. In a partnership, equity interest holders include both general and limited partners. In a limited liability company, the

equity interest holders are the members. Finally, with respect to an individual who is a debtor, the debtor is the equity interest holder.

In this Chapter 11 Case, the Debtor is a Nevada corporation. In light of the valuation of the Debtor's estate, the Equity Interest Holders shall receive their pro-rata share of the New Equity, but will be diluted by 13% by the issuance of equity to the Holders of Claims in Classes 2 and 3, and the claims of WSF. It is anticipated the current Holders of Equity shall be diluted from 100% to 87% ownership of the Debtor of the Reorganized Debtor is successful in the North Carolina Litigation.

While the Debtor cannot and does not make any assurances or representations with respect to the outcome of the North Carolina Litiation, the estimated amount of dilution of the existing Equity Interest Holders set forth in this Section III.D.3 reflects the Debtor's anticipated highest and lowest ranges of dilution that may occur in this Chapter 11 case. It is possible the North Carolina Litigation results in an outcome that is outside of the anticipated best and worse case scenarios set forth in this Disclosure Statement, in which case the diluition estimated above would change on a Pro Rata basis in accordance with the Plan.

Distributions of the New Equity shall be made in accordance with the Provisions Governing Distributions set forth herein in Section III.H below.

### E.        MEANS FOR IMPLEMENTATION OF THE PLAN

#### 1.        General Settlement of Claims

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, in consideration for the classification, distributions, releases and other benefits provided under the Plan, and as a result of arm's-length negotiations among the Debtor and its creditors, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and Equity Interests and controversies resolved pursuant to the Plan.

#### 2.        Restructuring Transactions

On or before the Effective Date, and pursuant to the Plan, the Debtor and the Reorganized Debtor shall enter into such restructuring transactions (the "**Restructuring Transactions**") and shall take any actions as may be necessary or appropriate to affect a restructuring of their businesses or the overall organizational structure of the Reorganized Debtor. Upon the Effective Date, the Debtor's primary Restructuring Transaction will be to issue the New Equity to WSF in accordance with the DIP Facility and Classes 2, 3 and 4 based on their Pro Rata share of the value of the Reorganized Debtor, and finalize the amendment the Curiam Litigation Financing.

On the Effective Date, all property of the Estate, all Causes of Action, and any property acquired by the Debtor pursuant to the Plan shall vest in the Reorganized Debtor, free and clear of all Liens, Claims, charges, Causes of Action, or other encumbrances. To the extent provided in the Plan the Debtor may be deemed dissolved in accordance with applicable law, without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity. The Reorganized Debtor shall be the issuer of New Equity to the applicable Holders of Claims and Interests as set forth herein.

The Restructuring Transactions may include one or more sales, mergers, consolidations, restructurings, conversions, dissolutions, transfers or liquidations as may be determined by the secured claim holders to be necessary or appropriate to fully effectuate the transfer of the New Equity Interests and finalize the amendment to the Curiam Litiagiton Financing. The actions to effect the Restructuring Transactions may include: (1) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or reorganization containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable parties may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, duty, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (3) the rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; (4) the filing

18

of appropriate certificates or articles of incorporation, formation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable law; (5) all transactions necessary or appropriate to provide for the purchase of substantially all of the assets or Interests of the Debtor by the Reorganized Debtor, which purchase, if applicable, may be structured as a taxable transaction for United States federal income tax purposes; and (6) all other actions that the applicable parties determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law in connection with the Plan in each case of clauses (1) through (6).

The Confirmation Order shall and shall be deemed to, pursuant to sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including the Restructuring Transactions.

To the extent that any such Restructuring Transactions result in the assignment of any Executory Contract or Unexpired Lease assumed under the Plan to a party other than the Debtor which was originally a party to such Executory Contract or Unexpired Lease (including such Debtor as Reorganized Debtor), the Debtor shall follow the procedures in Article VI of the Plan for the assignment of such Executory Contracts and Unexpired Leases under section 365 of the Bankruptcy Code. The chairman of the board of directors, president, chief executive officer, chief financial officer, any executive vice-president or senior vice-president, member or manager or any other appropriate officer of each Debtor, (as applicable), shall be authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents, and take such other actions, as may be necessary or appropriate, to effectuate and further evidence the terms and conditions of this Plan and the Restructuring Transactions. The secretary or assistant secretary of the appropriate Debtor and of a Reorganized Debtor, as the case may be, shall be authorized to certify or attest to any of the foregoing actions.

On or before the Effective Date, and pursuant to the Plan, the Debtor and the Reorganized Debtor, as applicable, shall take any actions as may be necessary or appropriate to affect a restructuring of its businesses or the overall organizational structure of the Reorganized Debtor. As of the date hereof, the actions to effect the Restructuring Transactions may include:

- the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, debt or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree;
- the filing of appropriate certificates or articles of formation, reformation, merger, consolidation, conversion or dissolution pursuant to applicable state law; and
- all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable state law in connection with the Restructuring Transactions.

3.    **New Corporate Existence and Management**

The Debtor shall continue to exist after the Effective Date as a separate corporate entity or limited liability company, as applicable, with all the powers of a corporation or limited liability company pursuant to laws of the State of Nevada and pursuant to the certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, in such a manner as to preserve the Debtor's net operating losses for Federal tax purposes, except to the extent such certificate of incorporation or bylaws (or other formation documents) are amended by or in connection with the Plan or otherwise and, to the extent such documents are amended, such documents are deemed to be authorized pursuant hereto and without the need for any other approvals, authorizations, actions or consents.

The Reorganized Debtor will be managed and operated by a new Board of Directors, including the following individuals:

- Chaarles G. Fogelgren, MBA;
- Mitchel K. May, Esq.;
- Jörg Schreiber, Ph.D.; and
- Kevin W. Wilson, MBA.

Mr. John Steel, IV, the current Officer and Director of the Debtor will remain with the Reorganized Debtor for a period of time sufficient to transfer management to the new Board of Directors. Mr. Steel has a long history with the Debtor, and in the clinical biotechnology development, which experience will facilitate the smooth transition of the Debtor's operations to the Reorganized Debtor's post-confirmation operation. The Reorganized Debtor also anticipates appointing Officers to help manage and operate the Reorganized Debtor in connection and coinciding with the issuance of the New Equity Interests. The background and resumes of the Directors listed above are available upon request.

On the Effective Date, or following the entry of the Confirmation Order and prior to the Effective Date, the organizational documents of the Debtor shall be amended, amended and restated, or replaced as may be necessary to effectuate the transactions contemplated or permitted by the Plan. On the Effective Date, or following the entry of the Confirmation Order and prior to the Effective Date, the Reorganized Debtor will file its New Organizational Documents with the applicable Secretary of State or applicable authority in its respective state or country of incorporation if and to the extent required in accordance with the corporate laws of the respective state or country of incorporation. The New Organizational Documents will prohibit the issuance of non-voting equity securities, to the extent required under section 1123(a)(6) of the Bankruptcy Code. For the avoidance of doubt, the New Organizational Documents shall be included as exhibits to the Plan Supplement. After the Effective Date, the Reorganized Debtor may amend and restate New Organizational Documents, and the Reorganized Debtor may file its respective certificates or articles of incorporation, bylaws, or such other applicable formation documents, and other constituent documents as permitted by the laws of the respective states, provinces, or countries of incorporation and the New Organizational Documents.

4.      **Vesting of Assets in the Reorganized Debtor**

Except as otherwise provided in the Plan, in any agreement, instrument or other document relating thereto, on or after the Effective Date, all property of the Estate (including, without limitation, Causes of Action) and any property acquired by the Debtor pursuant to the Plan, shall vest in the Reorganized Debtor, free and clear of all liens, Claims, charges or other encumbrances. Except as may be provided in the Plan and any sale all or a portion of the Debtor's Assets, on and after the Effective Date, the Reorganized Debtor may operate its businesses and may use, acquire or dispose of property and compromise or settle any Claims without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan and the Confirmation Order. Without limiting the foregoing, the Reorganized Debtor shall pay the charges that they incur after the Effective Date for Retained Professionals' fees, disbursements, expenses or related support services (including reasonable fees relating to the preparation of Retained Professional fee applications) without application to the Bankruptcy Court.

5.      **New Equity Interests**

On the Effective Date, upon cancellation of the Existing Equity Interests, the Reorganized Debtor shall issue the New Equity directly or indirectly to Holders of Claims to the extent provided in the Plan. The issuance of the New Equity shall be authorized without the need for any further corporate action and without any further action by any party. The terms of the New Equity shall be governed by the Plan.

All of the New Equity issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable. Each distribution and issuance referred to in Article VII of the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Holder of Equity Interest or Allowed Claims receiving such distribution or issuance.

6.      **Securities Registration Exemption and Registration Rights Agreement**

The New Equity Interests to be issued pursuant to the Plan will be issued without registration under the Securities Act or any similar federal, state or local law in reliance upon the exemptions set forth in section 1145 of the Bankruptcy Code.

F.      **TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

1.      **Assumption and Rejection of Executory Contracts and Unexpired Leases**

On the Effective Date, except as otherwise provided in the Plan, each Executory Contract and Unexpired Lease (including those set forth as assumed in the Schedules of Assumed and Rejected Contracts) shall be deemed assumed as of the Effective Date by the Debtor pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease: (1) was previously assumed, assumed and assigned, or rejected by the Debtor; (2) previously expired or terminated pursuant to its own terms; (3) is identified as rejected on the Schedules of Assumed and Rejected Contracts; (4) is the subject of a motion to reject that is pending on the Effective Date; or (5) Is otherwise rejected pursuant to the Plan.

On the Effective Date, except as otherwise provided herein, each Executory Contract and Unexpired Lease that is identified as rejected on the Schedules of Assumed and Rejected Contracts shall be deemed rejected as of the Effective Date by the applicable Debtor pursuant to sections 365 and 1123 of the Bankruptcy Code.

Entry of the Confirmation Order by the Bankruptcy Court shall, subject to and upon the occurrence of the Effective Date, constitute a Final Order approving the assumptions, assumptions and assignments, and rejections, as applicable, of the Executory Contracts and Unexpired Leases as set forth in the Plan, and the Schedules of Assumed and Rejected Contracts, as applicable, pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Any motions to assume, assume and assign, or reject Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by the Bankruptcy Court on or after the Effective Date by a Final Order. Unless otherwise specified in the Plan Supplement, the Schedules of Assumed and Rejected Contracts, or an applicable Bankruptcy Court order, assumptions, assumptions and assignments, or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date. Each Executory Contract and Unexpired Lease assumed pursuant to the Plan or by any order of the Bankruptcy Court, which has not been assigned to a third party prior to the Confirmation Date, shall revest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may be modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law. Notwithstanding anything to the contrary in the Plan, the Debtor or the Reorganized Debtor, as applicable, shall have the right to alter, amend, modify, or supplement the Schedules of Assumed and Rejected Contracts identified in Article VI.A of the Plan at any time through and including 45 days after the Effective Date; provided, however, that after the date of the Confirmation Hearing, the Debtor may not subsequently reject any Unexpired Lease previously designated as assumed or assumed and assigned on the Schedules of Assumed and Rejected Contracts absent the consent of the applicable lessor.

To the extent that any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party or parties to such Executory Contract or Unexpired Lease to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.

2.      **Claims on Account of the Rejection of Executory Contracts or Unexpired Leases**

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed with and served on the Debtor or Reorganized Debtor, as applicable, no later than thirty (30) days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection. Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtor or the Reorganized Debtor, the Estate, or their property without the need for any objection by the Reorganized Debtor or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, and be subject to the permanent injunction set forth in Article X.D. of the Plan, including any Claims against any Debtor listed on the Schedules as unliquidated, contingent, or

21

disputed. All Allowed Claims arising from the rejection by any Debtor of any Executory Contract or Unexpired Lease shall be treated as a General Unsecured Claim in accordance with Article III.B and Article III.C of the Plan.

      **3.**      **Cure of Defaults for Assumed Executory Contracts and Unexpired Leases**

      The Debtor or the Reorganized Debtor, as applicable, shall pay Cures, if any, on the Effective Date or as soon as reasonably practicable thereafter. Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract or Unexpired Lease, all requests for payment of Cures that differ from the amounts paid or proposed to be paid by the Debtor or the Reorganized Debtor to a counterparty must be Filed with the Bankruptcy Court on or before seven (7) days after the Confirmation Hearing. Any such request that is not timely filed shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtor or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court. Any Cure shall be deemed fully satisfied, released, and discharged upon payment by the Debtor or the Reorganized Debtor of the Cure; provided that nothing herein shall prevent the Reorganized Debtor from paying any Cure despite the failure of the relevant counterparty to File such request for payment of such Cure. The Reorganized Debtor also may settle any Cure without any further notice to or action, order, or approval of the Bankruptcy Court. In addition, any objection to the assumption of an Executory Contract or Unexpired Lease under the Plan must be Filed with the Bankruptcy Court on or before thirty (30) days after the Effective Date. Any such objection will be scheduled to be heard by the Bankruptcy Court at the Debtor's or Reorganized Debtor's, as applicable, first scheduled hearing for which such objection is timely filed. Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption.

      Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure amount in Cash on the Effective Date, subject to the limitation described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. In the event of a dispute regarding (1) the amount of any payments to cure such a default, (2) the ability of the Reorganized Debtor or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption, the Cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order or orders resolving the dispute and approving the assumption; provided that the Reorganized Debtor may settle any such dispute without any further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity; provided, further, that notwithstanding anything to the contrary herein, prior to the entry of a Final Order resolving any such dispute and approving the assumption of any such Executory Contract or Unexpired Lease, the Reorganized Debtor shall have the right to reject any such Executory Contract or Unexpired Lease that is subject to dispute, whether by amending the Schedules of Assumed and Rejected Contracts.

      At least ten (10) days prior to the first day of the Confirmation Hearing, the Debtor shall file with the Bankruptcy Court and serve upon counterparties to such Executory Contracts and Unexpired Leases, a notice of the proposed assumption, which will: (a) list the applicable cure amount, if any; (b) describe the procedures for filing objections thereto; and (c) explain the process by which related disputes will be resolved by the Bankruptcy Court; additionally, the Debtor shall file with the Bankruptcy Court a list of such Executory Contracts and Unexpired Leases to be assumed and the proposed cure amounts.

      Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or assumption and assignment or related Cure amount must be Filed, served, and actually received by the Debtor no later than seven (7) days prior to the first day of the Confirmation Hearing. Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption or Cure amount will be deemed to have assented to such assumption or assumption and assignment and cure amount.

      Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise and full payment of any applicable Cure pursuant to of the Plan shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory

Contract or Unexpired Lease at any time prior to the effective date of assumption. Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including pursuant to the Confirmation Order, and for which any Cure has been fully paid pursuant to the Plan, shall be deemed disallowed and expunged as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.

### 4.      Contracts and Leases Entered into After the Commencement Date

Contracts and leases entered into after the Commencement Date by the Debtor, including any Executory Contracts and Unexpired Leases assumed by the Debtor, will be performed by the Debtor or Reorganized Debtor in the ordinary course of its business.  Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

### G.      EXCULPATION

As defined in the Plan, "Exculpated Parties" means, collectively, and in this case in its capacity as such: (a) the Debtor and the Reorganized Debtor; (b) any official committees appointed in the Chapter 11 Cases and each of their respective members; (c) WSF; (d) Curiam; (e) with respect to each of the foregoing entities, each such Entity's current and former predecessors, successors, Affiliates (regardless of whether such interests are held directly or indirectly), subsidiaries, direct and indirect equity holders, funds, portfolio companies, management companies, consultants, financial advisors, and attorneys (each in their capacity as such).

The Debtor believes that all of the Released Parties and the Exculpated Parties have made substantial and valuable contributions to the Debtor's restructuring through efforts to negotiate and implement the Plan, which will maximize and preserve the going-concern value of the Debtor for the benefit of all parties in interest. Accordingly, each of the Exculpated Parties warrants the benefit of the exculpation provisions.

Based on the foregoing, the Debtor believes that the exculpations in the Plan are necessary and appropriate and meet the requisite legal standard promulgated by the United States Court of Appeals for the Ninth Circuit. Moreover, the Debtor will present evidence at the Confirmation Hearing to demonstrate the basis for and propriety of the release and exculpation provisions. As set forth in Article X of the Plan, the releases (as well as the definitions of Released Parties and Releasing Parties) are subject to approval by the Court at the Confirmation Hearing.

### 1.      Discharge of Claims and Termination of Interests

PURSUANT TO SECTION 1141(D) OF THE BANKRUPTCY CODE, AND EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED IN THE PLAN OR IN ANY CONTRACT, INSTRUMENT, OR OTHER AGREEMENT OR DOCUMENT CREATED PURSUANT TO THE PLAN, THE DISTRIBUTIONS, RIGHTS, AND TREATMENT THAT ARE PROVIDED IN THE PLAN SHALL BE IN COMPLETE SATISFACTION, DISCHARGE, AND RELEASE, EFFECTIVE AS OF THE EFFECTIVE DATE, OF CLAIMS (INCLUDING ANY INTERCOMPANY CLAIMS RESOLVED OR COMPROMISED AFTER THE EFFECTIVE DATE BY THE REORGANIZED DEBTOR), INTERESTS, AND CAUSES OF ACTION OF ANY NATURE WHATSOEVER, INCLUDING ANY INTEREST ACCRUED ON CLAIMS OR INTERESTS FROM AND AFTER THE PETITION DATE, WHETHER KNOWN OR UNKNOWN, AGAINST, LIABILITIES OF, LIENS ON, OBLIGATIONS OF, RIGHTS AGAINST, AND INTERESTS IN, THE DEBTOR OR ANY OF ITS ASSETS OR PROPERTIES, REGARDLESS OF WHETHER ANY PROPERTY SHALL HAVE BEEN DISTRIBUTED OR RETAINED PURSUANT TO THE PLAN ON ACCOUNT OF SUCH CLAIMS AND INTERESTS, INCLUDING DEMANDS, LIABILITIES, AND CAUSES OF ACTION THAT AROSE BEFORE THE EFFECTIVE DATE, ANY LIABILITY (INCLUDING WITHDRAWAL LIABILITY) TO THE EXTENT SUCH CLAIMS OR INTERESTS RELATE TO SERVICES PERFORMED BY EMPLOYEES OF THE DEBTOR BEFORE THE EFFECTIVE DATE AND THAT ARISE FROM A TERMINATION OF EMPLOYMENT, ANY CONTINGENT OR NON-CONTINGENT LIABILITY ON ACCOUNT OF REPRESENTATIONS OR WARRANTIES ISSUED ON OR BEFORE THE EFFECTIVE DATE, AND ALL DEBTS OF THE KIND SPECIFIED IN SECTIONS 502(G), 502(H), OR 502(I) OF

THE BANKRUPTCY CODE, IN EACH CASE WHETHER OR NOT: (1) A PROOF OF CLAIM BASED UPON SUCH DEBT OR RIGHT IS FILED OR DEEMED FILED PURSUANT TO SECTION 501 OF THE BANKRUPTCY CODE; (2) A CLAIM OR INTEREST BASED UPON SUCH DEBT, RIGHT, OR INTEREST IS ALLOWED PURSUANT TO SECTION 502 OF THE BANKRUPTCY CODE; OR (3) THE HOLDER OF SUCH A CLAIM OR INTEREST HAS ACCEPTED THE PLAN. ANY DEFAULT OR "EVENT OF DEFAULT" BY THE DEBTOR OR ITS AFFILIATES WITH RESPECT TO ANY CLAIM OR INTEREST THAT EXISTED IMMEDIATELY BEFORE OR ON ACCOUNT OF THE FILING OF THE CHAPTER 11 CASES SHALL BE DEEMED CURED (AND NO LONGER CONTINUING) AS OF THE EFFECTIVE DATE. THE CONFIRMATION ORDER SHALL BE A JUDICIAL DETERMINATION OF THE DISCHARGE OF ALL CLAIMS AND INTERESTS SUBJECT TO THE EFFECTIVE DATE OCCURRING.

### 2.    Releases of Liens

EXCEPT AS OTHERWISE PROVIDED IN THE DIP FACILITY DOCUMENTS, THE LITIGATION FINANCING DOCUMENTS, THE PLAN, THE CONFIRMATION ORDER, OR ANY CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT CREATED PURSUANT TO THE PLAN, ON THE EFFECTIVE DATE AND CONCURRENTLY WITH THE APPLICABLE DISTRIBUTIONS MADE PURSUANT TO THE PLAN AND, IN THE CASE OF A SECURED CLAIM, SATISFACTION IN FULL OF THE PORTION OF THE SECURED CLAIM THAT IS ALLOWED AS OF THE EFFECTIVE DATE, ALL MORTGAGES, DEEDS OF TRUST, LIENS, PLEDGES, OR OTHER SECURITY INTERESTS AGAINST ANY PROPERTY OF THE ESTATES SHALL BE FULLY RELEASED AND DISCHARGED, AND ALL OF THE RIGHT, TITLE, AND INTEREST OF ANY HOLDER OF SUCH MORTGAGES, DEEDS OF TRUST, LIENS, PLEDGES, OR OTHER SECURITY INTERESTS SHALL REVERT TO THE REORGANIZED DEBTOR AND ITS SUCCESSORS AND ASSIGNS. ANY HOLDER OF SUCH SECURED CLAIM (AND THE APPLICABLE AGENTS FOR SUCH HOLDER) SHALL BE AUTHORIZED AND DIRECTED, AT THE SOLE COST AND EXPENSE OF THE REORGANIZED DEBTOR, TO RELEASE ANY COLLATERAL OR OTHER PROPERTY OF THE DEBTOR (INCLUDING ANY CASH COLLATERAL AND POSSESSORY COLLATERAL) HELD BY SUCH HOLDER (AND THE APPLICABLE AGENTS FOR SUCH HOLDER), AND TO TAKE SUCH ACTIONS AS MAY BE REASONABLY REQUESTED BY THE REORGANIZED DEBTOR TO EVIDENCE THE RELEASE OF SUCH LIEN, INCLUDING THE EXECUTION, DELIVERY, AND FILING OR RECORDING OF SUCH RELEASES. THE PRESENTATION OR FILING OF THE CONFIRMATION ORDER TO OR WITH ANY FEDERAL, STATE, PROVINCIAL, OR LOCAL AGENCY OR DEPARTMENT SHALL CONSTITUTE GOOD AND SUFFICIENT EVIDENCE OF, BUT SHALL NOT BE REQUIRED TO EFFECT, THE TERMINATION OF SUCH LIENS.

### 3.    Exculpation

EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED IN THE PLAN, NO EXCULPATED PARTY SHALL HAVE OR INCUR, AND EACH EXCULPATED PARTY IS HEREBY RELEASED AND EXCULPATED FROM ANY CAUSE OF ACTION FOR ANY CLAIM RELATED TO ANY ACT OR OMISSION IN CONNECTION WITH, RELATING TO, OR ARISING OUT OF, THE CHAPTER 11 CASE, THE FORMULATION, PREPARATION, DISSEMINATION, NEGOTIATION, FILING, OR TERMINATION OF THE RESTRUCTURING SUPPORT AGREEMENT AND RELATED PREPETITION TRANSACTIONS, THE DISCLOSURE STATEMENT, THE PLAN, OR ANY RESTRUCTURING TRANSACTION, CONTRACT, INSTRUMENT, RELEASE OR OTHER AGREEMENT OR DOCUMENT (INCLUDING PROVIDING ANY LEGAL OPINION REQUESTED BY ANY ENTITY REGARDING ANY TRANSACTION, CONTRACT, INSTRUMENT, DOCUMENT, OR OTHER AGREEMENT CONTEMPLATED BY THE PLAN OR THE RELIANCE BY ANY EXCULPATED PARTY ON THE PLAN OR THE CONFIRMATION ORDER IN LIEU OF

SUCH LEGAL OPINION) CREATED OR ENTERED INTO IN CONNECTION WITH THE DISCLOSURE STATEMENT OR THE PLAN, THE FILING OF THE CHAPTER 11 CASE, THE PURSUIT OF CONFIRMATION, THE PURSUIT OF CONSUMMATION, THE ADMINISTRATION AND IMPLEMENTATION OF THE PLAN, INCLUDING THE ISSUANCE OF SECURITIES PURSUANT TO THE PLAN, OR THE DISTRIBUTION OF PROPERTY UNDER THE PLAN OR ANY OTHER RELATED AGREEMENT, EXCEPT FOR CLAIMS RELATED TO ANY ACT OR OMISSION THAT CONSTITUTES ACTUAL FRAUD, WILLFUL MISCONDUCT, OR GROSS NEGLIGENCE, BUT IN ALL RESPECTS SUCH ENTITIES SHALL BE ENTITLED TO REASONABLY RELY UPON THE ADVICE OF COUNSEL WITH RESPECT TO THEIR DUTIES AND RESPONSIBILITIES PURSUANT TO THE PLAN. THE EXCULPATED PARTIES HAVE, AND UPON COMPLETION OF THE PLAN SHALL BE DEEMED TO HAVE, PARTICIPATED IN GOOD FAITH AND IN COMPLIANCE WITH THE APPLICABLE LAWS WITH REGARD TO THE SOLICITATION OF, AND DISTRIBUTION OF, CONSIDERATION PURSUANT TO THE PLAN AND, THEREFORE, ARE NOT, AND ON ACCOUNT OF SUCH DISTRIBUTIONS SHALL NOT BE, LIABLE AT ANY TIME FOR THE VIOLATION OF ANY APPLICABLE LAW, RULE, OR REGULATION GOVERNING THE SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN OR SUCH DISTRIBUTIONS MADE PURSUANT TO THE PLAN.

NOTHING IN THE PLAN SHALL BE CONSTRUED TO LIMIT, IMPAIR OR EXCULPATE ANY MEMBER OF THE COMMITTEE IN CONNECTION WITH OR IN ANY WAY RELATED TO THE DEBTOR'S CLAIMS OR CAUSES OF ACTION IN THE NORTH CAROLINA LITIGATION.

4.      **Injunction**

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN OR FOR OBLIGATIONS ISSUED OR REQUIRED TO BE PAID PURSUANT TO THE PLAN OR THE CONFIRMATION ORDER, ALL ENTITIES THAT HAVE HELD, HOLD, OR MAY HOLD CLAIMS OR INTERESTS THAT ARE SUBJECT TO EXCULPATION PURSUANT TO THE PLAN, ARE PERMANENTLY ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS AGAINST, AS APPLICABLE, THE DEBTOR, OR THE REORGANIZED DEBTOR: (I) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (II) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING BY ANY MANNER OR MEANS.

ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (III) CREATING, PERFECTING, OR ENFORCING ANY LIEN OR ENCUMBRANCE OF ANY KIND AGAINST SUCH ENTITIES OR THE PROPERTY OR THE ESTATES OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (IV) ASSERTING ANY RIGHT OF SETOFF, SUBROGATION, OR RECOUPMENT OF ANY KIND AGAINST ANY OBLIGATION DUE FROM SUCH ENTITIES OR AGAINST THE PROPERTY OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS UNLESS SUCH ENTITY HAS TIMELY ASSERTED SUCH SETOFF RIGHT IN A DOCUMENT FILED WITH THE BANKRUPTCY COURT EXPLICITLY PRESERVING SUCH SETOFF, AND NOTWITHSTANDING AN INDICATION OF A CLAIM OR INTEREST OR OTHERWISE THAT SUCH ENTITY ASSERTS, HAS, OR INTENDS TO PRESERVE ANY RIGHT OF SETOFF PURSUANT TO APPLICABLE LAW OR OTHERWISE; AND (V) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS RELEASED OR SETTLED PURSUANT TO THE PLAN.

THE FORGOING SHALL NOT APPLY TO THE PETITIONING CREDITORS PROSECUTION OF THEIR RIGHTS IN THE NORTH CAROLINA LITIGATION, HOWEVER, THE DISTRIBUTIONS TO THE PETITIONING CREDITORS, IF ANY, SHALL BE LIMITED TO THE PROVISIONS OF THE PLAN AND THEIR RIGHTS IN THE NEW EQUITY INTERESTS AND THE PETITIONING CREDITORS EQUITY POOL.

H.      **PROVISIONS GOVERNING DISTRIBUTIONS**

1.      **Distributions for Claims Allowed as of the Effective Date**

Except as otherwise provided in the Plan, a Final Order or as agreed to by the relevant parties, the Reorganized Debtor shall make initial distributions under the Plan on account of Claims Allowed before the Effective Date on or as soon as practicable after the Initial Distribution Date; provided, however, that the issuance of equity on account of General Unsecured Claims that become Allowed Claims on or before the Effective Date shall commence on the Effective Date.

2.      **Distributions on Account of Claims Allowed After the Effective Date**

(a)      Payments and Distributions on Disputed Claims

Except as otherwise provided in the Plan, a Final Order or as agreed to by the relevant parties, distributions under the Plan on account of a Disputed Claim that becomes an Allowed Claim after the Effective Date shall be made on the Periodic Distribution Date that is at least thirty (30) days after the Disputed Claim becomes an Allowed Claim.

(b)      Special Rules for Distributions to Holders of Disputed Claims

Notwithstanding anything in the Plan to the contrary, and except as otherwise agreed to by the relevant parties, no partial distributions of the New Equity Interests and no partial distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order.  In the event that there are Disputed Claims requiring adjudication and resolution, the Reorganized Debtor shall establish appropriate reserves for potential distributions of the New Equity Interests to such Claims pursuant to Article VII of the Plan.

3.      **Delivery and Distributions and Undeliverable or Unclaimed Distributions**

(a)      Record Date for Distributions

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall instead be authorized and entitled to recognize only those Holders of Claims listed on the Claims Register as of the close of business on the Distribution Record Date.  If a Claim is transferred twenty (20) or fewer days before the Distribution Record Date, the Distribution Agent shall make distributions to the transferee only to the extent practical and, in any event, only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

(b)      Delivery of Distributions in General

Except as otherwise provided in the Plan, the Debtor or the Reorganized Debtor, as applicable, shall make distributions to Holders of Allowed Claims at the address for each such Holder as indicated on the Debtor's records as of the date of any such distribution; provided, however, that the manner of such distributions shall be determined at the discretion of the Debtor or the Reorganized Debtor, as applicable; and provided further, that the address for each Holder of an Allowed Claim shall be deemed to be the address set forth in any Proof of Claim Filed by that Holder.

(c)      Distributions by Distribution Agent

The Debtor or the Reorganized Debtor, as applicable, shall have the authority, in their sole discretion, to enter into agreements with the Distribution Agent to facilitate the distributions required under the Plan.  As a condition to serving as a Distribution Agent, a Distribution Agent must (i) affirm its obligation to facilitate the prompt distribution of any documents, (ii) affirm its obligation to facilitate the prompt distribution of any recoveries or distributions required under the Plan and (iii) waive any right or ability to setoff, deduct from or assert any lien or encumbrance against the distributions required under the Plan that are to be distributed by the Distribution Agent.

The Distribution Agent, and its respective agents, employees, officers, directors, professionals, attorneys, accountants, advisors, representatives and principals shall be indemnified and held harmless by the Debtor and the Reorganized Debtor, to the fullest extent permitted by law for any losses, claims, damages, liabilities and expenses, including, without limitation, reasonable attorneys' fees, disbursements and related expenses which the Indemnified Parties may incur or to which the Indemnified Parties may become subject in connection with any action, suit, proceeding or investigation brought or threatened against one or more of the Indemnified Parties on account of the acts or omissions of the Distribution Agent solely in its capacity as such; provided, however, that the Debtor and the Reorganized Debtor shall not be liable to indemnify any Indemnified Party for any act or omission constituting gross negligence, fraud or reckless, intentional or willful misconduct. The foregoing indemnity in respect of any Indemnified Party shall survive the termination of such Indemnified Party from the capacity for which they are indemnified.

The Debtor or the Reorganized Debtor, as applicable, shall pay to the Distribution Agent all reasonable and documented fees and expenses of the Distribution Agent without the need for any approvals, authorizations, actions or consents. The Distribution Agent shall submit detailed invoices to the Debtor or Reorganized Debtor, as applicable, for all fees and expenses for which the Distribution Agent seeks reimbursement and the Debtor shall pay those amounts that they, in their sole discretion, deem reasonable, and shall object in writing to those fees and expenses, if any, that the Debtor deems to be unreasonable. In the event that the Debtor objects to all or any portion of the amounts requested to be reimbursed in a Distribution Agent's invoice, the Debtor or the Reorganized Debtor, as applicable, and such Distribution Agent shall endeavor, in good faith, to reach mutual agreement on the amount of the appropriate payment of such disputed fees and/or expenses. In the event that the Debtor or the Reorganized Debtor, as applicable, and a Distribution Agent is unable to resolve any differences regarding disputed fees or expenses, either party shall be authorized to move to have such dispute heard by the Bankruptcy Court.

(d)     Minimum Distributions

Notwithstanding anything in the Plan to the contrary, the Reorganized Debtor shall not be required to make distributions of the New Equity Interests of less than $10.00 and shall not be required to make partial distributions or payments of fractions of dollars. Whenever any distribution of a fraction of a dollar or share of New Equity Interests under the Plan would otherwise be called for, the actual payment or distribution will reflect a rounding of such fraction to the nearest whole dollar (up or down) or share of New Membership Interests (up or down), with half dollars and half shares of New Equity Interests or less being rounded down.

No Distribution Agent shall have any obligation to make a distribution on account of an Allowed Claim if: (i) the aggregate amount of all distributions authorized to be made on the Periodic Distribution Date in question is or has an economic value less than **$100.00**, unless such distribution is a final distribution; or (ii) the amount to be distributed to the specific Holder of an Allowed Claim on such Periodic Distribution Date does not constitute a final distribution to such Holder and is or has an economic value less than $10.00, which shall be treated as an undeliverable distribution under Article VII.C.5 of the Plan.

(e)     Undeliverable Distributions

Holding of Certain Undeliverable Distributions. If any distribution to a Holder of an Allowed Claim or Equity Interest made in accordance herewith is returned to the Reorganized Debtor (or the Distribution Agent) as undeliverable, no further distributions shall be made to such Holder unless and until the Reorganized Debtor (or the Distribution Agent) is notified in writing of such Holder's then current address, at which time all currently due missed distributions shall be made to such Holder on the next Periodic Distribution Date. Undeliverable distributions shall remain in the possession of the Reorganized Debtor, subject to Article VII.C.5 of the Plan, until such time as any such distributions become deliverable. Undeliverable distributions shall not be entitled to any additional interest, dividends or other accruals of any kind on account of their distribution being undeliverable.

Failure to Claim Undeliverable Distributions. No later than 210 days after the Effective Date, the Reorganized Debtor shall file with the Bankruptcy Court a list of the Holders of undeliverable distributions. This list shall be maintained and updated periodically in the sole discretion of the Reorganized Debtor for as long as the Chapter 11 Case stays open. Any Holder of an Allowed Claim or Equity Interest, irrespective of when a Claim or Equity Interest becomes an Allowed Claim or Equity Interest, that does not notify the Reorganized Debtor of such Holder's

then current address in accordance herewith within the latest of (i) one year after the Effective Date, (ii) 60 days after the attempted delivery of the undeliverable distribution and (iii) 180 days after the date such Claim or Equity Interest becomes an Allowed Claim or Equity Interest, shall have its Claim or Equity Interst for such undeliverable distribution discharged and shall be forever barred, estopped and enjoined from asserting any such Claim or Interest against the Reorganized Debtor or its property.  In such cases, (i) any Cash or Equity Interest held for distribution on account of Allowed Claims or Equity Interests shall be redistributed to Holders of Allowed Claims or Interests in the applicable Class on the next Periodic Distribution Date and (ii) any New Equity held for distribution to other creditors or equity holders shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and become property of the Reorganized Debtor, free of any Claims of such Holder with respect thereto.  Nothing contained in the Plan shall require the Reorganized Debtor to attempt to locate any Holder of an Allowed Claim or Interest.

       <u>Failure to Present Checks</u>.  Checks issued by the Distribution Agent on account of Allowed Claims or Equity Interests shall be null and void if not accepted within 180 days after the issuance of such New Equity Interest.  In an effort to ensure that all Holders of Allowed Claims and Interests receive their allocated distributions, no later than 180 days after the issuance of such New Equity Interests, the Reorganized Debtor shall File with the Bankruptcy Court a list of the Holders of any un-accepted distributions.  This list shall be maintained and updated periodically in the sole discretion of the Reorganized Debtor for as long as the Chapter 11 Case remains open.  Requests for reissuance of New Equity Interest shall be made directly to the Distribution Agent by the Holder of the relevant Allowed Claim with respect to which such check originally was issued.  Any Holder of an Allowed Claim or Equity Interest holding an un-accepted New Equity Interest that does not request reissuance of such un-accepted New Equity Interest within 240 days after the date of mailing or other delivery of such interest shall have its Claim for such un-negotiated interest discharged and be discharged and forever barred, estopped and enjoined from asserting any such Claim or Equity Interest against the Reorganized Debtor or its property.  In such cases, any Cash held for payment on account of such Claims shall be property of the Reorganized Debtor, free of any Claims of such Holder with respect thereto.  Nothing contained in the Plan shall require the Reorganized Debtor to attempt to locate any Holder of an Allowed Claim or Equity Interest.

      **4.**       **Compliance with Tax Requirements/Allocations**

       In connection with the Plan, to the extent applicable, the Reorganized Debtor shall comply with all tax withholding and reporting requirements imposed on them by any governmental unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements.  Notwithstanding anything in the Plan to the contrary, the Reorganized Debtor and the Distribution Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions or establishing any other mechanisms they believe are reasonable and appropriate.  The Reorganized Debtor reserves the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support and other spousal awards, liens and encumbrances.  For tax purposes, distributions in full or partial satisfaction of Allowed Claims shall be allocated first to the principal amount of Allowed Claims, with any excess allocated to unpaid interest that accrued on such Claims.

      **5.**       **Timing and Calculation of Amounts to be Distributed**

       On the Initial Distribution Date (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such a Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim against the Debtor shall receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class; <u>provided</u>, <u>however</u>, that distributions on account of General Unsecured Claims that become Allowed Claims before the Effective Date shall be distributed on the Effective Date.  If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in the applicable class treatment or in Article VII of the Plan.  Except as otherwise provided in the Plan, Holders of Claims or Equity Interests shall not be entitled to interest, dividends or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

**6.**    **Setoffs**

The Debtor and the Reorganized Debtor may withhold (but not setoff except as set forth below) from the distributions called for under the Plan on account of any Allowed Claim or Equity Interest an amount equal to any claims, equity interests, rights and Causes of Action of any nature that the Debtor or the Reorganized Debtor may hold against the Holder of any such Allowed Claim or Equity Interest.  In the event that any such claims, equity interests, rights and Causes of Action of any nature that the Debtor or the Reorganized Debtor may hold against the Holder of any such Allowed Claim are adjudicated by Final Order or otherwise resolved, the Debtor may, pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy law, set off against any Allowed Claim or Equity Interest and the distributions to be made pursuant to the Plan on account of such Allowed Claim or Equity Interest (before any distribution is made on account of such Allowed Claim), the amount of any adjudicated or resolved claims, equity interests, rights and Causes of Action of any nature that the Debtor or the Reorganized Debtor may hold against the Holder of any such Allowed Claim or Equity Interest, but only to the extent of such adjudicated or resolved amount. Neither the failure to effect such a setoff nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Debtor or the Reorganized Debtor of any such claims, equity interests, rights and Causes of Action that the Debtor or the Reorganized Debtor may possess against any such Holder, except as specifically provided in the Plan.

**I.**    **PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED AND DISPUTED CLAIMS**

**1.**    **Resolution of Disputed Claims**

(a)    <u>Allowance of Claims</u>

After the Effective Date, the Reorganized Debtor shall have and shall retain any and all rights and defenses that the Debtor had with respect to any Claim or Equity Interest, except with respect to any Claim or Equity Interest deemed Allowed under the Plan.  Except as expressly provided in the Plan or in any order entered in the Chapter 11 Case prior to the Effective Date (including, without limitation, the Confirmation Order), no Claim or Equity Interest shall become an Allowed Claim or Equity Interest unless and until such Claim or Equity Interest is deemed Allowed under the Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order, including, without limitation, the Confirmation Order, in the Chapter 11 Case allowing such Claim or Equity Interest.  All settled Claims or Equity Interests approved prior to the Effective Date pursuant to a Final Order of the Bankruptcy Court pursuant to Bankruptcy Rule 9019 or otherwise shall be binding on all parties.

(b)    <u>Prosecution of Objection to Claims</u>

After the Confirmation Date but before the Effective Date, the Debtor, and after the Effective Date until the Claims Objection Bar Date, the Reorganized Debtor shall have the exclusive authority to File objections to Claims or Equity Interests, settle, compromise, withdraw or litigate to judgment objections to any and all Claims or Equity Interst, regardless of whether such Claims or Equity Interest are in a Class or otherwise; <u>provided, however</u>, this provision shall not apply to Fee Claims or Equity Interests. From and after the Effective Date, the Reorganized Debtor may settle or compromise any Disputed Claim or Equity Interests without any further notice to or action, order or approval of the Bankruptcy Court. The Reorganized Debtor shall have the sole authority to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order or approval of the Bankruptcy Court.

(c)    <u>Claims Estimation</u>

After the Confirmation Date, but before the Effective Date, the Debtor, and after the Effective Date, the Reorganized Debtor may, at any time, request that the Bankruptcy Court estimate: (i) any Disputed Claim or Equity Interest pursuant to applicable law; and (ii) any contingent or unliquidated Claim or Equity Interest pursuant to applicable law, including, without limitation, section 502(c) of the Bankruptcy Code, regardless of whether the Debtor or the Reorganized Debtor has previously objected to such Claim or Interest or whether the Bankruptcy Court has ruled on any such objection.  The Bankruptcy Court shall retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any Disputed Claim or Equity Interest, contingent Claim or Equity Interest or unliquidated Claim or Equity

Interest, including during the litigation concerning any objection to any Claim or Equity Interest or during the pendency of any appeal relating to any such objection.

Notwithstanding anything in the Plan to the contrary, a Claim or Equity Interest that has been expunged from the Claims Register but that is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. All of the aforementioned Claims or Equity Interests and objection, estimation and resolution procedures are cumulative and not exclusive of one another. Claims or Equity Interests may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

(d)     <u>Expungement or Adjustment of Claims Without Objection</u>

Any Claim or Equity Interest that has been paid, satisfied or superseded may be expunged on the Claims Register by the Reorganized Debtor, and any Claim or Equity Interest that has been amended may be adjusted thereon by the Reorganized Debtor, in both cases without a claims objection having to be Filed and without any further notice to or action, order or approval of the Bankruptcy Court.

(e)     <u>Deadline to File Objections to Claims</u>

Any objections to Claims shall be Filed no later than the Claims Objection Bar Date.

**2.    Disallowance of Claims**

All Claims of any Entity from which property is sought by the Debtor or the Reorganized Debtor under section 542, 543, 550 or 553 of the Bankruptcy Code or that the Debtor or the Reorganized Debtor allege is a transferee of a transfer that is avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549 or 724(a) of the Bankruptcy Code shall be disallowed if (a) the Entity, on the one hand, and the Debtor or the Reorganized Debtor, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turnover any property or monies under any of the aforementioned sections of the Bankruptcy Code and (b) such Entity or transferee has failed to turnover such property by the date set forth in such agreement or Final Order.

**EXCEPT AS OTHERWISE AGREED, ANY AND ALL PROOFS OF CLAIM FILED AND PROOFS OF INTEREST AFTER THE APPLICABLE CLAIMS BAR DATE SHALL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER OR APPROVAL OF THE BANKRUPTCY COURT, AND HOLDERS OF SUCH CLAIMS AND EQUITY INTERESTS MAY NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS AND EQUITY INTERESTS, UNLESS SUCH LATE PROOF OF CLAIM OR EQUITY INTEREST IS DEEMED TIMELY FILED BY A BANKRUPTCY COURT ORDER ON OR BEFORE THE LATER OF (A) THE CONFIRMATION HEARING AND (B) 45 DAYS AFTER THE APPLICABLE CLAIMS BAR DATE.**

**3.    Amendment to Claims**

On or after the Effective Date, except as otherwise provided in the Plan, a Claim or Interest may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Reorganized Debtor, and, to the extent such prior authorization is not received, any such new or amended Claim or Interest Filed shall be deemed disallowed and expunged without any further notice to or action, order or approval of the Bankruptcy Court.

**J.    CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN**

**1.    Conditions Precedent to Confirmation**

It shall be a condition to Confirmation of the Plan that all provisions, terms and conditions set forth in the Plan are approved in the Confirmation Order.

30

2. **Conditions Precedent to Consummation**

It shall be a condition to Consummation of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX of the Plan:

- The Plan and all Plan Supplement documents, if any, including any amendments, modifications or supplements thereto, shall be reasonably acceptable to the Debtor;

- The Confirmation Order shall have been entered and become a Final Order in a form and in substance reasonably satisfactory to the Debtor. The Confirmation Order shall provide that, among other things, the Debtor or the Reorganized Debtor, as appropriate, is authorized and directed to take all actions necessary or appropriate to consummate the Plan, including, without limitation, entering into, implementing and consummating the contracts, instruments, releases, leases, indentures and other agreements or documents created in connection with or described in the Plan;

- All documents and agreements necessary to implement the Plan shall have (a) been tendered for delivery and (b) been affected or executed. All conditions precedent all to such documents and agreements shall have been satisfied or waived pursuant to the terms of such documents or agreements;

- All actions, documents, certificates and agreements necessary to implement the Plan shall have been effected or executed and delivered to the required parties and, to the extent required, Filed with the applicable governmental units in accordance with applicable laws.

3. **Waiver of Conditions**

The conditions to Confirmation of the Plan and to Consummation of the Plan set forth in Article IX of the Plan may be waived by the Debtor without notice, leave or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate the Plan.

4. **Effect of Non-Occurrence of Conditions to Consummation**

If the Consummation of the Plan does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall: (a) constitute a waiver or release of any claims by or Claims against or Equity Interests in the Debtor; (b) prejudice in any manner the rights of the Debtor, any Holders or any other Entity; or (c) constitute an admission, acknowledgment, offer or undertaking by the Debtor, any Holders or any other Entity in any respect.

K. **SETTLEMENT, RELEASE AND RELATED PROVISIONS**

1. **Compromise and Settlement**

Notwithstanding anything in the Plan to the contrary, the allowance, classification and treatment of all Allowed Claims and Equity Interests and their respective distributions and treatments under the Plan takes into account and conforms to the relative priority and rights of the Claims and the Equity Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto whether arising under general principles of equitable subordination, sections 510(b) and (c) of the Bankruptcy Code or otherwise. As of the Effective Date, any and all contractual, legal and equitable subordination rights, whether arising under general principles of equitable subordination, section 510(b) and (c) of the Bankruptcy Code or otherwise, relating to the allowance, classification and treatment of all Allowed Claims and their respective distributions and treatments hereunder are settled, compromised, terminated and released pursuant to the Plan.

The Confirmation Order will constitute the Bankruptcy Court's finding and determination that the settlements reflected in the Plan are: (a) in the best interests of the Debtor, its estate and all Holders of Claims and Equity Interests; (b) fair, equitable and reasonable; (c) made in good faith; and (d) approved by the Bankruptcy Court pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019. The Confirmation Order shall approve the releases

by all Entities of all such contractual, legal and equitable subordination rights or Causes of Action that are satisfied, compromised and settled pursuant hereto.

In accordance with the provisions of the Plan and pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019, without any further notice to or action, order or approval of the Bankruptcy Court, after the Effective Date (a) the Reorganized Debtor may, in its sole and absolute discretion, compromise and settle Claims against it and (b) the Reorganized Debtor may, in its sole and absolute discretion, compromise and settle Causes of Action against other Entities.

**2.    Preservation of Rights of Action**

(a)    <u>Maintenance of Causes of Action</u>

Except as otherwise provided in the Plan or Confirmation Order, after the Effective Date, the Reorganized Debtor shall retain all rights to commence, pursue, litigate or settle, as appropriate, any and all Causes of Action, whether existing as of the Commencement Date or thereafter arising, in any court or other tribunal including, without limitation, in an adversary proceeding Filed in the Chapter 11 Case.

(b)    <u>Preservation of All Causes of Action Not Expressly Settled or Released</u>

Unless a Claim or Cause of Action against a Holder of a Claim or an Equity Interest or other Entity is expressly waived, relinquished, released, compromised or settled in the Plan or any Final Order (including, without limitation, the Confirmation Order), the Debtor expressly reserves such claim or Cause of Action for later adjudication by the Debtor or the Reorganized Debtor (including, without limitation, claims and Causes of Action not specifically identified or of which the Debtor may presently be unaware or which may arise or exist by reason of additional facts or circumstances unknown to the Debtor at this time or facts or circumstances that may change or be different from those the Debtor now believes to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches shall apply to such claims or Causes of Action upon or after the Confirmation or Consummation of the Plan based on the Disclosure Statement, the Plan or the Confirmation Order, except where such claims or Causes of Action have been expressly released in the Plan or any other Final Order (including, without limitation, the Confirmation Order).  In addition, the Debtor and the Reorganized Debtor expressly reserve the right to pursue or adopt any claims alleged in any lawsuit in which the Debtor is a plaintiff, defendant or an interested party, against any Entity, including, without limitation, the plaintiffs or codefendants in such lawsuits.

**L.    BINDING NATURE OF THE PLAN**

THE PLAN SHALL BIND ALL HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS AND INTERCOMPANY INTERESTS IN THE DEBTOR TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, NOTWITHSTANDING WHETHER OR NOT SUCH HOLDER (A) WILL RECEIVE OR RETAIN ANY PROPERTY OR INTEREST IN PROPERTY UNDER THE PLAN, (B) HAS FILED A PROOF OF CLAIM OR INTEREST IN THE CHAPTER 11 CASE OR (C) FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN OR VOTED TO REJECT THE PLAN.

**IV.    CONFIRMATION AND CONSUMMATION PROCEDURES**

**A.    Solicitation of Votes**

The process by which the Debtor will solicit votes to accept or reject the Plan is summarized in that certain Solicitation and Procedures Motion (the "**Procedures Motion**"), filed with the Court on _____, 2020, Docket No. ___.  On _____, 2020, this Court approved the Procedures Motion.

**PLEASE REFER TO THE PROCEDURES MOTION FOR MORE INFORMATION REGARDING VOTING REQUIREMENTS TO ENSURE THAT VOTES ARE PROPERLY AND TIMELY SUBMITTED SUCH THAT THEY ARE COUNTED AS VOTES TO ACCEPT OR REJECT THE PLAN.**

B.      **Confirmation Procedures**

1.      **Confirmation Hearing**

**The Confirmation Hearing will commence at _____.m.  prevailing Pacific Time on _____, 2020.**

**The Plan Objection Deadline is 5:00 p.m., prevailing Pacific Time on _____, 2020.**

All Plan objections must be filed with the Bankruptcy Court and served on the Debtor and certain other parties in accordance with the Disclosure Statement Order on or before the Plan Objection Deadline.

THE BANKRUPTCY COURT WILL <u>NOT</u> CONSIDER PLAN OBJECTIONS UNLESS THEY ARE TIMELY SERVED AND FILED IN COMPLIANCE WITH THE DISCLOSURE STATEMENT ORDER.

2.      **Confirmation Hearing Notice**

Following the Disclosure Statement Hearing, the Debtor will serve the Confirmation Hearing Notice on all of the Debtor's creditors, parties in interest and parties which have requested notice pursuant to Bankruptcy Rule 2002, which will contain, among other things, the Plan Objection Deadline, the Voting Deadline and the date that the Confirmation Hearing is scheduled to commence.

3.      **Filing Objections to the Plan**

All objections, if any, must (a) be made in writing, (b) conform to the Bankruptcy Rules and the Local Rules and (c) be filed, contemporaneously with a proof of service, with the Bankruptcy Court and served so that they are **actually received** on or before the Plan Objection Deadline by each of the parties listed in the table below:

| Name: | Contact Information: |
|---|---|
| Debtor's counsel | Schwartz Law, PLLC<br>Attn: Samuel A. Schwartz, Esq.<br>601 East Bridger Ave.<br>Las Vegas, Nevada 89101<br>Fax: (702) 385-5544 |

C.      **STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN**

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code.  The Debtor believes that:  (i) the Plan satisfies or will satisfy all of the statutory requirements of chapter 11 of the Bankruptcy Code; (ii) it has complied or will have complied with all of the requirements of chapter 11 of the Bankruptcy Code; and (iii) the Plan has been proposed in good faith. Specifically, the Debtor believes that the Plan satisfies or will satisfy the applicable Confirmation requirements of section 1129 of the Bankruptcy Code set forth below:

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtor, as the Plan proponent, will have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Case, or in connection with the Plan and incident to the Chapter 11 Case, has been disclosed to the Bankruptcy Court, and any such payment: (a) made before the Confirmation of the Plan is reasonable; or (b) is subject to the approval of the Bankruptcy Court as

reasonable, if it is to be fixed after Confirmation of the Plan.

- Either each Holder of an Impaired Claim or Equity Interest has accepted the Plan, or will receive or retain under the Plan on account of such Claim or Equity Interest, property of a value, as of the Effective Date of the Plan, that is not less than the amount that such Holder would receive or retain if the Debtor was liquidated on that date under chapter 7 of the Bankruptcy Code, including pursuant to section 1129(b) of the Bankruptcy Code for Equity Interests deemed to reject the Plan.

- Each Class of Claims or Equity Interests that is entitled to vote on the Plan has either accepted the Plan or is not Impaired under the Plan, or the Plan can be confirmed without the approval of such voting Class pursuant to section 1129(b) of the Bankruptcy Code for Equity Interests deemed to reject the Plan.

- Except to the extent that the Holder of a particular Claim will agree to a different treatment of its Claim or Equity Interests, the Plan provides that Administrative Claims and Other Priority Claims will be paid in full on the Effective Date, or as soon thereafter as is reasonably practicable.

- At least one Class of Impaired Claims and Equity Interests has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim or Equity Interest in that Class.

- Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor or any successors thereto under the Plan.

- The Debtor has paid the required filing fees pursuant to 28 U.S.C. § 1930 to the clerk of the Bankruptcy Court.

- In addition to the filing fees paid to the clerk of the Bankruptcy Court, the Debtor will pay quarterly fees no later than the last day of the calendar month, following the calendar quarter for which the fee is owed in the Debtor's Chapter 11 Case for each quarter (including any fraction thereof), to the Office of the U.S. Trustee, until the case is converted or dismissed, whichever occurs first.

1.      **Best Interests of Creditors Test/Liquidation Analysis**

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each class, that each holder of a claim or an equity interest in such class either (a) has accepted the plan or (b) will receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor is liquidated under chapter 7 of the Bankruptcy Code. To make these findings, the bankruptcy court must:  (a) estimate the Cash liquidation proceeds that a chapter 7 trustee would generate if the debtor's Chapter 11 Case was converted to a chapter 7 case and the assets of such debtor's estate were liquidated; (b) determine the liquidation distribution that each non-accepting holder of a claim or an equity interest would receive from such liquidation proceeds under the priority scheme dictated in chapter 7; and (c) compare such holder's liquidation distribution to the distribution under the plan that such holder would receive if the plan were confirmed.  The Debtor's liquidation analysis is attached hereto as **Exhibit C**.

In chapter 7 cases, unsecured creditors and interest holders of a debtor are paid from available assets generally in the following order, with no junior class receiving any payments until all amounts due to senior classes have been paid fully or any such payment is provided for:  (a) holders of secured claims (to the extent of the value of their collateral); (b) holders of priority claims; (c) holders of unsecured claims; (d) holders of debt expressly subordinated by its terms or by order of the bankruptcy court; and (e) holders of equity interests.

Accordingly, the Cash amount that would be available for satisfaction of Claims (other than Secured Claims) would consist of the proceeds resulting from the disposition of the unencumbered assets of the Debtor, augmented by the unencumbered Cash held by the Debtor at the time of the commencement of the liquidation.  Such Cash would be

reduced by the amount of the costs and expenses of the liquidation and by such additional administrative and priority claims that may result from termination of the Debtor's business and the use of chapter 7 for purposes of a liquidation.

The Debtor believes that confirmation of the Plan will provide each Holder of an Allowed Claim or Equity Interests with a greater recovery than the value of any distributions if the Chapter 11 Case was converted to a case under chapter 7 of the Bankruptcy Code because, among other reasons, the Debtor does not own significant, tangible assets which could be liquidated. Additionally, in a chapter 7 liquidation, the Debtor would be subject to the fees and expenses of a chapter 7 trustee which would likely further reduce Cash available for distribution. In addition, distributions in chapter 7 cases may not occur for a longer period of time than distributions under the Plan, thereby reducing the present value of such distributions. In this regard, it is possible that distribution of the proceeds of a liquidation could be delayed for a significant period while the chapter 7 trustee and its advisors become knowledgeable about, among other things, the Chapter 11 Case and the Claims and Equity Interests against the Debtor. As set forth in the Liquidation Analysis, Holders of Class 4 Equity Interests would not receive any recovery under a chapter 7 liquidation, so the Plan satisfies the requirements of section 1129(a)(7) of the Bankruptcy Code with respect to such Classes.

      **2.**        **Feasibility**

Section 1129(a)(11) of the Bankruptcy Code requires that the Bankruptcy Court find that confirmation is not likely to be followed by the liquidation of the Reorganized Debtor or the need for further financial reorganization, unless the Plan contemplates such liquidation. For purposes of demonstrating that the Plan meets this "feasibility" standard, the Debtor has analyzed the ability of the Reorganized Debtor to meet its obligations under the Plan and to retain sufficient liquidity and capital resources to conduct its business.

The Debtor believes that the Plan meets the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code, as Confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Debtor or any successor under the Plan. In connection with the development of the Plan and for the purposes of determining whether the Plan satisfies this feasibility standard, the Debtor analyzed its ability to satisfy its financial obligations while maintaining sufficient liquidity and capital resources.

Accordingly, the Debtor believes that Confirmation and Consummation is, therefore, not likely to be followed by the liquidation or further reorganization of the Reorganized Debtor. Therefore, the Debtor believes that the Plan satisfies the feasibility requirement of section 1129(a)(11) of the Bankruptcy Code.

      **3.**        **Acceptance by Impaired Classes**

The Bankruptcy Code requires, as a condition to confirmation, that, except as described in the following section, each class of claims or equity interests that is impaired under a plan, accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required. A class is "impaired" unless the plan: (a) leaves unaltered the legal, equitable and contractual rights to which the claim or the equity interest entitles the holder of such claim or equity interest; (b) cures any default and reinstates the original terms of such obligation; or (c) provides that, on the consummation date, the holder of such claim or equity interest receives Cash equal to the allowed amount of that claim or, with respect to any equity interest, any fixed liquidation preference to which the holder of such equity interest is entitled to any fixed price at which the debtor may redeem the security.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject the plan. Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number actually voting cast their ballots in favor of acceptance.

Claims in Classes 1, 2, 3, and 4 are Impaired under the Plan, and as a result, the Holders of Claims in Classes 1, 2, 3 and 4 are entitled to vote to accept or reject the Plan. Pursuant to section 1129 of the Bankruptcy Code, the Holders of Claims in the Voting Classes must accept the Plan for the Plan to be confirmed without application of the "fair and equitable test" to such Classes, and without considering whether the Plan "discriminates unfairly" with

respect to such Classes, as both standards are described herein.  As stated above, Classes of Claims will have accepted the Plan if the Plan is accepted by at least two-thirds in amount and a majority in number of the Claims of each such Class (other than any Claims of creditors designated under section 1126(e) of the Bankruptcy Code) that have voted to accept or reject the Plan.

### 4. Confirmation Without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes entitled to vote on the plan have not accepted it, provided that the plan has been accepted by at least one impaired class.  Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, such plan will be confirmed, at the plan proponent's request, in a procedure commonly known as "cram down," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

### 5. No Unfair Discrimination

This test applies to classes of claims or equity interests that are of equal priority and are receiving different treatment under the Plan.  The test does not require that the treatment be the same or equivalent, but that such treatment be "fair."  In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (e.g., classes of the same legal character).  Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly, and, accordingly, a plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

### 6. Fair and Equitable Test

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in the class. As to the dissenting class, the test sets different standards depending upon the type of claims or equity interests in the class. The Debtor submits that if the Debtor was to "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so that it would not "discriminate unfairly" and would satisfy the "fair and equitable" requirement. With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank. With respect to the fair and equitable requirement, no Class under the Plan will receive more than 100 percent of the amount of Allowed Claims in that Class. The Debtor believes that the Plan and the treatment of all Classes of Claims or Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

**The Debtor anticipates that it will seek Confirmation of the Plan under section 1129(b) of the Bankruptcy Code.**  To the extent that any of the Voting Classes vote to reject the Plan, the Debtor, however, reserves the right to seek (a) Confirmation of the Plan under section 1129(b) of the Bankruptcy Code and/or (b) modify the Plan in accordance with Article XIII.B. of the Plan.

The Debtor does not believe that the Plan discriminates unfairly against any Impaired Class of Claims or Equity Interests.  The Debtor believes that the Plan and the treatment of all Classes of Claims and Equity Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

### D. CONSUMMATION OF THE PLAN

The Plan will be consummated on the Effective Date.  For a more detailed discussion of the conditions precedent to consummation of the Plan and the impact of failure to meet such conditions, see Article IX of the Plan.

V.      **CERTAIN SECURITIES LAW MATTERS**

A.      **PLAN SECURITIES**

The Plan provides for the Reorganized Debtor to distribute, among other things, the New Equity, to certain Holders of Allowed Claims and Equity Interests. The Debtor believes that the New Equity will be "securities," as defined in Section 2(a)(1) of the Securities Act, Section 101 of the Bankruptcy Code, and all applicable state securities laws.

B.      **ISSUANCE AND RESALE OF SECURITIES**

1.      **Exemptions from Registration Requirements of the Securities Act and Applicable State Securities Laws**

Section 1145(a)(1) of the Bankruptcy Code exempts the offer or sale of securities under a plan of reorganization from registration under Section 5 of the Securities Act and state laws if three principal requirements are satisfied: (a) the securities must be issued "under a plan" of reorganization by the debtor or its successor under a plan or by an affiliate participating in a joint plan of reorganization with the debtor; (b) the recipients of the securities must hold a claim against, an interest in, or a claim for administrative expenses in the case concerning the debtor; and (c) the securities must be issued in exchange for the recipient's claim against or interest in the debtor, or "principally" in such exchange and "partly" for cash or property. In reliance upon these exemptions, the Debtor believes that the offer, issuance and distribution under the Plan of the New Equity to the Holders of Allowed Claims and Equity Interests entitled to receive the New Equity under the Plan (collectively, the "New Equity Holders"), following the filing of the Chapter 11 Cases may be made without registration under the Securities Act or any applicable state securities laws.

To the extent that the offer, issuance and distribution of the New Equity to the New Equity Holders following the filing of the Chapter 11 Cases is covered by section 1145 of the Bankruptcy Code, subject to compliance with the New Organizational Documents, such New Equity may be resold without registration under the Securities Act or other federal securities laws, unless such holder is an "underwriter" (as discussed below) with respect to such securities, as that term is defined in section 1145(b)(1) of the Bankruptcy Code. In addition, such New Equity governed by section 1145 of the Bankruptcy Code generally may be able to be resold without registration under applicable state securities laws pursuant to various exemptions provided by the applicable states; however, the availability of such exemptions cannot be known unless applicable individual state securities laws are examined.

Recipients of the New Equity are advised to consult with their own legal advisors as to the availability of any exemption from registration under the Bankruptcy Code, the Securities Act and any applicable state securities laws.

2.      **Resale of Certain New Equity; Definition of Underwriter**

Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer": (a) purchases a claim against, interest in, or claim for an administrative expense in the case concerning, the debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such claim or interest; (b) offers to sell securities offered or sold under a plan for the Holders of such securities; (c) offers to buy securities offered or sold under a plan from the Holders of such securities, if such offer to buy is (i) with a view to distribution of such securities and (ii) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan; or (d) is an issuer of the securities within the meaning of section 2(a)(11) of the Securities Act. In addition, a person who receives a fee in exchange for purchasing an issuer's securities could also be considered an underwriter within the meaning of section 2(a)(11) of the Securities Act.

The definition of an "issuer" for purposes of whether a person is an underwriter under section 1145(b)(1)(D) of the Bankruptcy Code, by reference to section 2(a)(11) of the Securities Act, includes as "statutory underwriters" all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under

common control with, an issuer of securities. The reference to "issuer," as used in the definition of "underwriter" contained in section 2(a)(11) of the Securities Act, is intended to cover "Controlling Persons" of the issuer of the securities. "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise. Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "Controlling Person" of the debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities. In addition, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns ten percent (10%) or more of a class of securities of a reorganized debtor may be presumed to be a "Controlling Person" and, therefore, an underwriter.

Resales of the New Equity issued to the New Equity Holders by Entities deemed to be "underwriters" (which definition includes "Controlling Persons") are not exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Under certain circumstances, holders of such New Equity who are deemed to be "underwriters" may be entitled to resell their New Equity pursuant to the limited safe harbor resale provisions of Rule 144 of the Securities Act. Generally, Rule 144 of the Securities Act would permit the public sale of securities received by such person if the required holding period has been met and if current information regarding the issuer is publicly available and volume limitations, manner of sale requirements and certain other conditions are met.

Whether any particular person would be deemed to be an "underwriter" (including whether the person is a "**Controlling Person**") with respect to such New Equity would depend upon various facts and circumstances applicable to that person. Accordingly, the Debtor expresses no view as to whether any person would be deemed an "underwriter" with respect to the New Equity issued to the New Equity Holders, and, in turn, whether any person may freely resell such New Equity. The Debtor recommends that potential recipients of New Equity consult their own counsel concerning their ability to freely trade such securities under applicable federal securities law and state securities laws.

## VI.    PLAN-RELATED RISK FACTORS

> PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN, ALL HOLDERS OF CLAIMS THAT ARE IMPAIRED SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH HEREIN, AS WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT.    ALTHOUGH THESE RISK FACTORS ARE MANY, THESE FACTORS SHOULD <u>NOT</u> BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE DEBTOR'S BUSINESS OR THE PLAN AND ITS IMPLEMENTATION.

### A.    CERTAIN BANKRUPTCY LAW CONSIDERATIONS

#### 1.    Parties in Interest May Object to the Debtor's Classification of Claims and Equity Interests.

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Debtor believes that the classification of the Claims and Equity Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtor created Classes of Claims and Equity Interests each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class. Nevertheless, there can be no assurance that the Court will reach the same conclusion..

#### 2.    The Debtor May Fail to Satisfy the Vote Requirement

If votes are received in number and amount sufficient to enable the Court to confirm the Plan, the Debtor intends to seek, as promptly as practicable thereafter, Confirmation of the Plan. In the event sufficient votes are not received, the Debtor may seek to confirm an alternative chapter 11 plan of reorganization. There can be no assurance that the terms of any such alternative chapter 11 plan of reorganization would be similar or as favorable to the Holders of Allowed Claims and Interests as those proposed in the Plan..

3.      **The Debtor May Not Be Able to Secure Confirmation of the Plan**

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims and equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtor was liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Court will confirm the Plan. A non-accepting Holder of an Allowed Claim or Interest might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Court determines that this Disclosure Statement, the balloting procedures, and voting results are appropriate, the Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met, including the requirement that the terms of the Plan do not "unfairly discriminate" and are "fair and equitable" to non-accepting Classes.

Confirmation of the Plan is also subject to certain conditions as described in Article IX of the Plan.  If the Plan is not confirmed, it is unclear what distributions, if any, Holders of Allowed Claims would receive with respect to their Allowed Claims and Equity Interests.

The Debtor, subject to the terms and conditions of the Plan, reserves the right to modify the terms and conditions of the Plan as necessary for Confirmation.  Any such modifications could result in less favorable treatment of any non-accepting Class, as well as any Classes junior to such non-accepting Class, than the treatment currently provided in the Plan.  Such less favorable treatment could include a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan or no distribution of property whatsoever under the Plan.

4.      **Nonconsensual Confirmation of the Plan May be Necessary**

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es). The Debtor believes that the Plan satisfies these requirements, and the Debtor may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Court will reach this conclusion. In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

5.      **The Debtor May Object to the Amount or Classification of a Claim**

Except as otherwise provided in the Plan, the Debtor and Reorganized Debtor reserve the right to object to the amount or classification of any Claim under the Plan.  The estimates set forth in this Disclosure Statement cannot be relied on by any Holder of a Claim or Interest where such Claim or Interest is subject to an objection.  Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

6.      **Risk of Non-Occurrence of the Effective Date**

Although the Debtor believes that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing, or as to whether the Effective Date will, in fact, occur.

7.      **Contingencies Will Not Affect Votes of Impaired Classes to Accept or Reject the Plan**

The distributions available to Holders of Allowed Claims and Equity Interests under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Court orders certain Allowed Claims or Interests to be subordinated to other Allowed Claims or Interests. The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims and Interests under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

The estimated Claims, Interests, and creditor recoveries that will be forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims and Interests may significantly differ from the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims or Equity Interests may vary from the estimated Claims and Interests contained in this Disclosure Statement. Moreover, the Debtor cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed. Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims and Interests under the Plan.

B.      **RISK FACTORS THAT MAY AFFECT RECOVERIES UNDER THE PLAN**

1.      **The Valuation of the Reorganized Debtor May Not Be Adopted by the Bankruptcy Court**

The approximate value of the Debtor is negative due to the Debtor's inability to collect fair value for its assets.  Parties in interest in this Chapter 11 Case may oppose Confirmation of the Plan by alleging that the equity value of the Reorganized Debtor is higher than the amounts projected by the Debtor at confirmation and that the Plan thereby improperly limits or extinguishes their rights to recoveries under the Plan.  At the Confirmation Hearing, the Bankruptcy Court will hear evidence regarding the views of the Debtor and opposing parties, if any, with respect to the valuation of the Reorganized Debtor.  Based on that evidence, the Bankruptcy Court will determine the appropriate valuation for the Reorganized Debtor for purposes of the Plan.

2.      **The Reorganized Debtor May Not Be Able to Achieve Projected Financial Results or Finance All Operating Expenses, Working Capital Needs and Capital Expenditures**

The Financial Projections attached hereto as **Exhibit D** represent the Debtor's best estimate of the Debtor's future financial performance, which is necessarily based on certain assumptions regarding the anticipated future performance of the Reorganized Debtor's operations, as well as the United States and world economies in general, which has been particularly affected by the recent COVID-19 outbreak and actions taken in response thereto. While the Debtor believes that the Financial Projections are reasonable, there can be no assurance that they will be realized. If the Debtor does not achieve its projected financial results, (a) the value of the New Equity may be negatively affected, and the recoveries by Holders of Claims that receive New Equity may be negatively affected, (b) the Debtor may lack sufficient liquidity to continue operating as planned after the Effective Date and (c) the Debtor may be unable to service its debt obligations as they come due (d) the Debtor may not be able to obtain such working capital when it is required and (e) even if the Debtor was able to obtain additional working capital, it may only be available on unreasonable terms. Any one of these failures may preclude the Reorganized Debtor from, among other things, maintaining and growing its business. Moreover, the financial condition and results of operations of the Reorganized Debtor from and after the Effective Date may not be comparable to the financial condition or results of operations reflected in the Debtor's historical financial statements.

C.      **RISK FACTORS THAT COULD NEGATIVELY IMPACT THE DEBTOR'S BUSINESS**

1.      **Prolonged Continuation of the Chapter 11 Case is Likely to Harm the Debtor's Asset Values**

The Debtor's future results will be dependent upon the successful confirmation and implementation of a plan of reorganization. A long period of operations under Court protection could have a material adverse effect on the Debtor's business, financial condition, results of operations, and liquidity. So long as the proceedings related to the Chapter 11 Cases continue, management will be required to spend a significant amount of time and effort dealing with

the reorganization instead of focusing exclusively on business operations. A prolonged period of operating under Court protection also may make it more difficult to retain management and other key personnel necessary to the success and growth of the Debtor's businesses. In addition, the longer the proceedings related to the Chapter 11 Cases continue, the more likely it is that the public and will lose confidence in the Debtor's ability to reorganize their business successfully and will seek to establish alternative commercial relationships.

So long as the proceedings related to the Chapter 11 Cases continue, the Debtor will be required to incur substantial costs for professional fees and other expenses associated with the administration of the Chapter 11 Cases.

Furthermore, the Debtor cannot predict the ultimate amount of all settlement terms for the liabilities that will be subject to a plan of reorganization. Even after a plan of reorganization is approved and implemented, the Debtor's operating results may be adversely affected by the possible reluctance of prospective lenders and other counterparties to do business with a company that recently emerged from bankruptcy protection.

**2.      Certain Tax Implications of the Debtor's Bankruptcy and Reorganization May Increase the Tax Liability of the Reorganized Debtor**

Holders of Allowed Claims should carefully review Section VIII herein, "Certain U.S. Federal Tax Consequences of the Plan," to determine how the tax implications of the Plan and this Chapter 11 Case may adversely affect the Reorganized Debtor.

**3.      The Debtor May Be Controlled by Significant Holders**

If the Plan contemplating the Restructuring is confirmed and consummated, Holders of DIP Facility Claims will own a significant percent of the New Equity. If the Holder of any DIP Facility Claim acquires a significant portion of the New Equity or the holders of a significant portion of the New Equity were to act as a group, such Holders would be in a position to control the outcome of actions requiring shareholder approval.

**4.      The New Equity Is Subject to Dilution.**

The ownership percentage represented by the New Equity distributed on the Effective Date under the Plan will be subject to dilution by securities that may be issued post-emergence, including any securities issued in connection with the conversion of any other options, warrants, convertible securities, or exercisable securities.

**5.      Islet's or Its Reorganized Successor's New Equity is Not Certain to be Publicly Traded.**

There can be no assurance that an active market for the New Equity will develop, nor can any assurance be given as to the prices at which such stock might be traded. The New Equity to be issued under the Plan will not be listed on or traded on any nationally recognized market or exchange. Further, the New Equity to be issued under the Plan has not been registered under the Securities Act, any state securities laws or the laws of any other jurisdiction. Absent such registration, the New Equity may be offered or sold only in transactions that are not subject to, or that are exempt from, the registration requirements of the Securities Act and other applicable securities laws. Most recipients of New Equity will be able to resell such securities without registration pursuant to the exemption from registration provided by section 1145 of the Bankruptcy Code, subject to any restrictions set forth in the certificate of incorporation and bylaws of Reorganized Debtor.

**D.      DISCLOSURE STATEMENT DISCLAIMERS**

**1.      The Information Contained Herein Is for Soliciting Votes Only**

The information contained in this Disclosure Statement is for purposes of soliciting acceptances of the Plan and may not be relied upon for any other purpose.

**2.      This Disclosure Statement Was Not Approved by the Securities and Exchange Commission**

This Disclosure Statement has not been filed with the Commission or any state regulatory authority. Neither

the Commission nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement, or the exhibits or the statements contained herein, and any representation to the contrary is unlawful.

###### 3. The Disclosure Statement Contains Forward Looking Statements

This Disclosure Statement contains "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "expect," "anticipate," "estimate" or "continue" or the negative thereof or other variations thereon or comparable terminology. The reader is cautioned that all forward looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements. The liquidation analysis, distribution projections and other information contained herein and attached hereto are estimates only, and the timing and amount of actual distributions to Holders of Allowed Claims may be affected by many factors that cannot be predicted. Therefore, any analyses, estimates or recovery projections may or may not turn out to be accurate.

###### 4. No Legal or Tax Advice is Provided to You by this Disclosure Statement

**This Disclosure Statement is not legal advice to you.** The contents of this Disclosure Statement should not be construed as legal, business or tax advice. Each Holder of a Claim or an Equity Interest should consult his or her own legal counsel and accountant with regard to any legal, tax and other matters concerning his or her Claim or Equity Interest. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation of the Plan.

###### 5. No Admissions Are Made by this Disclosure Statement

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any Entity (including, without limitation, the Debtor) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtor, the Reorganized Debtor, Holders of Allowed Claims or Equity Interest or any other parties in interest.

###### 6. No Reliance Should be Placed on any Failure to Identify Litigation Claims or Projected Objections

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Equity Interest is, or is not, identified in this Disclosure Statement. The Debtor or the Reorganized Debtor may seek to investigate, File and prosecute Claims and Equity Interest and may object to Claims after the Confirmation or Effective Date of the Plan irrespective of whether the Disclosure Statement identifies such Claims or Objections to Claims.

###### 7. Nothing Herein Constitutes a Waiver of any Rights to Object to Claims or Recover Transfers and Assets

The vote by a Holder of an Allowed Claim for or against the Plan does not constitute a waiver or release of any Claims or rights of the Debtor or the Reorganized Debtor (or any party in interest, as the case may be) to object to that Holder's Allowed Claim, or recover any preferential, fraudulent or other voidable transfer or assets, regardless of whether any Claims or Causes of Action of the Debtor or its Estate are specifically or generally identified herein.

###### 8. The Information Used Herein Was Provided to the Debtor and Was Relied Upon by the Debtor's Advisors

Counsel to the Debtor has relied upon information provided by the Debtor in connection with the preparation of this Disclosure Statement. Although counsel to the Debtor has performed certain limited due diligence in connection with the preparation of this Disclosure Statement, it has not verified independently the information contained herein.

9.      **The Potential Exists for Inaccuracies, and the Debtor has no Duty to Update**

The statements contained in this Disclosure Statement are made by the Debtor as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has not been a change in the information set forth herein since that date. While the Debtor has used its reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtor, nonetheless cannot, and does not, confirm the current accuracy of all statements appearing in this Disclosure Statement. Further, although the Debtor may subsequently update the information in this Disclosure Statement, the Debtor has no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

10.     **No Representations Made Outside of the Disclosure Statement Are Authorized**

No representations concerning or relating to the Debtor, the Chapter 11 Case or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, should not be relied upon by you in arriving at your decision. You should promptly report unauthorized representations or inducements to the counsel to the Debtor, and the United States Trustee.

**VII.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN**

C.      **Liquidation Under Chapter 7 of the Bankruptcy Code**

If no chapter 11 plan can be confirmed, the Chapter 11 Case may be converted to a case under chapter 7 of the Bankruptcy Code in which case, a trustee would be elected or appointed to liquidate the Debtor's assets. A discussion of the effect that a chapter 7 liquidation would have on the recovery of holders of Claims is set forth in Section IV.C. herein, titled "Statutory Requirements for Confirmation of the Plan." In performing the liquidation analysis, the Debtor has assumed that all Holders of Claims will be determined to have "claims" that are entitled to share in the proceeds from any such liquidation. The Debtor believes that liquidation under chapter 7 would result in (i) smaller distributions being made to creditors than those provided for in the Plan because of the additional administrative expenses involved in the appointment of a trustee and attorneys and other professionals to assist such trustee, (ii) smaller distributions being made to creditors than those provided in the Plan because the Debtor's only real assets consist of the Receivables and the Medical Services, neither of which have any value in a liquidation, (iii) additional expenses and claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of unexpired leases and executory contracts in connection with the cessation of the Debtor's operations, and (iv) the failure to realize the greater, going-concern value of all of the Debtor's assets.

D.      **Filing of an Alternative Plan of Reorganization**

If the Plan is not confirmed, the Debtor or any other party in interest could attempt to formulate a different plan of reorganization. Such a plan might involve either a reorganization and continuation of the Debtor's business or an orderly liquidation of their assets. During the negotiations prior to the filing of the Plan, the Debtor explored various alternatives to the Plan.

The Debtor believes that the Plan enables the Debtor to emerge from chapter 11 successfully and expeditiously, preserves its business and allows creditors to realize the highest recoveries under the circumstances. In a liquidation under chapter 11 of the Bankruptcy Code, the assets of the Debtor would be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7, and a trustee need not be appointed. Although the administrative costs associated with a chapter 11 liquidation are less than the costs associated with a chapter 7 liquidation, the fact still remains that the Debtor does not own substantial assets that have any value separate and apart from its business. Thus, although creditors would normally receive greater recoveries in a chapter 11 liquidation than in a chapter 7 liquidation, in the present case, creditors would receive little, if any recoveries in either instance. The Debtor believes that a liquidation under chapter 11 is a much less attractive alternative to creditors than the Plan because the Plan provides for a greater return to creditors.

## VIII.    RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall, after the Effective Date, retain such jurisdiction over the Chapter 11 Case and all Entities with respect to all matters related to the Chapter 11 Case, the Debtor and the Plan as legally permissible, including, without limitation, jurisdiction to:

1.    allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Equity Interest, including, without limitation, the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the allowance or priority of any Claim or Equity Interest;

2.    grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan, for periods ending on or before the Confirmation Date;

3.    resolve any matters related to the assumption, assignment or rejection of any Executory Contract or Unexpired Lease to which the Debtor is party or with respect to which the Debtor or the Reorganized Debtor may be liable and to adjudicate and, if necessary, liquidate, any Claims arising therefrom, including, without limitation, those matters related to any amendment to the Plan after the Effective Date to add Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed;

4.    resolve any issues related to any matters adjudicated in the Chapter 11 Case;

5.    ensure that distributions to Holders of Allowed Claims and Equity Interests are accomplished pursuant to the provisions of the Plan;

6.    decide or resolve any motions, adversary proceedings, contested or litigated matters and any other Causes of Action that are pending as of the Effective Date or that may be commenced in the future, and grant or deny any applications involving the Debtor that may be pending on the Effective Date or instituted by the Reorganized Debtor after the Effective Date, *provided* that the Reorganized Debtor shall reserve the right to commence actions in all appropriate forums and jurisdictions;

7.    enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all other contracts, instruments, releases, indentures and other agreements or documents adopted in connection with the Plan, the Plan Supplement or the Disclosure Statement;

8.    resolve any cases, controversies, suits or disputes that may arise in connection with the Consummation, interpretation or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

9.    hear and determine all Causes of Action that are pending as of the Effective Date or that may be commenced in the future;

10.    issue injunctions and enforce them, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan, except as otherwise provided in the Plan;

11.    enforce Article X.A. and X.B. of the Plan;

12.    resolve any cases, controversies, suits or disputes with respect to the Exculpation and other provisions contained in Article X of the Plan and enter such orders or take such others actions as may be necessary or appropriate to implement or enforce all such injunctions and other provisions;

13.    enter and implement such orders or take such others actions as may be necessary or appropriate if the Confirmation Order is modified, stayed, reversed, revoked or vacated;

44

14. resolve any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document adopted in connection with the Plan or the Disclosure Statement; and

15. enter an order concluding the Chapter 11 Case.

IX.    **CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN**

**IRS CIRCULAR 230 DISCLOSURE: TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE IRS, ANY TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING TAX-RELATED PENALTIES UNDER THE IRC. TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS WRITTEN TO SUPPORT THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED BY THE DISCLOSURE STATEMENT. EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

A.    **CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN**

The following discussion is a summary of certain U.S. federal income tax consequences of the consummation of the Plan to Holders of Allowed Claims. This summary is based on the Internal Revenue Code (the "**IRC**"), the U.S. Treasury Regulations promulgated thereunder, judicial authorities, published administrative positions of the IRS and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect. No rulings or determinations of the IRS or any other taxing authorities have been sought or obtained with respect to the tax consequences discussed herein, and the discussion below is not binding upon the IRS or the courts. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This discussion is for general information only and does not purport to address all aspects of U.S. federal income taxation that may be relevant to Holders of Claims in light of their personal circumstances, nor does the discussion deal with tax issues with respect to taxpayers subject to special treatment under the U.S. federal income tax laws (including, for example, banks, governmental authorities or agencies, pass-through entities, brokers and dealers in securities, insurance companies, financial institutions, tax-exempt organizations, small business investment companies or regulated investment companies). This discussion only addresses the tax consequences to Holders of Claims who have held such Claims as capital assets within the meaning of the IRC. No aspect of foreign, state, local or estate and gift taxation is addressed.

Importantly, the Debtor anticipates that the Restructuring Transactions will be exempt from taxation pursuant to Section 1146 of the Bankruptcy Code. Accordingly, little or no tax liability will accrue if the Plan is confirmed.

**THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF AN ALLOWED CLAIM. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE U.S. FEDERAL, STATE, LOCAL AND NONUNITED STATES TAX CONSEQUENCES OF THE PLAN.**

B.    **IN GENERAL**

The U.S. federal income tax consequences of the distributions contemplated by the Plan to Holders of Claims will depend upon a number of factors. The character and amount of income, gain or loss recognized as a consequence of the Plan and the distributions provided thereby will depend upon, among other things, (i) the manner in which a Holder acquired a Claim, (ii) the length of time the Claim has been Held, (iii) whether the Claim was acquired at a

discount, (iv) whether the Holder has taken a bad debt deduction with respect to the Claim (or any portion thereof) in the current or prior years, (v) whether the Holder has previously included in income accrued but unpaid interest with respect to the Claim (vi) the method of tax accounting of the Holder, and (vii) whether the Claim is an installment obligation for U.S. federal income tax purposes.

For purposes of the following discussion, a "U.S. Holder" is any person (i) who is a citizen resident of the United States; (ii) that is a corporation or partnership created or organized in or under the laws of the United States or any state thereof of the District of Columbia; (iii) that is an estate, the income of which is subject to U.S. federal income taxation regardless of its source; or (iv) that is a trust (a) the administration over which a United States person can exercise primary supervision and all of the substantial decisions of which one or more United States persons have the authority to control or (b) that has elected to continue to be treated as United States person for U.S. federal income tax purposes. A "Non-U.S. Holder" is any person that is not U.S. Holder. In the case of a partnership, the tax treatment of its partners will depend on the status of the partner and the activities of the partnership. Holders who are partnerships or partners in a partnership should consult their tax advisors.

Certain Holders of Claims (such as foreign persons, S corporations, regulated investment companies, insurance companies, financial institutions, small business investment companies, broker-dealers, and tax exempt organizations) may be subject to special rules not addressed in this summary of the U.S. federal tax consequences. There also may be state, local and/or foreign income or other tax considerations or U.S. federal estate and gift tax consideration applicable to Holders of Claims, which are not addressed herein. EACH HOLDER OF A CLAIM OR EQUITY INTEREST AFFECTED BY THE PLAN IS STRONGLY URGED TO CONSULT ITS TAX ADVISOR WITH RESPECT TO DISTRIBUTIONS RECEIVED UNDER THE PLAN.

C.      U.S. HOLDERS OF CLAIMS

A U.S. Holder should generally recognize capital gain or loss for U.S. income tax purposes in an amount equal to the difference between the amount of Cash (and other consideration received) under the Plan in respect of such Holder's Claim and the Holder's adjusted tax basis in the Claim. However, to the extent a U.S. Holder received any Cash (or other consideration) in satisfaction of any accrued and unpaid interest, such Holder may recognize ordinary income or loss to the extent that such Cash (or other consideration) is allocable to the accrued and unpaid interest, unless such Holder has previously included the accrued interest in such Holder's taxable income.

D.      NON-U.S. HOLDERS OF CLAIMS

A Non-U.S. Holder of a Claim generally will not be subject to the U.S. federal income tax with respect to any income or gain recognized upon the exchange of such Holder's Claim with Cash (or other property) pursuant to the Plan, unless (i) such Holder is engaged in a trade or business in the United States to which income, gain from the exchange is "effective connected" for U.S. federal income tax purposes, or (ii) if such Holder is an individual, such Holder is present in the United States for 183 days or more during the taxable year of the exchange and certain other requirements are met. To the extent any cash (or other consideration) is distributed for accrued and unpaid interest, however, a Non-U.S. Holder may be subject to U.S. withholding taxes at (30%) unless such Holder is qualified for the so-called "portfolio interest exemption" or eligible to claim a reduction or exemption under any applicable treaty and complies with certain required certification procedures.

E.      IMPORTANCE OF OBTAINING PROFESSIONAL TAX ASSISTANCE

The U.S. federal income tax consequences to a Holder other than a Holder receiving Cash (or other property) in satisfaction of such Holder's Claim may be different from the tax consequences described above. Holders of each such Claim should consult their tax advisers regarding potential federal income tax consequences.

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A CLAIM HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, CLAIM HOLDERS ARE URGED TO CONSULT THEIR TAX ADVISORS ABOUT THE U.S., STATE AND LOCAL, AND APPLICABLE FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

## X.    GLOSSARY OF DEFINED TERMS

For purposes herein:  (a) in the appropriate context, each term, whether stated in the singular or the plural, will include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender will include the masculine, feminine and the neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document will be substantially in that form or substantially on those terms and conditions; (c) any reference herein to an existing document or exhibit having been filed or to be filed will mean that document or exhibit, as it may thereafter be amended, modified or supplemented; (d) unless otherwise specified, all references herein to "Sections" are references to Sections hereof or hereto; (e) unless otherwise stated, the words ''herein,'' ''hereof'' and ''hereto'' refer to the Disclosure Statement in its entirety rather than to a particular portion of the Disclosure Statement; (f) captions and headings to Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (g) the rules of construction set forth in section 102 of the Bankruptcy Code will apply; and (h) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules will have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

Unless the context otherwise requires, the following terms will have the following meanings when used in capitalized form herein:

1.    "*Accrued Professional Compensation*" means, at any given moment, all accrued, contingent and/or unpaid fees and expenses (including, without limitation, success fees and Allowed Professional Compensation) for legal, financial advisory, accounting and other services and reimbursement of expenses that are awardable and allowable under sections 328, 330(a), 331 or 503 of the Bankruptcy Code or otherwise rendered allowable prior to the Confirmation Date by any Retained Professionals in the Chapter 11 Case, that the Bankruptcy Court has not denied by a Final Order, to the extent that any such fees and expenses have not been previously paid regardless of whether a fee application has been Filed for any such amount.

2.    "*Administrative Claim*" means any Claim for costs and expenses of administration of the Estate under sections 503(b), 507(b) or 1114(e)(2) of the Bankruptcy Code (excluding claims under section 503(b)(9) of the Bankruptcy Code), including, without limitation: (a) the actual and necessary costs and expenses incurred after the Commencement Date of preserving the Estate and operating the business of the Debtor; (b) Allowed Professional Compensation; and (c) all fees and charges assessed against the Estate under chapter 123 of title 28 of the United States Code, 28 U.S.C. §§ 1911-1930.

3.    "*Affiliate*" has the meaning set forth at section 101(2) of the Bankruptcy Code.

4.    "*Allowed*" means, with respect to Claims or Equity Interests:  (a) any Claim or Equity Interest, proof of which is timely Filed by the applicable Claims Bar Date (or which by the Bankruptcy Code or Final Order is not or shall not be required to be Filed); (b) any Claim or Equity Interest that is listed in the Schedules as of the Effective Date as not contingent, not unliquidated and not Disputed, and for which no Proof of Claim or Interest has been timely Filed; or (c) any Claim or Equity Interest Allowed pursuant to the Plan; *provided*, *however,* that with respect to any Claim or Equity Interest described in clause (a) above, such Claim or Equity Interest shall be considered Allowed only if and to the extent that (x) with respect to any Claim or Equity Interest, no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy Court, or (y) such an objection is so interposed and the Claim or Equity Interest shall have been Allowed for distribution purposes only by a Final Order.  Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated or disputed, and for which no Proof of Claim has been timely Filed, is not considered Allowed and shall be expunged without further action by the Debtor or the Reorganized Debtor and without any further notice to or action, order or approval of the Bankruptcy Court.

5.    "*Allowed Professional Compensation*" means all Accrued Professional Compensation allowed or awarded by a Final Order of the Bankruptcy Court or any other court of competent jurisdiction.

6.    "*Anderson Law*" means the Anderson Law Firm, Ltd., counsel to the committee of unsecured creditors.

7.        "*Assets*" means all of the Debtor's right, title and interest of any nature in property, wherever located, as specified in section 541 of the Bankruptcy Code.

8.        "*Avoidance Actions*" means any and all claims and causes of action which any of the Debtor, the debtor in possession, the Estate, or other appropriate party in interest has asserted or may assert under sections 502, 510, 542, 544, 545, or 547 through 553 of the Bankruptcy Code or under similar or related state or federal statutes and common law, including fraudulent transfer laws.

9.        "*AT*" means Armstrong Teasdale, LLP, litigation counsel to the Debtor in the North Carolina Litigation.

10.        "*Ballots*" means the ballots accompanying the Disclosure Statement upon which certain Holders of Impaired Claims (modified, as necessary, based on voting party in accordance with the Disclosure Statement Order) entitled to vote shall, among other things, indicate its acceptance or rejection of the Plan in accordance with the Plan and the procedures governing the solicitation process, and which must be actually received on or before the Voting Deadline.

11.        "*Bankruptcy Code*" means Chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 101-1532, as applicable to the Chapter 11 Case, and to the extent of the withdrawal of any reference under section 157 of Title 28 of the United States Code and/or the Order of the United States District Court for the District of Nevada pursuant to section 157(a) of Title 28 of the United States Code, the United States District Court for the District of Nevada.

12.        "*Bankruptcy Court*" means the United States Bankruptcy Court for the District of Nevada, having jurisdiction over the Chapter 11 Case, and to the extent of the withdrawal of any reference under section 157 of Title 28 of the United States Code and/or the Order of the United States District Court for the District of Nevada pursuant to section 157(a) of Title 28 of the United States Code, the United States District Court for the District of Nevada.

13.        "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Case, promulgated under 28 U.S.C. § 2075 or any otherwise applicable statutory enactment or authorization and the general, local and chambers rules of the Bankruptcy Court.

14.        "*BHFS*" means Brownstein Hyatt Farber Schreck, LLP, the Debtor's prior bankruptcy counsel.

15.        "*Business Day*" means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

16.        "*BHV*" means Brighthaven Ventures, LLC.

17.        "*Cash*" means the legal tender of the United States of America or the equivalent thereof.

18.        "*Causes of Action*" means all actions, causes of action (including Avoidance Actions), Claims, liabilities, obligations, rights, suits, debts, damages, judgments, remedies, demands, setoffs, defenses, recoupments, crossclaims, counterclaims, third-party claims, indemnity claims, contribution claims or any other claims disputed or undisputed, suspected or unsuspected, foreseen or unforeseen, direct or indirect, choate or inchoate, existing or hereafter arising, in law, equity or otherwise, based in whole or in part upon any act or omission or other event occurring prior to the Commencement Date or during the course of the Chapter 11 Case, including through the Effective Date.

19.        "*Chapter 11 Case*" means the chapter 11 case pending for the  Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court.

20.        "*Claim*" means any claim against a Debtor as defined in section 101(5) of the Bankruptcy Code.

21.      "*Claims Bar Date*" means, as applicable, (a) January 22, 2020, (b) the Governmental Bar Date, or (c) such other period of limitation as may be specifically fixed by an order of the Bankruptcy Court for Filing such Claims.

22.      "*Claims Objection Bar Date*" means, for each Claim, the later of (a) 180 days after the Effective Date and (b) such other period of limitation as may be specifically fixed by an order of the Bankruptcy Court for objecting to such Claims; *provided, however*, that in no event shall the Claims Objection Bar Date be greater than 120 days after the Effective Date with respect to any General Unsecured Claim in Class 4.

23.      "*Claims Register*" means the official register of Claims maintained by the Bankruptcy Court.

24.      "*Class*" means a category of Holders of Claims or Equity Interests as set forth in **Error! Reference source not found.** hereof pursuant to section 1122(a) of the Bankruptcy Code.

25.      "*Commencement Date" or "Petition Date*" means May 29, 2019, the date on which Debtor's bankruptcy case was commenced by the filing of an involuntary petition under 11 U.S.C. § 303 under chapter 7 of the Bankruptcy Code.

26.      "*Commission*" means the U.S. Securities and Exchange Commission.

27.      "*Confirmation*" means the entry of the Confirmation Order on the docket of the Chapter 11 Case, subject to all conditions specified in **Error! Reference source not found.** hereof having been:  (a) satisfied; or (b) waived pursuant to **Error! Reference source not found.** hereof.

28.      "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Case, within the meaning of Bankruptcy Rules 5003 and 9021.

29.      "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court on Confirmation of the Plan pursuant to section 1128(a) of the Bankruptcy Code, as such hearing may be continued from time to time.

30.      "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

31.      "*Consummation*" means the occurrence of the Effective Date.

32.      "*Creditor*" means a Holder of a Claim.

33.      "*Cure Claim*" means a Claim based upon the Debtor's default on an Executory Contract or Unexpired Lease at the time such contract or lease is assumed by the Debtor under sections 365 or 1123 of the Bankruptcy Code.

34.      "*Curiam*" means Curiam Investments 2 LLC.

35.      "*Debtor*" means Islet Sciences, Inc., in its capacity as a debtor in this Chapter 11 Case.

36.      "*Debtor in Possession*" means the Debtor, as debtor in possession in this Chapter 11 Case.

37.      "*Disclosure Statement*" means the *The Disclosure Statement for the Plan of Reorganization for Debtor Islet Sciences, Inc. Dated December 23, 2020*, as amended, supplemented or modified from time to time, including all exhibits and schedules thereto and references therein that relate to the Plan, that is prepared and distributed in accordance with the Bankruptcy Code, Bankruptcy Rules and any other applicable law.

38.      "*Disclosure Statement Motion*" means that certain *Motion for Order (i) Approving The Disclosure Statement; (ii) Approving The Form Of Ballots And Proposed Solicitation And Tabulation Procedures; (iii) Fixing The Voting Deadline With Respect To The Debtor's Chapter 11 Plan; (iv) Prescribing The Form And Manner Of*

*Notice Thereof; (v) Fixing The Last Date For Filing Objections To The Chapter 11 Plan; (vi) Scheduling A Hearing To Consider Confirmation Of The Chapter 11 Plan; and (vii) Appointing SL As Solicitation And Tabulation Agent,* filed with the Bankruptcy Court on _____, as the Motion may be amended from time to time.

39.    "*Disclosure Statement Order*" means that certain *Order (i) Approving The Disclosure Statement; (ii) Approving The Form Of Ballots And Proposed Solicitation And Tabulation Procedures; (iii) Fixing The Voting Deadline With Respect To The Debtor's Chapter 11 Plan; (iv) Prescribing The Form And Manner Of Notice Thereof; (v) Fixing The Last Date For Filing Objections To The Chapter 11 Plan; (vi) Scheduling A Hearing To Consider Confirmation Of The Chapter 11 Plan; and (vii) Appointing SL As Solicitation And Tabulation Agent,* approved by the Bankruptcy Court on _____, as the order may be amended from time to time.

40.    "*DIP Facility*" means the postpetition financing made available to the Debtor by WSF.

41.    "*DIP Facility Claim*" means Claims arising out of the DIP Facility.

42.    "*DIP Facility Motion*" means collectively the motions at Docket Nos. 11 and 361 seeking approval of post-petition financing.

43.    "*Disputed Claim*" means, with respect to any Claim or Equity Interests, any Claim or Equity Interests listed on (a) the Claims Register that is not yet Allowed, or (b) Scheduled as Disputed.

44.    "*Distribution Agent*" means the Debtor.

45.    "*Distribution Record Date"* means the date for determining which Holders of Claims are eligible to receive distributions hereunder and shall be the Voting Deadline or such other date as designated in an order of the Bankruptcy Court.

46.    "*Effective Date*" means the day that is the first Business Day occurring at least ten (10) days after the Confirmation Date on which: (a) no stay of the Confirmation Order is in effect; and (b) all conditions specified in **Error! Reference source not found.** hereof have been: (i) satisfied; or (ii) waived pursuant to **Error! Reference source not found.** hereof.

47.    "*Entity*" means an entity as defined in section 101(15) of the Bankruptcy Code.

48.    "*Equity Interest*" means any: (a) equity security in the Debtor, including all issued, unissued, authorized, or outstanding shares of stock, together with any warrants, options, or contractual rights to purchase or acquire such equity securities at any time and all rights arising with respect thereto or (b) partnership, limited liability company, or similar interest in the Debtor.

49.    "*Estate*" means, as to the Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

50.    "*Exchange Act"* means the Securities Act of 1933, 15 U.S.C. §§ 77a-77aa, or any similar federal, state or local law.

51.    "*Exculpated Parties*" means, collectively, and in this case in its capacity as such: (a) the Debtor and the Reorganized Debtor; (b) any official committees appointed in the Chapter 11 Cases and each of their respective members; (c) WSF; (d) Curiam; and (e) with respect to each of the foregoing entities, each such Entity's current and former predecessors, successors, affiliates (regardless of whether such interests are held directly or indirectly), subsidiaries, direct and indirect equity holders, funds, portfolio companies, management companies, consultants, financial advisors, and attorneys (each in their capacity as such).

52.    "*Executory Contract*" means a contract to which the Debtor is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

53.    "*Existing Equity Interests*" means any Equity Security, including all issued, unissued, authorized, or outstanding shares of capital stock and any other common stock, preferred stock, limited liability company interests, and any other equity, ownership, or profit interests of the Debtor, including all options, warrants, rights, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable, or exchangeable securities, or other agreements, whether or not arising under or in connection with any employment agreement and whether or not certificated, transferable, preferred, common, voting, or denominated "stock" or a similar security.

54.    "*Fee Claim*" means a Claim under sections 328, 330(a), 331, 363, 503 or 1103 of the Bankruptcy Code for Accrued Professional Compensation.

55.    "*File*" or "*Filed*" means file, filed or filing with the Bankruptcy Court or its authorized designee in this Chapter 11 Case.

56.    "*Final Order*" means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction with respect to the subject matter, as entered on the docket in the Chapter 11 Case or the docket of any court of competent jurisdiction, that has not been reversed, stayed, modified or amended, and as to which the time to appeal, or seek certiorari or move for a new trial, reargument or rehearing has expired and no appeal or petition for certiorari or other proceedings for a new trial, reargument or rehearing been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been timely Filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument or rehearing shall have been denied, resulted in no modification of such order or has otherwise been dismissed with prejudice.

57.    "*General Unsecured Claim*" means claim against the Debtor that is not (i) an Administrative Claim, (ii) a Priority Tax Claim, (iii) Priority Non-Tax Claim, or (iv) Secured Claim.

58.    "*Governmental Bar Date*" means March 16, 2020.

59.    "*Green*" means James Green.

60.    "*Holder*" means an Entity holding a Claim or an Equity Interest.

61.    "*Impaired*" means any Claims in an Impaired Class.

62.    "*Impaired Class*" means an impaired Class within the meaning of section 1124 of the Bankruptcy Code.

63.    "*Indemnified Parties*" means the Distribution Agent, and its respective agents, employees, officers, directors, professionals, attorneys, accountants, advisors, representatives and principals.

64.    "*Initial Distribution Date*" means the date that is as soon as practicable after the Effective Date, but no later than thirty (30) days after the Effective Date, when distributions under the Plan shall commence.

65.    "*Involuntary Petition*" means the involuntary petition for relief filed by the Petition Creditors on the Petition Date.

66.    "*JPF*" means JPF Securities Law, LLC, the Debtors securities law counsel.

67.    "*Litigation Financing*" means the prepetition and postpetition credit facility made by Curiam to the Debtor secured by Debtor's recovery, if any, in the North Carolina Litigation.

68.    "*Motion to Convert*" means the motion to convert the case to one under Chapter 11 at Docket No. 9.

69.    "*NERA*" means the National Economic Research Associates, Inc., the Debtor's expert witness for purposed of the North Carolina Litigation.

70.    "*New Board*" means the board of directors or the board of managers of the Reorganized Debtor.

71.    "*New Equity" or "New Equity Interests*" means the equity in the Reorganized Debtor to be authorized, issues or reserved on the Effective Date of the Plan, which shall constitute all of the direct or indirect equity of the Reorganized Debtor.

72.    "*New Equity Holders*" means Holders of Claims entitled to receive New Equity under Article III of the Plan and the participants in the Management Incentive Plan.

73.    "*New Organizational Documents*" means the form of the certificates or articles of incorporation, bylaws, and applicable shareholder agreements or such other applicable formation documents of Reorganized Debtor.

74.    "*North Carolina Litigation*" means case 5:19-cv-00145-D, brought by Islet against Wilkison, Green, BHV and Avolynt, for breach of contract, breach of fiduciary duty, unjust enrichment, fraud and constructive trust, currently being litigated in the Eastern District of North Carolina.

75.    "*North Carolina State Court Litigation*" means the case brought by Islet against Green, Wilkison, and BHV in the Court for the State of North Carolina, Superior Division.

76.    *"Periodic Distribution Date"* means the first Business Day that is as soon as reasonably practicable occurring no later than approximately 180 days after the Initial Distribution Date, and thereafter, the first Business Day that is as soon as reasonably practicable occurring no later than 180 days after the immediately preceding Periodic Distribution Date.

77.    "*Person*" means a person as defined in section 101(41) of the Bankruptcy Code.

78.    *"Petition Date"* means May 29, 2019, the date on which the Petitioning Creditors filed the Involuntary Petition.

79.    *"Petitioning Creditors"* means Green, Wilkison, BHV, Kevin M. Long, VACO Raleigh, LLC, Steve Delmar, and Apex Biostatistics, Inc.

80.    *"Petitioning Creditors Equity Pool"* means the New Equity allocated to the Petitioning Creditors held in reserve by the Reorganized Debtor pending the outcome of the North Carolina Litigation for the for satisfaction of any Judgment arising out of North Carolina Litigation, if any, and the North Carolina State Court Litigation.

81.    "*PKF*" means PKF San Diego, tax accountant to the Debtor.

82.    "*PPP*" means Portage Point Partners, LLC, Debtor's financial advisor in the Chapter 11 Case.

83.    "*Plan*" means this *Plan of Reorganization of the Debtor Under Chapter 11 of the Bankruptcy Code*, including, without limitation, the Plan Supplement, which is incorporated herein by reference.

84.    "*Plan Supplement*" means, collectively, the compilation of documents and forms of documents, and all exhibits, attachments, schedules, agreements, documents and instruments referred to therein, ancillary or otherwise, all of which are incorporated by reference into, and are an integral part of, the Plan, as all of the same may be amended, modified, replaced and/or supplemented from time to time in accordance with the terms hereof and the Bankruptcy Code and the Bankruptcy Rules.

85.    "*Priority Non-Tax Claim*" means any Claim accorded priority in right of payment pursuant to section 507(a) of the Bankruptcy Code, other than a Priority Tax Claim or an Administrative Claim.

86.    "*Priority Tax Claim*" means any Claim of a governmental unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

87.    "*Proof of Claim*" means a proof of Claim Filed against the Debtor in the Chapter 11 Case.

88.    "*Proof of Interest*" means proof of Equity Interest filed against the Debtor in the Chapter 11 Case.

89.    "*Pro Rata*" means the proportion that an Allowed Claim or Equity Interest in a particular Class bears to the aggregate amount of Allowed Claims or Equity Interests in that Class, or the proportion that Allowed Claims or Equity Interests in a particular Class bear to the aggregate amount of Allowed Claims or Equity Interests in a particular Class and other Classes entitled to share in the same recovery as such Allowed Claim or Equity Interests under the Plan.

90.    "*Protective Order*" means the Order on Motion for Protective Order at Docket No. 134 executed by the Petitioning Creditors, the UCC, the individual members of the UCC, and the Debtor.

91.    "*Record Date*" means the close of business on 90 days from the Effective Date.

92.    "*Reorganized Debtor*" means the Debtor, or any successor thereto, by merger, consolidation or otherwise, on or after the Effective Date.

93.    "*Restructuring Transactions*" means transactions necessary or appropriate to affect a restructuring of Debtor's businesses or the overall organizational structure of the Reorganized Debtor as set forth in Section III.E.2 of the Disclosure Statement.

94.    "*Retained Professional*" means any Entity: (a) employed in this Chapter 11 Case pursuant to a Final Order in accordance with sections 327 and 1103 of the Bankruptcy Code and to be compensated for services rendered prior to the Effective Date, pursuant to sections 327, 328, 329, 330 or 331 of the Bankruptcy Code; or (b) for which compensation and reimbursement has been allowed by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

95.    "*Schedules*" mean, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases and statements of financial affairs Filed by the Debtor pursuant to section 521 of the Bankruptcy Code and in substantial compliance with the Official Bankruptcy Forms, as the same may have been amended, modified or supplemented from time to time.

96.    "*Schwartz Law*" means Schwartz Law, PLLC, bankruptcy counsel to the Debtor.

97.    "*Secured*" means a Claim secured by a Lien on property in which the Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is secured pursuant to section 365(j) of the Bankruptcy Code, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, in each case to the extent of the value of the creditor's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code.

98.    "*Securities Act*" means the United States Securities Act of 1933, as amended.

99.    "*Signature*" means Signature Analytics, accountant to the Debtor.

100.    "*Solicitation Deadline*" means the close of business on _____.

101.    "*Stifel*" means Stifel Financial Corp.

102.    "*Tort Claim*" means any Claim that has not been settled, compromised or otherwise resolved that: (a) arises out of allegations of personal injury, wrongful death, property damage, products liability or similar legal

theories of recovery; or (b) arises under any federal, state or local statute, rule, regulation or ordinance governing, regulating or relating to protection of human health, safety or the environment.

103.    "*UCC*" means the committee of unsecured creditors.

104.    "*Unexpired Lease*" means a lease to which the Debtor is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.  "*Unimpaired*" means, with respect to a Class of Claims or Equity Interests, a Claim or an Equity Interest that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

105.    "*Unimpaired Class*" means an unimpaired Class within the meaning of section 1124 of the Bankruptcy Code.

106.    "*Unimpaired Claim*" means any Claim in an Unimpaired Class.

107.    "*Valuation*" means  thevaluation prepared by the Debtor's valuation professionals, Portage Point Partners, attached as Exhibit B to the Disclsure Statement.

108.    "*Voting Classes*" means impaired Classes entitled to vote found in Article III. B. of the Plan.

109.    "*Voting Deadline"* means _____, 2020 at 5:00 p.m. prevailing Pacific Time for all Holders of Claims, which is the date and time by which all Ballots must be received by the Debtor in accordance with the Disclosure Statement Order, or such other date and time as may be established by the Bankruptcy Court with respect to any Voting Class.

110.    "*Wilkison*" means William Wilkison.

111.    "*WM*" means Williams Mullen, the Debtor's local counsel in the North Carolina Litigation.

112.    "*WSF*" Western States Funding, LLC.

## XI.    RECOMMENDATION

In the opinion of the Debtor, the Plan is preferable to the alternatives described in this Disclosure Statement because it provides for a larger distribution to the Debtor's creditors than would otherwise result in a liquidation under chapter 7 of the Bankruptcy Code.  In addition, any alternative other than Confirmation of the Plan could result in extensive delays and increased administrative expenses resulting in smaller distributions to Holders of Allowed Claims than that which is proposed under the Plan.  Accordingly, the Debtor recommends that Holders of Claims entitled to vote on the Plan support Confirmation of the Plan and vote to accept the Plan.

Respectfully submitted,

Iselt Scienes, Inc. a Nevada Corporation

By:    /s/John Steel, IV

Its Chief Executive Officer

/s/ Samuel A. Schwartz
Samuel A. Schwartz, Esq.
Schwartz Law, PLLC
Attorneys for the Debtor

**EXHIBITS**

**Exhibit A –** Copy of Proposed Plan of Reorganization

**Exhibit B** – Valuation Report of the Debtor - Subject to Protective Order, *See* Docket No. 134

**Exhibit C** - Liquidation Analysis

**Exhibit D** – Financial Projections

19142554

# Exhibit A

Samuel A. Schwartz, Esq.
Nevada Bar No. 10985
saschwartz@nvfirm.com
SCHWARTZ LAW, PLLC
601 East Bridger Avenue
Las Vegas, NV 89101
Telephone: 702.385.5544
Facsimile: 702.385.2741

*Attorneys for the Debtor*

**UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF NEVADA**

| | | |
|---|---|---|
| In re: | ) | Case No.: 19-13366-MKN |
| | ) | |
| Islet Sciences, Inc., a Nevada corporation, | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | Hearing Date: February 17, 2021 |
| | ) | Hearing Time: 9:30 a.m. |
| | ) | |
| _____ | ) | |

**THE PLAN OF REORGANIZATION**
**OF ISLET SCIENCES, INC., UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

**TABLE OF CONTENTS**

ARTICLE I. RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW AND
    DEFINED TERMS ...................................................................................................................1
    A.    Rules of Interpretation, Computation of Time and Governing Law ...................................1
    B.    Governing Law. ...................................................................................................................8
    C.    Reference to Monetary Figures. ..........................................................................................8
    D.    Controlling Document. .........................................................................................................8

ARTICLE II. ADMINISTRATIVE CLAIMS, DIP FACILITY CLAIMS, PRIORITY TAX CLAIMS,
    AND PROFESSIONAL COMPENSATION ..........................................................................9
    A.    Administrative Claims .........................................................................................................9
    B.    DIP Facility Claims..............................................................................................................9
    C.    Priority Tax Claims ............................................................................................................10
    D.    Professional Compensation ................................................................................................10

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS AND EQUITY
    INTERESTS..........................................................................................................................10
    A.    Summary .............................................................................................................................10
    B.    Classification and Treatment of Claims and Equity Interests ...........................................11
    C.    Discharge of Claims ...........................................................................................................12

ARTICLE IV. ACCEPTANCE OR REJECTION OF THE PLAN ........................................................12
    A.    Presumed Acceptance of Plan ............................................................................................12
    B.    Voting Classes ....................................................................................................................12
    C.    Acceptance by Impaired Classes of Claims .......................................................................12
    D.    Cramdown ...........................................................................................................................13
    E.    Elimination of Vacant Classes ...........................................................................................13

ARTICLE V. MEANS FOR IMPLEMENTATION OF THE PLAN ......................................................13
    A.    General Settlement of Claims and Interests. ......................................................................13
    B.    Restructuring Transactions .................................................................................................13
    C.    The Reorganized Debtor. ...................................................................................................14
    D.    Sourced of Consideration for Plan Distribution. ...............................................................15
    E.    Corporate Existence. ..........................................................................................................15
    F.    Vesting of Assets in the Reorganized Debtor ...................................................................15
    G.    Corporate Action. ...............................................................................................................15
    H.    New Organizational Documents. ........................................................................................16
    I.    New Equity Interests...........................................................................................................16
    J.    Directors and Officers of the Reorganized Debtor. ..........................................................16
    K.    Effectuating Documents; Further Transactions. ................................................................16
    L.    Certain Securities Law Matters. .........................................................................................17
    M.    Section 1146 Exemption. ...................................................................................................17
    N.    Preservation of Causes of Action; Waiver of Avoidance Actions. ...................................18
    O.    Closing the Chapter 11 Case. .............................................................................................18

ARTICLE VI. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES............18
    A.    Assumption and Rejection of Executory Contracts and Unexpired Leases .......................18
    B.    Claims on Account of the Rejection of Executory Contracts or Unexpired Leases.....................19
    C.    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases....................19
    D.    Contracts and Leases Entered Into After the Commencement Date ..................................20

ARTICLE VII. PROVISIONS GOVERNING DISTRIBUTIONS.........................................................20
    A.    Distributions for Claims Allowed as of the Effective Date................................................20
    B.    Distributions on Account of Claims Allowed After the Effective Date.............................20

C.    Delivery and Distributions and Undeliverable or Unclaimed Distributions ................................... 20
D.    Compliance with Tax Requirements/Allocations ............................................................................. 22
E.    Timing and Calculation of Amounts to Be Distributed ................................................................. 23
F.    Setoffs .............................................................................................................................................. 23

ARTICLE VIII. PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED AND
DISPUTED CLAIMS .................................................................................................................................. 23
A.    Resolution of Disputed Claims ...................................................................................................... 23
B.    Disallowance of Claims .................................................................................................................. 24
C.    Amendments to Claims ................................................................................................................... 25

ARTICLE IX. CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE
PLAN ......................................................................................................................................................... 25
A.    Conditions Precedent to Confirmation ........................................................................................... 25
B.    Conditions Precedent to Consummation ......................................................................................... 25
C.    Waiver of Conditions ...................................................................................................................... 25
D.    Effect of Non-Occurrence of Conditions to Consummation .......................................................... 25

ARTICLE X. SETTLEMENT, RELEASE AND RELATED PROVISIONS ............................................. 26
A.    Discharge of Claims and Termination of Interests ........................................................................ 26
B.    Release of Liens. .............................................................................................................................. 26
C.    Exculpation. ..................................................................................................................................... 26
D.    Injunction. ........................................................................................................................................ 27
E.    Protections Against Discriminatory Treatment. .............................................................................. 27
F.    Document Retention. ....................................................................................................................... 27
G.    Reimbursement or Contribution. .................................................................................................... 27

ARTICLE XI. BINDING NATURE OF PLAN .......................................................................................... 28

ARTICLE XII. RETENTION OF JURISDICTION .................................................................................... 28

ARTICLE XIII. MISCELLANEOUS PROVISIONS ................................................................................. 29
A.    Payment of Statutory Fees .............................................................................................................. 29
B.    Modification of Plan ........................................................................................................................ 29
C.    Revocation of Plan .......................................................................................................................... 29
D.    Successors and Assigns .................................................................................................................... 29
E.    Reservation of Rights ...................................................................................................................... 29
F.    Further Assurances ........................................................................................................................... 30
G.    Severability ...................................................................................................................................... 30
H.    Service of Documents ...................................................................................................................... 30
I.    Filing of Additional Documents ...................................................................................................... 30
J.    Default .............................................................................................................................................. 30

## THE PLAN OF REORGANIZATION
## OF ISLET SCIENCES, INC., UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

Islet Sciences, Inc. ("**Debtor**"), the debtor and debtor-in-possession in the above-referenced case, proposes the following plan of reorganization (the "**Plan**") for the resolution of the outstanding claims against, and equity interests in, the Debtor.  The Debtor is the proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code (as defined below).  Reference is made to the Debtor's Disclosure Statement, for a discussion of the Debtor's history, business, results of operations, historical financial information, accomplishments during the Chapter 11 Cases (as defined below), projections and properties, and for a summary and analysis of this Plan and the treatment provided for herein.  There also are other agreements and documents, which are or will be filed with the Bankruptcy Court, that are referenced in this Plan or the Disclosure Statement.

# ARTICLE I.

## RULES OF INTERPRETATION, COMPUTATION OF TIME,
## GOVERNING LAW AND DEFINED TERMS

A.      *Rules of Interpretation, Computation of Time and Governing Law*

1.      "*Accrued Professional Compensation*" means, at any given moment, all accrued, contingent and/or unpaid fees and expenses (including, without limitation, success fees and Allowed Professional Compensation) for legal, financial advisory, accounting and other services and reimbursement of expenses that are awardable and allowable under sections 328, 330(a), 331 or 503 of the Bankruptcy Code or otherwise rendered allowable prior to the Confirmation Date by any Retained Professionals in the Chapter 11 Case, that the Bankruptcy Court has not denied by a Final Order, to the extent that any such fees and expenses have not been previously paid regardless of whether a fee application has been Filed for any such amount.

2.      "*Administrative Claim*" means any Claim for costs and expenses of administration of the Estate under sections 503(b), 507(b) or 1114(e)(2) of the Bankruptcy Code (excluding claims under section 503(b)(9) of the Bankruptcy Code), including, without limitation: (a) the actual and necessary costs and expenses incurred after the Commencement Date of preserving the Estate and operating the business of the Debtor; (b) Allowed Professional Compensation; and (c) all fees and charges assessed against the Estate under chapter 123 of title 28 of the United States Code, 28 U.S.C. §§ 1911-1930.

3.      "*Affiliate*" has the meaning set forth at section 101(2) of the Bankruptcy Code.

4.      "*Allowed*" means, with respect to Claims or Equity Interests:  (a) any Claim or Equity Interest, proof of which is timely Filed by the applicable Claims Bar Date (or which by the Bankruptcy Code or Final Order is not or shall not be required to be Filed); (b) any Claim or Equity Interest that is listed in the Schedules as of the Effective Date as not contingent, not unliquidated and not Disputed, and for which no Proof of Claim or Interest has been timely Filed; or (c) any Claim or Equity Interest Allowed pursuant to the Plan; *provided*, *however,* that with respect to any Claim or Equity Interest described in clause (a) above, such Claim or Equity Interest shall be considered Allowed only if and to the extent that (x) with respect to any Claim or Equity Interest, no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy Court, or (y) such an objection is so interposed and the Claim or Equity Interest shall have been Allowed for distribution purposes only by a Final Order.  Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated or disputed, and for which no Proof of Claim has been timely Filed, is not considered Allowed and shall be expunged without further action by the Debtor or the Reorganized Debtor and without any further notice to or action, order or approval of the Bankruptcy Court.

5.      "*Allowed Professional Compensation*" means all Accrued Professional Compensation allowed or awarded by a Final Order of the Bankruptcy Court or any other court of competent jurisdiction.

1

6.        "*Anderson Law*" means the Anderson Law Firm, Ltd., counsel to the committee of unsecured creditors.

7.        "*Assets*" means all of the Debtor's right, title and interest of any nature in property, wherever located, as specified in section 541 of the Bankruptcy Code.

8.        "*Avoidance Actions*" means any and all claims and causes of action which any of the Debtor, the debtor in possession, the Estate, or other appropriate party in interest has asserted or may assert under sections 502, 510, 542, 544, 545, or 547 through 553 of the Bankruptcy Code or under similar or related state or federal statutes and common law, including fraudulent transfer laws.

9.        "*AT*" means Armstrong Teasdale, LLP, litigation counsel to the Debtor in the North Carolina Litigation.

10.        "*Ballots*" means the ballots accompanying the Disclosure Statement upon which certain Holders of Impaired Claims (modified, as necessary, based on voting party in accordance with the Disclosure Statement Order) entitled to vote shall, among other things, indicate its acceptance or rejection of the Plan in accordance with the Plan and the procedures governing the solicitation process, and which must be actually received on or before the Voting Deadline.

11.        "*Bankruptcy Code*" means Chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 101-1532, as applicable to the Chapter 11 Case, and to the extent of the withdrawal of any reference under section 157 of Title 28 of the United States Code and/or the Order of the United States District Court for the District of Nevada pursuant to section 157(a) of Title 28 of the United States Code, the United States District Court for the District of Nevada.

12.        "*Bankruptcy Court*" means the United States Bankruptcy Court for the District of Nevada, having jurisdiction over the Chapter 11 Case, and to the extent of the withdrawal of any reference under section 157 of Title 28 of the United States Code and/or the Order of the United States District Court for the District of Nevada pursuant to section 157(a) of Title 28 of the United States Code, the United States District Court for the District of Nevada.

13.        "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Case, promulgated under 28 U.S.C. § 2075 or any otherwise applicable statutory enactment or authorization and the general, local and chambers rules of the Bankruptcy Court.

14.        "*BHFS*" means Brownstein Hyatt Farber Schreck, LLP, the Debtor's prior bankruptcy counsel.

15.        "*Business Day*" means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

16.        "*BHV*" means Brighthaven Ventures, LLC.

17.        "*Cash*" means the legal tender of the United States of America or the equivalent thereof.

18.        "*Causes of Action*" means all actions, causes of action (including Avoidance Actions), Claims, liabilities, obligations, rights, suits, debts, damages, judgments, remedies, demands, setoffs, defenses, recoupments, crossclaims, counterclaims, third-party claims, indemnity claims, contribution claims or any other claims disputed or undisputed, suspected or unsuspected, foreseen or unforeseen, direct or indirect, choate or inchoate, existing or hereafter arising, in law, equity or otherwise, based in whole or in part upon any act or omission or other event occurring prior to the Commencement Date or during the course of the Chapter 11 Case, including through the Effective Date.

19.        "*Chapter 11 Case*" means the chapter 11 case pending for the Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court.

20.        "*Claim*" means any claim against a Debtor as defined in section 101(5) of the Bankruptcy Code.

21.     "*Claims Bar Date*" means, as applicable, (a) January 22, 2020, (b) the Governmental Bar Date, or (c) such other period of limitation as may be specifically fixed by an order of the Bankruptcy Court for Filing such Claims.

22.     "*Claims Objection Bar Date*" means, for each Claim, the later of (a) 180 days after the Effective Date and (b) such other period of limitation as may be specifically fixed by an order of the Bankruptcy Court for objecting to such Claims; *provided, however*, that in no event shall the Claims Objection Bar Date be greater than 120 days after the Effective Date with respect to any General Unsecured Claim in Class 4.

23.     "*Claims Register*" means the official register of Claims maintained by the Bankruptcy Court.

24.     "*Class*" means a category of Holders of Claims or Equity Interests as set forth in Article III hereof pursuant to section 1122(a) of the Bankruptcy Code.

25.     "*Commencement Date*" or "*Petition Date*" means May 29, 2019, the date on which Debtor's bankruptcy case was commenced by the filing of an involuntary petition under 11 U.S.C. § 303 under chapter 7 of the Bankruptcy Code.

26.     "*Commission*" means the U.S. Securities and Exchange Commission.

27.     "*Confirmation*" means the entry of the Confirmation Order on the docket of the Chapter 11 Case, subject to all conditions specified in Article IX hereof having been:  (a) satisfied; or (b) waived pursuant to Article IX.C hereof.

28.     "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Case, within the meaning of Bankruptcy Rules 5003 and 9021.

29.     "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court on Confirmation of the Plan pursuant to section 1128(a) of the Bankruptcy Code, as such hearing may be continued from time to time.

30.     "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

31.     "*Consummation*" means the occurrence of the Effective Date.

32.     "*Creditor*" means a Holder of a Claim.

33.     "*Cure Claim*" means a Claim based upon the Debtor's default on an Executory Contract or Unexpired Lease at the time such contract or lease is assumed by the Debtor under sections 365 or 1123 of the Bankruptcy Code.

34.     "*Curiam*" means Curiam Investments 2 LLC.

35.     "*Debtor*" means Islet Sciences, Inc., in its capacity as a debtor in this Chapter 11 Case.

36.     "*Debtor in Possession*" means the Debtor, as debtor in possession in this Chapter 11 Case.

37.     "*Disclosure Statement*" means the *The Disclosure Statement for the Plan of Reorganization for Debtor Islet Sciences, Inc. Dated December 23, 2020*, as amended, supplemented or modified from time to time, including all exhibits and schedules annexed thereto and references therein that relate to the Plan, that is prepared and distributed in accordance with the Bankruptcy Code, Bankruptcy Rules and any other applicable law.

38.     "*Disclosure Statement Motion*" means that certain *Motion for Order (i) Approving The Disclosure Statement; (ii) Approving The Form Of Ballots And Proposed Solicitation And Tabulation Procedures; (iii) Fixing The Voting Deadline With Respect To The Debtor's Chapter 11 Plan; (iv) Prescribing The Form And Manner Of*

3

*Notice Thereof; (v) Fixing The Last Date For Filing Objections To The Chapter 11 Plan; (vi) Scheduling A Hearing To Consider Confirmation Of The Chapter 11 Plan; and (vii) Appointing SL As Solicitation And Tabulation Agent,* filed with the Bankruptcy Court on _____, as the Motion may be amended from time to time.

39.     "*Disclosure Statement Order*" means that certain *Order (i) Approving The Disclosure Statement; (ii) Approving The Form Of Ballots And Proposed Solicitation And Tabulation Procedures; (iii) Fixing The Voting Deadline With Respect To The Debtor's Chapter 11 Plan; (iv) Prescribing The Form And Manner Of Notice Thereof; (v) Fixing The Last Date For Filing Objections To The Chapter 11 Plan; (vi) Scheduling A Hearing To Consider Confirmation Of The Chapter 11 Plan; and (vii) Appointing SL As Solicitation And Tabulation Agent,* approved by the Bankruptcy Court on _____, as the order may be amended from time to time.

40.     "*DIP Facility*" means the postpetition financing made available to the Debtor by WSF.

41.     "*DIP Facility Claim*" means Claims arising out of the DIP Facility.

42.     "*DIP Facility Motion*" means collectively the motions at Docket Nos. 11 and 361 seeking approval of post-petition financing.

43.     "*Disputed Claim*" means, with respect to any Claim or Equity Interests, any Claim or Equity Interests listed on (a) the Claims Register that is not yet Allowed, or (b) Scheduled as Disputed.

44.     "*Distribution Agent*" means the Debtor.

45.     "*Distribution Record Date*" means the date for determining which Holders of Claims are eligible to receive distributions hereunder and shall be the Voting Deadline or such other date as designated in an order of the Bankruptcy Court.

46.     "*Effective Date*" means the day that is the first Business Day occurring at least ten (10) days after the Confirmation Date on which: (a) no stay of the Confirmation Order is in effect; and (b) all conditions specified in Article IX.B hereof have been: (i) satisfied; or (ii) waived pursuant to Article IX.C hereof.

47.     "*Entity*" means an entity as defined in section 101(15) of the Bankruptcy Code.

48.     "*Equity Interest*" means any: (a) equity security in the Debtor, including all issued, unissued, authorized, or outstanding shares of stock, together with any warrants, options, or contractual rights to purchase or acquire such equity securities at any time and all rights arising with respect thereto or (b) partnership, limited liability company, or similar interest in the Debtor.

49.     "*Estate*" means, as to the Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

50.     "*Exchange Act*" means the Securities Act of 1933, 15 U.S.C. §§ 77a-77aa, or any similar federal, state or local law.

51.     "*Exculpated Parties*" means, collectively, and in this case in its capacity as such: (a) the Debtor and the Reorganized Debtor; (b) any official committees appointed in the Chapter 11 Cases and each of their respective members; (c) WSF; (d) Curiam; and (e) with respect to each of the foregoing entities, each such Entity's current and former predecessors, successors, affiliates (regardless of whether such interests are held directly or indirectly), subsidiaries, direct and indirect equity holders, funds, portfolio companies, management companies, consultants, financial advisors, and attorneys (each in their capacity as such).

52.     "*Executory Contract*" means a contract to which the Debtor is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

53.    "*Existing Equity Interests*" means any Equity Security, including all issued, unissued, authorized, or outstanding shares of capital stock and any other common stock, preferred stock, limited liability company interests, and any other equity, ownership, or profit interests of the Debtor, including all options, warrants, rights, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable, or exchangeable securities, or other agreements, whether or not arising under or in connection with any employment agreement and whether or not certificated, transferable, preferred, common, voting, or denominated "stock" or a similar security.

54.    "*Fee Claim*" means a Claim under sections 328, 330(a), 331, 363, 503 or 1103 of the Bankruptcy Code for Accrued Professional Compensation.

55.    "*File*" or "*Filed*" means file, filed or filing with the Bankruptcy Court or its authorized designee in this Chapter 11 Case.

56.    "*Final Order*" means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction with respect to the subject matter, as entered on the docket in the Chapter 11 Case or the docket of any court of competent jurisdiction, that has not been reversed, stayed, modified or amended, and as to which the time to appeal, or seek certiorari or move for a new trial, reargument or rehearing has expired and no appeal or petition for certiorari or other proceedings for a new trial, reargument or rehearing been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been timely Filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument or rehearing shall have been denied, resulted in no modification of such order or has otherwise been dismissed with prejudice.

57.    "*General Unsecured Claim*" means claim against the Debtor that is not (i) an Administrative Claim, (ii) a Priority Tax Claim, (iii) Priority Non-Tax Claim, or (iv) Secured Claim.

58.    "*Governmental Bar Date*" means March 16, 2020.

59.    "*Green*" means James Green.

60.    "*Holder*" means an Entity holding a Claim or an Equity Interest.

61.    "*Impaired*" means any Claims in an Impaired Class.

62.    "*Impaired Class*" means an impaired Class within the meaning of section 1124 of the Bankruptcy Code.

63.    "*Indemnified Parties*" means the Distribution Agent, and its respective agents, employees, officers, directors, professionals, attorneys, accountants, advisors, representatives and principals.

64.    "*Initial Distribution Date*" means the date that is as soon as practicable after the Effective Date, but no later than thirty (30) days after the Effective Date, when distributions under the Plan shall commence.

65.    "*Involuntary Petition*" means the involuntary petition for relief filed by the Petition Creditors on the Petition Date.

66.    "*JPF*" means JPF Securities Law, LLC, the Debtors securities law counsel.

67.    "*Litigation Financing*" means the prepetition and postpetition credit facility made by Curiam to the Debtor secured by Debtor's recovery, if any, in the North Carolina Litigation.

68.    "*Motion to Convert*" means the motion to convert the case to one under Chapter 11 at Docket No. 9.

69.    "*NERA*" means the National Economic Research Associates, Inc., the Debtor's expert witness for purposed of the North Carolina Litigation.

70.    "*New Board*" means the board of directors or the board of managers of the Reorganized Debtor.

71.    "*New Equity" or "New Equity Interests*" means the equity in the Reorganized Debtor to be authorized, issues or reserved on the Effective Date of the Plan, which shall constitute all of the direct or indirect equity of the Reorganized Debtor.

72.    "*New Equity Holders*" means Holders of Claims entitled to receive New Equity under Article III of the Plan and the participants in the Management Incentive Plan.

73.    "*New Organizational Documents*" means the form of the certificates or articles of incorporation, bylaws, and applicable shareholder agreements or such other applicable formation documents of Reorganized Debtor.

74.    "*North Carolina Litigation*" means case 5:19-cv-00145-D, brought by Islet against Wilkison, Green, BHV and Avolynt, for breach of contract, breach of fiduciary duty, unjust enrichment, fraud and constructive trust, currently being litigated in the Eastern District of North Carolina.

75.    "*North Carolina State Court Litigation*" means the case brought by Islet against Green, Wilkison, and BHV in the Court for the State of North Carolina, Superior Division.

76.    "*Periodic Distribution Date*" means the first Business Day that is as soon as reasonably practicable occurring no later than approximately 180 days after the Initial Distribution Date, and thereafter, the first Business Day that is as soon as reasonably practicable occurring no later than 180 days after the immediately preceding Periodic Distribution Date.

77.    "*Person*" means a person as defined in section 101(41) of the Bankruptcy Code.

78.    "*Petition Date*" means May 29, 2019, the date on which the Petitioning Creditors filed the Involuntary Petition.

79.    "*Petitioning Creditors*" means Green, Wilkison, BHV, Kevin M. Long, VACO Raleigh, LLC, Steve Delmar, and Apex Biostatistics, Inc.

80.    "*Petitioning Creditors Equity Pool*" means the New Equity allocated to the Petitioning Creditors held in reserve by the Reorganized Debtor pending the outcome of the North Carolina Litigation for the for satisfaction of any Judgment arising out of North Carolina Litigation, if any, and the North Carolina State Court Litigation.

81.    "*PKF*" means PKF San Diego, tax accountant to the Debtor.

82.    "*PPP*" means Portage Point Partners, LLC, Debtor's financial advisor in the Chapter 11 Case.

83.    "*Plan*" means this *Plan of Reorganization of the Debtor Under Chapter 11 of the Bankruptcy Code* dated October _____, 2020, as amended, supplemented or modified from time to time, including, without limitation, the Plan Supplement, which is incorporated herein by reference.

84.    "*Plan Supplement*" means, collectively, the compilation of documents and forms of documents, and all exhibits, attachments, schedules, agreements, documents and instruments referred to therein, ancillary or otherwise, all of which are incorporated by reference into, and are an integral part of, the Plan, as all of the same may be amended, modified, replaced and/or supplemented from time to time in accordance with the terms hereof and the Bankruptcy Code and the Bankruptcy Rules.

85.    "*Priority Non-Tax Claim*" means any Claim accorded priority in right of payment pursuant to section 507(a) of the Bankruptcy Code, other than a Priority Tax Claim or an Administrative Claim.

86. "*Priority Tax Claim*" means any Claim of a governmental unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

87. "*Proof of Claim*" means a proof of Claim Filed against the Debtor in the Chapter 11 Case.

88. "*Proof of Interest*" means proof of Equity Interest filed against the Debtor in the Chapter 11 Case.

89. "*Pro Rata*" means the proportion that an Allowed Claim or Equity Interest in a particular Class bears to the aggregate amount of Allowed Claims or Equity Interests in that Class, or the proportion that Allowed Claims or Equity Interests in a particular Class bear to the aggregate amount of Allowed Claims or Equity Interests in a particular Class and other Classes entitled to share in the same recovery as such Allowed Claim or Equity Interests under the Plan.

90. "*Protective Order*" means the Order on Motion for Protective Order at Docket No. 134 executed by the Petitioning Creditors, the UCC, the individual members of the UCC, and the Debtor.

91. "*Record Date*" means the close of business on 90 days from the Effective Date.

92. "*Reorganized Debtor*" means the Debtor, or any successor thereto, by merger, consolidation or otherwise, on or after the Effective Date.

93. "*Restructuring Transactions*" means transactions necessary or appropriate to affect a restructuring of Debtor's businesses or the overall organizational structure of the Reorganized Debtor as set forth in Section III.E.2 of the Disclosure Statement.

94. "*Retained Professional*" means any Entity: (a) employed in this Chapter 11 Case pursuant to a Final Order in accordance with sections 327 and 1103 of the Bankruptcy Code and to be compensated for services rendered prior to the Effective Date, pursuant to sections 327, 328, 329, 330 or 331 of the Bankruptcy Code; or (b) for which compensation and reimbursement has been allowed by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

95. "*Schedules*" mean, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases and statements of financial affairs Filed by the Debtor pursuant to section 521 of the Bankruptcy Code and in substantial compliance with the Official Bankruptcy Forms, as the same may have been amended, modified or supplemented from time to time.

96. "*Schwartz Law*" means Schwartz Law, PLLC, bankruptcy counsel to the Debtor.

97. "*Secured*" means a Claim secured by a Lien on property in which the Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is issued pursuant to section 365(j) of the Bankruptcy Code, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, in each case to the extent of the value of the creditor's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code.

98. "*Securities Act*" means the United States Securities Act of 1933, as amended.

99. "*Signature*" means Signature Analytics, accountant to the Debtor.

100. "*Solicitation Deadline*" means the close of business on ⬛⬛⬛⬛⬛.

101. "*Stifel*" means Stifel Financial Corp.

102. "*Tort Claim*" means any Claim that has not been settled, compromised or otherwise resolved that: (a) arises out of allegations of personal injury, wrongful death, property damage, products liability or similar legal

theories of recovery; or (b) arises under any federal, state or local statute, rule, regulation or ordinance governing, regulating or relating to protection of human health, safety or the environment.

103.     "*UCC*" means the committee of unsecured creditors.

104.     "*Unexpired Lease*" means a lease to which the Debtor is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.  "*Unimpaired*" means, with respect to a Class of Claims or Equity Interests, a Claim or an Equity Interest that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

105.     "*Unimpaired Class*" means an unimpaired Class within the meaning of section 1124 of the Bankruptcy Code.

106.     "*Unimpaired Claim*" means any Claim in an Unimpaired Class.

107.     "*Valuation*" means the valuation prepared by the Debtor's valuation professionals, Portage Point Partners, attached as Exhibit B to the Disclosure Statement.

108.     "*Voting Classes*" means impaired Classes entitled to vote found in Article III. B. of the Plan.

109.     "*Voting Deadline*" means _____, 2020 at 5:00 p.m. prevailing Pacific Time for all Holders of Claims, which is the date and time by which all Ballots must be received by the Debtor in accordance with the Disclosure Statement Order, or such other date and time as may be established by the Bankruptcy Court with respect to any Voting Class.

110.     "*Wilkison*" means William Wilkison.

111.     "*WM*" means Williams Mullen, the Debtor's local counsel in the North Carolina Litigation.

112.     "*WSF*" Western States Funding, LLC.

B.     *Governing Law.*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of Nevada, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); provided that corporate governance matters relating to the Debtor or the Reorganized Debtor, as applicable, shall be governed by the laws of the state of incorporation or formation of the relevant Debtor or Reorganized Debtor, as applicable.

C.     *Reference to Monetary Figures.*

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided herein.

D.     *Controlling Document.*

In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects. In the event of an inconsistency between the Plan and the Plan Supplement, the Plan Supplement shall control. In the event of any inconsistency between the Plan or Plan Supplement, on the one hand, and the Confirmation Order on the other hand, the Confirmation Order shall control.

# ARTICLE II.

## ADMINISTRATIVE CLAIMS, DIP FACILITY CLAIMS, PRIORITY TAX CLAIMS, AND PROFESSIONAL COMPENSATION

A.      *Administrative Claims*

Each Holder of an Allowed Administrative Claim shall be paid the full unpaid amount of such Claim in Cash (a) on or as soon as reasonably practicable after the Effective Date, (b) if such Claim is Allowed after the Effective Date, on or as soon as reasonably practicable after the date such Claim is Allowed, or (c) upon such other terms as may be agreed upon by the Debtor or the Reorganized Debtor, as applicable, and such Holder or otherwise upon an order of the Bankruptcy Court; *provided*, *however*, that Allowed Administrative Expense Claims representing liabilities incurred by the Debtor in the ordinary course of business during the Chapter 11 Cases, other than those liabilities constituting or relating to commercial tort claims or patent, trademark or copyright infringement claims, shall be paid in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents related to such transactions, and holders of claims related to such ordinary course liabilities are not required to File or serve any request for payment of such Administrative Claims.  Allowed Administrative Claims shall be paid, the extent necessary, from the proceeds of the refinancing of the Debtor's assets.

B.      *DIP Facility Claims*

Pursuant to the DIP Facility Order and in accordance with Sections 364(c)(1), 503(b) and 507(b) of the Bankruptcy Code, WSF holds a super priority administrative claim against the Debtor's estate arising out of the DIP Facility.  DIP Facility Claim, as it may be amended, shall be deemed Allowed as of the Effective Date in an amount equal to (a) the principal amount outstanding under the DIP Facility on such date, (b) all accrued and unpaid interest thereon to the date of payment, and (c) all accrued and unpaid fees, expenses, and noncontingent indemnification obligations payable under the DIP Facility and the DIP Financing Order.

Except to the extent that a holder of an Allowed DIP Facility Claim agrees to less favorable treatment, on the Effective Date, each Holder of an Allowed DIP Facility Claim shall be Paid in Full. As used in this paragraph, "Paid in Full" shall mean each holder of an Allowed DIP Facility Claim shall receive the indefeasible repayment in full in Cash or New Equity Interests —as set forth in Section 5 of the DIP Facility Agreement—of all obligations (including principal, interests, fees, expenses, indemnities) under the DIP Facility Agreement.  WSF shall receive 11% of the New Equity, which is inclusive of its WSF's principal, interest, costs and reasonable legal fees.

1.      Bar Date for Administrative Claims

Except as otherwise provided in this Article II.A hereof, unless previously Filed, requests for payment of Administrative Claims must be Filed and served on the Reorganized Debtor pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than 45 days after the Effective Date.  Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims, including, without limitation, Holders of Claims for liabilities constituting or relating to commercial tort claims or patent, trademark or copyright infringement claims who assert that such claims constitute Administrative Claims, that do not File and serve such a request by the applicable Claims Bar Date shall be forever barred, estopped and enjoined from asserting such Administrative Claims against the Debtor or any Reorganized Debtor or its Estate and property and such Administrative Claims shall be deemed discharged as of the Effective Date. Objections to such requests must be Filed and served on the Reorganized Debtor and the requesting party by the later of (a) 120 days after the Effective Date and (b) 60 days after the Filing of the applicable request for payment of Administrative Claims, if applicable, as the same may be modified or extended from time to time by the Bankruptcy Court and/or on motion of a party in interest approved by the Bankruptcy Court.

C.      *Priority Tax Claims*

Each Holder of an Allowed Priority Tax Claim due and payable on or prior to the Effective Date shall receive, as soon as reasonably practicable after the Effective Date, on account of such Claim:  (1) Cash in an amount equal to the amount of such Allowed Priority Tax Claim; (2) Cash in an amount agreed to by the Debtor or Reorganized Debtor, as applicable, and such Holder; *provided, however,* that such parties may further agree for the payment of such Allowed Priority Tax Claim at a later date; or (3) at the option of the Debtor, Cash in an aggregate amount of such Allowed Priority Tax Claim payable in installment payments over a period not more than five years after the Commencement Date, plus simple interest at the rate required by applicable law on any outstanding balance from the Effective Date, or such lesser rate as is agreed to by a particular taxing authority, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code.  To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such claim shall be paid in full in cash in accordance with the terms of any agreement between the Debtor and such holder, or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business.

D.      *Professional Compensation*

1.      Professional Compensation and Reimbursement Claims

Retained Professionals or other Entities asserting a Fee Claim for services rendered before the Confirmation Date must File and serve on the Reorganized Debtor and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court an application for final allowance of such Fee Claim no later than 60 days after the Effective Date; *provided* that the Reorganized Debtor shall pay Retained Professionals or other Entities in the ordinary course of business for any work performed after the Confirmation Date. Objections to any Fee Claim must be Filed and served on the Reorganized Debtor and the requesting party by 14 days after the Filing of the applicable request for payment of the Fee Claim.  To the extent necessary, the Confirmation Order shall amend and supersede any previously entered order of the Bankruptcy Court regarding the payment of Fee Claims.  Each Holder of an Allowed Fee Claim shall be paid by the Reorganized Debtor in Cash within five (5) Business Days of entry of the order approving such Allowed Fee Claim.

# ARTICLE III.

## CLASSIFICATION AND TREATMENT
## OF CLASSIFIED CLAIMS AND EQUITY INTERESTS

A.      *Summary*

1.    This Plan constitutes the chapter 11 plan of reorganization for the Debtor.  Except for the Claims addressed in Article II above (or as otherwise set forth herein), all Claims against the Debtor are placed in Classes for the Debtor.  Class 4 consists of Equity Interests.  In accordance with section 1123(a)(1) of the Bankruptcy Code, the Debtor have not classified Administrative Claims and Priority Tax Claims, as described in Article II.

2.    The categories of Claims and Equity Interests listed below classify Claims and Equity Interests for all purposes, including, without limitation, voting, Confirmation and distribution pursuant hereto and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  The Plan deems a Claim or Equity Interest to be classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class.  A Claim or Equity Interest is in a particular Class only to the extent that any such Claim or Equity Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date.

3.    Summary of Classification and Treatment of Classified Claims and Equity Interests

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|

| Class | Claim | Status | Voting Rights |
|:---:|:---|:---:|:---:|
| 1 | Secured Claim of Curiam Investments | Impaired | Entitled to Vote |
| 2 | Petitioning Creditors Claims | Impaired | Entitled to Vote |
| 3 | General Unsecured Claims | Impaired | Entitled to Vote |
| 4 | Equity Interests | Impaired | Entitled to Vote |

B.      *Classification and Treatment of Claims and Equity Interests*

1.      <u>Class 1 – Secured Claim of Curiam Investments</u>

      (a)      *Classification*: Class 1 consists of the Secured Claim of Curiam Investments against the District Court Case and proceeds therefrom.

      (b)      *Treatment*:  The Holder of the Allowed Class 1 Claim shall be paid in accordance with the Terms of the Litigation Financing, as amended. Notwithstanding Article X.B. hereof, any prepetition security interest vested in the Holder of Class 1 claim shall remain in effect on the Effective Date.

      (c)      *Voting*: Class 1 is impaired and entitled to vote under the terms of the Plan.

2.      <u>Class 2 – Petitioning Creditors' Claims</u>

      (a)      *Classification*: Class 2 consists of the Petitioning Creditors' Claims.

      (b)      *Treatment*:  Subject to the outcome of the North Carolina Litigation, and except to the extent that a Holder of an Allowed Class 2 Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for each Allowed Class 2 Claim, each Holder thereof shall receive the Pro Rata of 0.4% of the New Equity in the Reorganized Debtor, pursuant to Section 1145 of the Bankruptcy Code, in the amount equal to the dollar value of their Claim as set by the Bankruptcy Court. Payment of any Holder of a Class 2 Claim is subject to the terms set forth in Sections 2(i) through 2(iii), each of which precondition is subject to the entry of a final, non-appealable order in the North Carolina Case.

            (i)      If the Petitioning Creditors are successful in the North Carolina Litigation, the Petitioning Creditors Equity Pool shall be transferred Pro Rata to the Holders of the Allowed Petitioning Creditors Claims;

            (ii)      If the Reorganized Debtor is successful in the North Carolina Litigation and the Petitioning Creditors Claims are reduced to zero, the Petitioning Creditors Equity Pool shall be distributed to the Debtor's then existing Equity Holders on a Pro Rata basis; or

            (iii)      If the result of the North Carolina Litigation leaves the Petitioning Creditors with reduced Claims against the Estate, the Petitioning Creditors Equity Pool shall be reduced to the corresponding amount of the reduced Claims; and

                (A) the Petitioning Creditors shall receive a Pro Rata distribution of the reduced Petitioning Creditors Equity Pool; and
                (B) the remaining New Equity held in the Petitioning Creditors Equity Pool will be distributed to the Debtor's then existing Equity Holders on a Pro Rata basis.

11

(c)    *Voting*: Class 2 is an impaired Class, and the Holder of the Class 2 Claim is entitled to vote to accept or reject the Plan.

3.    <u>Class 3 – General Unsecured Creditors</u>

(a)    *Classification*: Class 3 consists of General Unsecured Claims.

(b)    *Treatment*: Except to the extent that a Holder of an Allowed Class 3 Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for each Class 3 Claim, on the Effective Date, each Holder thereof shall receive the Pro Rata value of 1.6% of the New Equity in the Reorganized Debtor, pursuant to Section 1145 of the Bankruptcy Code, in the amount of the cash value of their Claim as set by the Bankruptcy Court.

(c)    *Voting*: Class 3 is an impaired Class, and the Holder of the Class 3 Claim is entitled to vote to accept or reject the Plan.

4.    <u>Class 4 – Equity Interests in the Debtor.</u>

(a)    *Classification:* Class 4 consists of all Equity Interests.

(b)    *Treatment:* In full and final satisfaction, settlement, release, and discharge of, and in exchange for each of the Equity Interests, on the Effective Date, the Holders thereof shall receive their Pro Rata value of 87% of shares of the New Equity Interests after the satisfaction of the Allowed Claims in Classes 2 and 3, in proportion to each Holder's Equity Interest ownership on the Record Date.

(c)    *Voting:* Class 4 is an Impaired Class, and the Holder of a Class 4 interest is entitled to vote for or against the Plan.

C.    *Discharge of Claims*

Pursuant to section 1141(c) of the Bankruptcy Code, all Claims and Equity Interests that are not expressly provided for and preserved herein shall be extinguished upon Confirmation. Upon Confirmation, the Debtor and all property dealt with herein shall be free and clear of all such claims and interests, including, without limitation, liens, security interests and any and all other encumbrances, except as provided in the Plan.

# ARTICLE IV.

## ACCEPTANCE OR REJECTION OF THE PLAN

A.    *Presumed Acceptance of Plan*

No class of Claims or Interests is presumed to accept the Plan.

B.    *Voting Classes*

Each Holder of an Allowed Claim as of the Record Date in each of the Voting Classes (Classes 1, 2, 3 and 4) shall be entitled to vote to accept or reject the Plan.

C.    *Acceptance by Impaired Classes of Claims*

Pursuant to section 1126(c) of the Bankruptcy Code and except as otherwise provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims has accepted the Plan if the Holders of at least two-thirds in dollar

amount and more than one-half in number of the Allowed Claims in such Class actually voting have voted to accept the Plan.

D.      *Cramdown*

The Debtor requests Confirmation of the Plan under section 1129(b) of the Bankruptcy Code with respect to any Impaired Class that does not accept the Plan pursuant to section 1126 of the Bankruptcy Code. The Debtor reserves the right to modify the Plan in accordance with Article XIII.B hereof to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

E.      *Elimination of Vacant Classes*

Any Class of Claims that is not occupied as of the date of commencement of the Confirmation Hearing by the Holder of an Allowed Claim or a Claim temporarily Allowed under Bankruptcy Rule 3018 (*i.e.*, no Ballots are cast in a Class entitled to vote on the Plan) shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptances or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

# ARTICLE V.

## MEANS FOR IMPLEMENTATION OF THE PLAN

A.      *General Settlement of Claims and Interests.*

As discussed further in the Disclosure Statement and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of Claims and Interests and controversies resolved pursuant to the Plan. The Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable and in the best interests of the Debtor and its Estate. Distributions made to Holders of Allowed Claims and Allowed Interests in any Class are intended to be final.

The Effective Date of the Plan shall occur once the Confirmation Order becomes a Final Order.

B.      *Restructuring Transactions*

On or before the Effective Date, and pursuant to the Plan, the Debtor and the Reorganized Debtor shall enter into such restructuring transactions (the "**Restructuring Transactions**") and shall take any actions as may be necessary or appropriate to affect a restructuring of its businesses or the overall organizational structure of the Reorganized Debtor. Upon the Effective Date, the Debtor's primary Restructuring Transactions will be to issue the New Equity to Classes 2, 3 and 4 based on their Pro Rata share of the value of the Reorganized Debtor and implement the Litigation Financing, as amended.

On the Effective Date, all property of the Estate, all Causes of Action, and any property acquired by the Debtor pursuant to the Plan shall vest in the Reorganized Debtor, free and clear of all Liens, Claims, charges, Causes of Action, or other encumbrances. To the extent provided in the Plan the Debtor may be deemed dissolved in accordance with applicable law, without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity. The Reorganized Debtor shall be the issuer of New Equity to the applicable Holders of Claims and Interests as set forth herein.

The Restructuring Transactions may include one or more sales, mergers, consolidations, restructurings, conversions, dissolutions, transfers or liquidations as may be determined by the secured claim holders to be necessary

or appropriate to fully effectuate the transfer of the New Equity Interests. The actions to effect the Restructuring Transactions may include: (1) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or reorganization containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable parties may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, duty, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (3) the rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; (4) the filing of appropriate certificates or articles of incorporation, formation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable law; (5) all transactions necessary or appropriate to provide for the purchase of substantially all of the assets or Interests of the Debtor by the Reorganized Debtor, which purchase, if applicable, may be structured as a taxable transaction for United States federal income tax purposes; and (6) all other actions that the applicable parties determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law in connection with the Plan in each case of clauses (1) through (6).

The Confirmation Order shall and shall be deemed to, pursuant to sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including the Restructuring Transactions.

To the extent that any such Restructuring Transactions result in the assignment of any Executory Contract or Unexpired Lease assumed under the Plan to a party other than the Debtor which was originally a party to such Executory Contract or Unexpired Lease (including such Debtor as Reorganized Debtor), the Debtor shall follow the procedures in Article VI of the Plan for the assignment of such Executory Contracts and Unexpired Leases under section 365 of the Bankruptcy Code. The chairman of the board of directors, president, chief executive officer, chief financial officer, any executive vice-president or senior vice-president, member or manager or any other appropriate officer of each Debtor, (as applicable), shall be authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents, and take such other actions, as may be necessary or appropriate, to effectuate and further evidence the terms and conditions of this Plan and the Restructuring Transactions. The secretary or assistant secretary of the appropriate Debtor and of a Reorganized Debtor, as the case may be, shall be authorized to certify or attest to any of the foregoing actions.

On or before the Effective Date, and pursuant to the Plan, the Debtor and the Reorganized Debtor, as applicable, shall take any actions as may be necessary or appropriate to affect a restructuring of its businesses or the overall organizational structure of the Reorganized Debtor. As of the date hereof, the actions to affect the Restructuring Transactions may include:

- the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, debt or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree;
- the filing of appropriate certificates or articles of formation, reformation, merger, consolidation, conversion or dissolution pursuant to applicable state law; and
- all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable state law in connection with the Restructuring Transactions.

C.    *The Reorganized Debtor.*

On the Effective Date, the New Board shall be established and Mr. John Steel, IV shall be appointed the Chief Executive Officer and Chairman of the Board, and the Reorganized Debtor shall adopt its New Organizational Documents. The Reorganized Debtor shall be authorized to adopt any other agreements, documents, and instruments and to take any other actions contemplated under the Plan as necessary to consummate the Plan.

14

D.    *Sourced of Consideration for Plan Distribution.*

On the Effective Date, upon cancellation of the prepetition Equity Interests, the Reorganized Debtor shall issue the New Equity directly or indirectly to Holders of Claims and Equity Interests to the extent provided in the Plan. The issuance of the New Equity shall be authorized without the need for any further corporate action and without any further action by any party. The terms of the New Equity shall be governed by the Shareholder Agreement and the New Equity Documentation, as applicable.

All of the New Equity issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable. Each distribution and issuance referred to in Article VI hereof shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

E.    *Corporate Existence.*

The Debtor shall continue to exist after the Effective Date as a separate corporate Entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and by-laws (or other formation documents) are amended under the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).

F.    *Vesting of Assets in the Reorganized Debtor*

Except as otherwise provided herein or in any agreement, instrument or other document relating thereto, on or after the Effective Date, all property of the Estate (including, without limitation, Causes of Action) and any property acquired including by the Debtor pursuant hereto shall vest in the Reorganized Debtor, free and clear of all liens, Claims, charges or other encumbrances.  Except as may be provided herein, on and after the Effective Date, the Reorganized Debtor may operate its business and may use, acquire or dispose of property and compromise or settle any Claims without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan and the Confirmation Order. Without limiting the foregoing, the Reorganized Debtor shall pay the charges that it incurs after the Effective Date for Retained Professionals' fees, disbursements, expenses or related support services (including reasonable fees relating to the preparation of Retained Professional fee applications) without application to the Bankruptcy Court.

G.    *Corporate Action.*

Upon the Effective Date, all actions contemplated under the Plan shall be deemed authorized and approved in all respects, including: (1) adoption or assumption, as applicable, of any employment obligations; (2) selection of the directors, officers, or managers for the Reorganized Debtor; (3) the distribution of the New Equity; (4) implementation of the Restructuring Transactions; (5) all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date); (6) adoption of the New Organizational Documents; (7) the rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; and (8) all other acts or actions contemplated or reasonably necessary or appropriate to promptly consummate the Restructuring Transactions contemplated by the Plan (whether to occur before, on, or after the Effective Date). All matters provided for in the Plan involving the corporate structure of the Debtor or the Reorganized Debtor, and any corporate action required by the Debtor or the Reorganized Debtor, as applicable, in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Equity Security Holders, directors, officers, or managers of the Debtor or the Reorganized Debtor, as applicable. On or (as applicable) prior to the Effective Date, the appropriate officers of the Debtor or the Reorganized Debtor, as applicable, shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Reorganized Debtor, including the New Equity, the New Organizational Documents,

15

and any and all other agreements, documents, securities, and instruments relating to the foregoing. The authorizations and approvals contemplated by this Section G shall be effective notwithstanding any requirements under non-bankruptcy law.

H.     *New Organizational Documents.*

On the Effective Date, or following the entry of the Confirmation Order and prior to the Effective Date, the organizational documents of the Debtor shall be amended, amended and restated, or replaced as may be necessary to effectuate the transactions contemplated or permitted by the Plan. On the Effective Date, or following the entry of the Confirmation Order and prior to the Effective Date, the Reorganized Debtor will file its New Organizational Documents with the applicable Secretary of State or applicable authority in its respective state or country of incorporation if and to the extent required in accordance with the corporate laws of the respective state or country of incorporation. The New Organizational Documents will prohibit the issuance of non-voting equity securities, to the extent required under section 1123(a)(6) of the Bankruptcy Code. For the avoidance of doubt, the New Organizational Documents shall be included as exhibits to the Plan Supplement. After the Effective Date, the Reorganized Debtor may amend and restate New Organizational Documents, and the Reorganized Debtor may file its respective certificates or articles of incorporation, bylaws, or such other applicable formation documents, and other constituent documents as permitted by the laws of the respective states, provinces, or countries of incorporation and the New Organizational Documents.

I.     *New Equity Interests.*

Reorganized Debtor is authorized to distribute and shall distribute, the New Equity without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule, or the vote, consent, authorization, or approval of any Person. The New Equity Interests shall be issued and distributed free and clear of all Liens, claims, and other interests.

Acceptance of New Equity shall be deemed to constitute its agreement to be bound by the New Organizational Documents, as the same may be amended, supplemented, or modified from time to time following the Effective Date in accordance with their terms. The New Organizational Documents shall be binding on all holders of the New Equity (and their respective successors and assigns), whether such New Equity are received or to be received on or after the Effective Date and regardless of whether such holder executes or delivers a signature page to the New Organizational Documents. Notwithstanding the foregoing, Reorganized Debtor may condition the receipt of any New Equity issued pursuant to the Plan upon the receipt of duly executed counter - signature pages to the Organizational Documents.

All of the New Equity issued and/or distributed pursuant to the Plan shall be duly authorized, validly issued, and, as applicable, fully paid, and non-assessable. Each distribution and issuance of the New Equity and Warrants under the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

J.     *Directors and Officers of the Reorganized Debtor.*

As of the Effective Date, the term of the current members of the board of directors of the Debtor shall expire, and the members for the initial term of the New Board shall be appointed. The initial members of the New Board will be identified in the Plan Supplement, to the extent known at the time of filing. Each such member and officer of the Reorganized Debtor shall serve from and after the Effective Date pursuant to the terms of the New Organizational Documents and other constituent documents of the Reorganized Debtor. The New Board shall consist of [placeholder] members.

K.     *Effectuating Documents; Further Transactions.*

On and after the Effective Date, the Reorganized Debtor and the New Board are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents

16

and take such actions as may be necessary to effectuate, implement, and further evidence the terms and conditions of the Plan and the Securities issued pursuant to the Plan in the name of and on behalf of Reorganized Debtor, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

L.      *Certain Securities Law Matters.*

Shares of New Equity issued under the Plan will be issued without registration under the Securities Act or any similar federal, state, or local law in reliance upon Section 1145 of the Bankruptcy Code. Shares of New Equity issued under the Plan in reliance upon section 1145 of the Bankruptcy Code are exempt from, among other things, the registration requirements of Section 5 of the Securities Act and any other applicable U.S. state or local law requiring registration prior to the offering, issuance, distribution, or sale of securities. Pursuant to section 1145 of the Bankruptcy Code, the New Equity issued under the Plan: (a) is not a "restricted security" as defined in Rule 144(a)(3) under the Securities Act; and (b) is freely tradable and transferable by any holder thereof that (i) is not an "affiliate" of the Reorganized Debtor as defined in Rule 144(a)(1) under the Securities Act, (ii) has not been such an "affiliate" within ninety (90) days of such transfer, (iii) has not acquired the New Equity from an "affiliate" within one year of such transfer, and (iv) is not an Entity that is an "underwriter" as defined in section 1145(b) of the Bankruptcy Code. Such New Equity will be freely tradable in the United States by the recipients thereof, subject to the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 1145(b) of the Bankruptcy Code, and compliance with applicable securities laws and any rules and regulations of the United States Securities and Exchange Commission, if any, applicable at the time of any future transfer of such Securities or instruments and subject to any restrictions in the New Organizational Documents.

The Depository Trust Company shall be required to accept and conclusively rely upon the Plan or Confirmation Order in lieu of a legal opinion regarding whether such securities are exempt from registration and/or eligible for the Depository Trust Company book-entry delivery, settlement, and depository services. Notwithstanding anything to the contrary in the Plan, no legal opinion regarding the offering, issuance, and distribution of any Securities contemplated by the Plan, including, for the avoidance of doubt, whether the New Equity is exempt from registration and/or eligible for the Depository Trust Company book-entry delivery, settlement, and depository services shall be required.

M.      *Section 1146 Exemption.*

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from the Debtor to the Reorganized Debtor or to any other Person) of property under the Plan or pursuant to: (1) the issuance, reinstatement, distribution, transfer, or exchange of any debt, Equity Security, or other interest in the Debtor or the Reorganized Debtor; (2) the Restructuring Transactions; (3) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (4) the making, assignment, or recording of any lease or sublease; or (5) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, personal property transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax, recordation fee or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(c) of the Bankruptcy Code, shall forego the collection of any such tax, recordation fee or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee or governmental assessment.

N.      *Preservation of Causes of Action; Waiver of Avoidance Actions.*

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII hereof, the Reorganized Debtor shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including those Causes of Action relating to the North Carolina Litigation, and the Reorganized Debtor's rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtor pursuant to the releases and exculpations contained in the Plan, including in Article VIII.

The Reorganized Debtor may pursue such retained Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtor. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtor or the Reorganized Debtor, as applicable, will not pursue any and all available Causes of Action against it. The Debtor or the Reorganized Debtor, as applicable, expressly reserves all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan, including Article VIII of the Plan.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, Reorganized Debtor expressly reserves all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtor reserves and shall retain such Causes of Action notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in Reorganized Debtor, except as otherwise expressly provided in the Plan, including Article VIII of the Plan. The Reorganized Debtor, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtor shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

O.      *Closing the Chapter 11 Case.*

Upon the occurrence of the Effective Date, the Reorganized Debtor shall be permitted to close its Chapter 11 Case.

# ARTICLE VI.

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.      *Assumption and Rejection of Executory Contracts and Unexpired Leases*

    1.      <u>Assumption of Executory Contracts and Unexpired Leases</u>

Effective Date, except as otherwise provided in the Plan, each Executory Contract and Unexpired Lease (including those set forth as assumed in the Schedules of Assumed and Rejected Contracts) shall be deemed assumed as of the Effective Date by the Debtor pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease: (1) was previously assumed, assumed and assigned, or rejected by the Debtor; (2) previously expired or terminated pursuant to its own terms; (3) is identified as rejected on the Schedules of Assumed and Rejected Contracts; (4) is the subject of a motion to reject that is pending on the Effective Date; or (5) Is otherwise rejected pursuant to the Plan.

On the Effective Date, except as otherwise provided herein, each Executory Contract and Unexpired Lease that is identified as rejected on the Schedules of Assumed and Rejected Contracts shall be deemed rejected as of the Effective Date by the applicable Debtor pursuant to sections 365 and 1123 of the Bankruptcy Code.

18

Entry of the Confirmation Order by the Bankruptcy Court shall, subject to and upon the occurrence of the Effective Date, constitute a Final Order approving the assumptions, assumptions and assignments, and rejections, as applicable, of the Executory Contracts and Unexpired Leases as set forth in the Plan, and the Schedules of Assumed and Rejected Contracts, as applicable, pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Any motions to assume, assume and assign, or reject Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by the Bankruptcy Court on or after the Effective Date by a Final Order. Unless otherwise specified in the Plan Supplement, the Schedules of Assumed and Rejected Contracts, or an applicable Bankruptcy Court order, assumptions, assumptions and assignments, or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date. Each Executory Contract and Unexpired Lease assumed pursuant to the Plan or by any order of the Bankruptcy Court, which has not been assigned to a third party prior to the Confirmation Date, shall revest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may be modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law. Notwithstanding anything to the contrary in the Plan, the Debtor or the Reorganized Debtor, as applicable, shall have the right to alter, amend, modify, or supplement the Schedules of Assumed and Rejected Contracts identified in Article VI.A of the Plan at any time through and including 45 days after the Effective Date; provided, however, that after the date of the Confirmation Hearing, the Debtor may not subsequently reject any Unexpired Lease previously designated as assumed or assumed and assigned on the Schedules of Assumed and Rejected Contracts absent the consent of the applicable lessor.

To the extent that any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party or parties to such Executory Contract or Unexpired Lease to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.

B.      *Claims on Account of the Rejection of Executory Contracts or Unexpired Leases*

All proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be filed with the Bankruptcy Court within thirty (30) days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection.

Any Entity that is required to file a Proof of Claim arising from the rejection of an Executory Contract or an Unexpired Lease that fails to timely do so shall be forever barred, estopped and enjoined from asserting such Claim, and such Claim shall not be enforceable, against any Debtor or any Reorganized Debtor or its Estate and property, and the Debtor or the Reorganized Debtor and its Estate and property shall be forever discharged from any and all indebtedness and liability with respect to such Claim unless otherwise ordered by the Bankruptcy Court or as otherwise provided herein.

C.      *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases*

Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.   At least ten (10) days prior to the Confirmation Hearing, the Debtor shall serve upon counterparties to such Executory Contracts and Unexpired Leases, a notice of the proposed assumption, which will: (1) list the applicable cure amount, if any; (2) describe the procedures for filing objections thereto; and (3) explain the process by which related disputes will be resolved by the Bankruptcy Court; additionally, the Debtor shall file with the Bankruptcy Court a list of such Executory Contracts and Unexpired Leases to be assumed and the proposed cure amounts.

Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or related cure amount must be filed, served and actually received by the Debtor, and its counsel, Schwartz Law PLLC,

at least five (5) days prior to the Confirmation Hearing. Any counterparty to an Executory Contract and Unexpired Lease that fails to object timely to the proposed assumption or cure amount will be deemed to have assented to such matters. In the event of a dispute regarding (1) the amount of any payments to cure such a default, (2) the ability of the Reorganized Debtor or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed or (3) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order or orders resolving the dispute and approving the assumption. If an objection to Cure is sustained by the Bankruptcy Court, the Reorganized Debtor in its sole option, may elect to reject such executory contract or unexpired lease in lieu of assuming it.

D.      *Contracts and Leases Entered Into After the Commencement Date*

Contracts and leases entered into after the Commencement Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the Debtor or Reorganized Debtor liable thereunder in the ordinary course of its business. Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

# ARTICLE VII.

## PROVISIONS GOVERNING DISTRIBUTIONS

A.      *Distributions for Claims Allowed as of the Effective Date*

Except as otherwise provided in the Plan, a Final Order or as agreed to by the relevant parties, the Reorganized Debtor shall make initial distributions under the Plan on account of Claims Allowed before the Effective Date on or as soon as practicable after the Initial Distribution Date; *provided*, *however*, that payments on account of General Unsecured Claims that become Allowed Claims on or before the Effective Date may commence on the Effective Date.

B.      *Distributions on Account of Claims Allowed After the Effective Date*

1.      Payments and Distributions on Disputed Claims

Except as otherwise provided in the Plan, a Final Order or as agreed to by the relevant parties, distributions under the Plan on account of a Disputed Claim that becomes an Allowed Claim after the Effective Date shall be made on the first Periodic Distribution Date after the Disputed Claim becomes an Allowed Claim.

2.      Special Rules for Distributions to Holders of Disputed Claims

Notwithstanding any provision otherwise in the Plan and except as otherwise agreed to by the relevant parties no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order. In the event that there are Disputed Claims requiring adjudication and resolution, the Reorganized Debtor shall establish appropriate reserves for potential payment of such Claims.

C.      *Delivery and Distributions and Undeliverable or Unclaimed Distributions*

1.      Record Date for Distributions

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall instead be authorized and entitled to recognize only those Holders of Claims listed on the Claims Register as of the close of business on the Distribution Record Date. If a Claim is transferred twenty (20) or fewer days before the Distribution Record Date, the Distribution Agent shall make distributions to the transferee only to the extent practical and, in any event, only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

20

2. <u>Delivery of Distributions in General</u>

Except as otherwise provided herein, the Debtor or the Reorganized Debtor, as applicable, shall make distributions to Holders of Allowed Claims at the address for each such Holder as indicated on the Debtor's records as of the date of any such distribution; *provided*, *however*, that the manner of such distributions shall be determined at the discretion of the Debtor or the Reorganized Debtor, as applicable; and *provided further*, that the address for each Holder of an Allowed Claim shall be deemed to be the address set forth in any Proof of Claim Filed by that Holder.

3. <u>Distributions by Distribution Agents</u>

The Debtor or the Reorganized Debtor, as applicable, shall have the authority, in their sole discretion, to enter into agreements with the Distribution Agent to facilitate the distributions required under the Plan. As a condition to serving as a Distribution Agent, a Distribution Agent must (i) affirm its obligation to facilitate the prompt distribution of any documents, (ii) affirm its obligation to facilitate the prompt distribution of any recoveries or distributions required under the Plan and (iii) waive any right or ability to setoff, deduct from or assert any lien or encumbrance against the distributions required under the Plan that are to be distributed by the Distribution Agent.

The Distribution Agent, and its respective agents, employees, officers, directors, professionals, attorneys, accountants, advisors, representatives and principals (collectively, the "**Indemnified Parties**") shall be indemnified and held harmless by the Debtor and the Reorganized Debtor, to the fullest extent permitted by law for any losses, claims, damages, liabilities and expenses, including, without limitation, reasonable attorneys' fees, disbursements and related expenses which the Indemnified Parties may incur or to which the Indemnified Parties may become subject in connection with any action, suit, proceeding or investigation brought or threatened against one or more of the Indemnified Parties on account of the acts or omissions of the Distribution Agent solely in its capacity as such; provided, however, that the Debtor and the Reorganized Debtor shall not be liable to indemnify any Indemnified Party for any act or omission constituting gross negligence, fraud or reckless, intentional or willful misconduct. The foregoing indemnity in respect of any Indemnified Party shall survive the termination of such Indemnified Party from the capacity for which they are indemnified.

The Debtor or the Reorganized Debtor, as applicable, shall pay to the Distribution Agent all reasonable and documented fees and expenses of the Distribution Agent without the need for any approvals, authorizations, actions or consents. The Distribution Agent shall submit detailed invoices to the Debtor or Reorganized Debtor, as applicable, for all fees and expenses for which the Distribution Agent seeks reimbursement and the Debtor shall pay those amounts that they, in their sole discretion, deem reasonable, and shall object in writing to those fees and expenses, if any, that the Debtor deems to be unreasonable. In the event that the Debtor objects to all or any portion of the amounts requested to be reimbursed in a Distribution Agent's invoice, the Debtor or the Reorganized Debtor, as applicable, and such Distribution Agent shall endeavor, in good faith, to reach mutual agreement on the amount of the appropriate payment of such disputed fees and/or expenses. In the event that the Debtor or the Reorganized Debtor, as applicable, and a Distribution Agent is unable to resolve any differences regarding disputed fees or expenses, either party shall be authorized to move to have such dispute heard by the Bankruptcy Court.

4. <u>Minimum Distributions</u>

Notwithstanding anything herein to the contrary, the Reorganized Debtor shall not be required to make distributions or payments of less than $10 (whether Cash or otherwise) and shall not be required to make partial distributions or payments of fractions of dollars. Whenever any payment or distribution of a fraction of a dollar or share of New Equity Interests under the Plan would otherwise be called for, the actual payment or distribution will reflect a rounding of such fraction to the nearest whole dollar or share of New Membership Interests (up or down), with half dollars and half shares of New Equity Interests or less being rounded down.

No Distribution Agent shall have any obligation to make a distribution on account of an Allowed Claim if: (a) the aggregate amount of all distributions authorized to be made on the Periodic Distribution Date in question is or has an economic value less than $5,000, unless such distribution is a final distribution; or (b) the amount to be distributed to the specific Holder of an Allowed Claim on such Periodic Distribution Date does not constitute a final

distribution to such Holder and is or has an economic value less than $10, which shall be treated as an undeliverable distribution under Article VII.C.5 below.

5.    Undeliverable Distributions

(a)    Holding of Certain Undeliverable Distributions

If any distribution to a Holder of an Allowed Claim made in accordance herewith is returned to the Reorganized Debtor (or their Distribution Agent) as undeliverable, no further distributions shall be made to such Holder unless and until the Reorganized Debtor (or their Distribution Agent) is notified in writing of such Holder's then current address, at which time all currently and due missed distributions shall be made to such Holder on the next Periodic Distribution Date.  Undeliverable distributions shall remain in the possession of the Reorganized Debtor, subject to Article VII.C.5(b) hereof, until such time as any such distributions become deliverable.  Undeliverable distributions shall not be entitled to any additional interest, dividends or other accruals of any kind on account of their distribution being undeliverable.

(b)    Failure to Claim Undeliverable Distributions

No later than 210 days after the Effective Date, the Reorganized Debtor shall File with the Bankruptcy Court a list of the Holders of undeliverable distributions.  This list shall be maintained and updated periodically in the sole discretion of the Reorganized Debtor for as long as the Chapter 11 Case stays open.  Any Holder of an Allowed Claim, irrespective of when a Claim becomes an Allowed Claim, that does not notify the Reorganized Debtor of such Holder's then current address in accordance herewith within the latest of (i) one year after the Effective Date, (ii) 60 days after the attempted delivery of the undeliverable distribution and (iii) 180 days after the date such Claim becomes an Allowed Claim shall have its Claim for such undeliverable distribution discharged and shall be forever barred, estopped and enjoined from asserting any such Claim against the Reorganized Debtor or its property.  In such cases, (i) any Cash held for distribution on account of Allowed Claims shall be redistributed to Holders of Allowed Claims in the applicable Class on the next Periodic Distribution Date and (ii) any Cash held for distribution to other creditors shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and become property of the Reorganized Debtor, free of any Claims of such Holder with respect thereto.  Nothing contained herein shall require the Reorganized Debtor to attempt to locate any Holder of an Allowed Claim.

(c)    Failure to Present Checks

Checks issued by the Distribution Agent on account of Allowed Claims shall be null and void if not negotiated within 180 days after the issuance of such check.  In an effort to ensure that all Holders of Allowed Claims receive their allocated distributions, no later than 180 days after the issuance of such checks, the Reorganized Debtor shall File with the Bankruptcy Court a list of the Holders of any un-negotiated checks.  This list shall be maintained and updated periodically in the sole discretion of the Reorganized Debtor for as long as the Chapter 11 Case stay open. Requests for reissuance of any check shall be made directly to the Distribution Agent by the Holder of the relevant Allowed Claim with respect to which such check originally was issued.  Any Holder of an Allowed Claim holding an un-negotiated check that does not request reissuance of such un-negotiated check within 240 days after the date of mailing or other delivery of such check shall have its Claim for such un-negotiated check discharged and be discharged and forever barred, estopped and enjoined from asserting any such Claim against the Reorganized Debtor or its property.  In such cases, any Cash held for payment on account of such Claims shall be property of the Reorganized Debtor, free of any Claims of such Holder with respect thereto.  Nothing contained herein shall require the Reorganized Debtor to attempt to locate any Holder of an Allowed Claim.

D.    *Compliance with Tax Requirements/Allocations*

In connection with the Plan, to the extent applicable, the Reorganized Debtor shall comply with all tax withholding and reporting requirements imposed on them by any governmental unit, and all distributions pursuant hereto shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtor and the Distribution Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the

22

distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions or establishing any other mechanisms they believe are reasonable and appropriate.  The Reorganized Debtor reserves the right to allocate all distributions made under the Plan in compliance with all applicable liens and encumbrances.

For tax purposes, distributions in full or partial satisfaction of Allowed Claims shall be allocated first to the principal amount of Allowed Claims, with any excess allocated to unpaid interest that accrued on such Claims.

E.      *Timing and Calculation of Amounts to Be Distributed*

On the Initial Distribution Date (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such a Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim against the Debtor shall receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class.  Except as otherwise provided herein, Holders of Claims shall not be entitled to interest, dividends or accruals on the distributions provided for herein, regardless of whether such distributions are delivered on or at any time after the Effective Date.

F.      *Setoffs*

The Debtor and the Reorganized Debtor may withhold (but not setoff except as set forth below) from the distributions called for hereunder on account of any Allowed Claim an amount equal to any claims, equity interests, rights and Causes of Action of any nature that the Debtor or the Reorganized Debtor may hold against the Holder of any such Allowed Claim.  In the event that any such claims, equity interests, rights and Causes of Action of any nature that the Debtor or the Reorganized Debtor may hold against the Holder of any such Allowed Claim are adjudicated by Final Order or otherwise resolved, the Debtor may, pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy law, set off against any Allowed Claim and the distributions to be made pursuant hereto on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), the amount of any adjudicated or resolved claims, equity interests, rights and Causes of Action of any nature that the Debtor or the Reorganized Debtor may hold against the Holder of any such Allowed Claim, but only to the extent of such adjudicated or resolved amount.  Neither the failure to effect such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtor or the Reorganized Debtor of any such claims, equity interests, rights and Causes of Action that the Debtor or the Reorganized Debtor may possess against any such Holder, except as specifically provided herein.

# ARTICLE VIII.

## PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED AND DISPUTED CLAIMS

A.      *Resolution of Disputed Claims*

1.      <u>Allowance of Claims</u>

After the Effective Date, the Reorganized Debtor shall have and shall retain any and all rights and defenses that the Debtor had with respect to any Claim, except with respect to any Claim deemed Allowed under the Plan. Except as expressly provided in the Plan or in any order entered in the Chapter 11 Case prior to the Effective Date (including, without limitation, the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order, including, without limitation, the Confirmation Order, in the Chapter 11 Case allowing such Claim.  All settled claims approved prior to the Effective Date pursuant to a Final Order of the Bankruptcy Court pursuant to Bankruptcy Rule 9019 or otherwise shall be binding on all parties.

2.      <u>Prosecution of Objections to Claims</u>

After the Confirmation Date the Debtor or the Reorganized Debtor, as applicable, shall have the exclusive authority to File objections to Claims, settle, compromise, withdraw or litigate to judgment objections to any and all

Claims, regardless of whether such Claims are in a Class or otherwise; provided, however, this provision shall not apply to Fee Claims. From and after the Effective Date, the Reorganized Debtor may settle or compromise any Disputed Claim without any further notice to or action, order or approval of the Bankruptcy Court. The Reorganized Debtor shall have the sole authority to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order or approval of the Bankruptcy Court.

       3.    <u>Claims Estimation</u>

After the Confirmation Date the Debtor or the Reorganized Debtor, as applicable, may, at any time, request that the Bankruptcy Court estimate (a) any Disputed Claim pursuant to applicable law and (b) any contingent or unliquidated Claim pursuant to applicable law, including, without limitation, section 502(c) of the Bankruptcy Code, regardless of whether the Debtor or the Reorganized Debtor has previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any Disputed Claim, contingent Claim or unliquidated Claim, including during the litigation concerning any objection to any Claim or during the pendency of any appeal relating to any such objection. Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the Claims Register but that is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. All of the aforementioned Claims and objection, estimation and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

       4.    <u>Expungement or Adjustment to Claims Without Objection</u>

Any Claim that has been paid, satisfied or superseded may be expunged on the Claims Register by the Reorganized Debtor, and any Claim that has been amended may be adjusted thereon by the Reorganized Debtor, in both cases without a claims objection having to be Filed and without any further notice to or action, order or approval of the Bankruptcy Court.

       5.    <u>Deadline to File Objections to Claims</u>

Any objections to Claims shall be Filed no later than the Claims Objection Bar Date.

B.    *Disallowance of Claims*

All Claims of any Entity from which property is sought by the Debtor or the Reorganized Debtor under section 542, 543, 550 or 553 of the Bankruptcy Code or that the Debtor or the Reorganized Debtor allege is a transferee of a transfer that is avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549 or 724(a) of the Bankruptcy Code shall be disallowed if (i) the Entity, on the one hand, and the Debtor or the Reorganized Debtor, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turnover any property or monies under any of the aforementioned sections of the Bankruptcy Code and (ii) such Entity or transferee has failed to turnover such property by the date set forth in such agreement or Final Order.

**EXCEPT AS OTHERWISE AGREED, ANY AND ALL PROOFS OF CLAIM AND PROOFS OF INTEREST FILED AFTER THE APPLICABLE CLAIMS BAR DATE SHALL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER OR APPROVAL OF THE BANKRUPTCY COURT, AND HOLDERS OF SUCH CLAIMS AND EQUITY INTERESTS MAY NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS AND EQUITY INTERESTS, UNLESS SUCH LATE PROOF OF CLAIM OR EQUITY INTEREST IS DEEMED TIMELY FILED BY A BANKRUPTCY COURT ORDER ON OR BEFORE THE LATER OF (1) THE CONFIRMATION HEARING AND (2) 45 DAYS AFTER THE APPLICABLE CLAIMS BAR DATE.**

C.    *Amendments to Claims*

On or after the Effective Date, except as otherwise provided herein, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Reorganized Debtor, and, to the extent such prior authorization is not received, any such new or amended Claim Filed shall be deemed disallowed and expunged without any further notice to or action, order or approval of the Bankruptcy Court.

# ARTICLE IX.

### CONDITIONS PRECEDENT TO CONFIRMATION
### AND CONSUMMATION OF THE PLAN

A.    *Conditions Precedent to Confirmation*

It shall be a condition to Confirmation hereof that all provisions, terms and conditions hereof are approved in the Confirmation Order.

B.    *Conditions Precedent to Consummation*

It shall be a condition to Consummation of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.C hereof.

1.    The Plan and all Plan Supplement documents, including any amendments, modifications or supplements thereto, shall be reasonably acceptable to the Debtor.

2.    The Confirmation Order shall have been entered and become a Final Order in a form and in substance reasonably satisfactory to the Debtor.  The Confirmation Order shall provide that, among other things, the Debtor or the Reorganized Debtor, as appropriate, is authorized and directed to take all actions necessary or appropriate to consummate the Plan, including, without limitation, entering into, implementing and consummating the contracts, instruments, releases, leases, indentures and other agreements or documents created in connection with or described in the Plan.

3.    All actions, documents, certificates and agreements necessary to implement this Plan shall have been affected or executed and delivered to the required parties and, to the extent required, Filed with the applicable governmental units in accordance with applicable laws.

C.    *Waiver of Conditions*

The conditions to Confirmation of the Plan and to Consummation of the Plan set forth in this Article IX may be waived by the Debtor without notice, leave or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate the Plan.

D.    *Effect of Non-Occurrence of Conditions to Consummation*

If the Consummation of the Plan does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any claims by or Claims against or Equity Interests in the Debtor; (2) prejudice in any manner the rights of the Debtor, any Holders or any other Entity; or (3) constitute an admission, acknowledgment, offer or undertaking by the Debtor, any Holders or any other Entity in any respect.

# ARTICLE X.

## SETTLEMENT, RELEASE AND RELATED PROVISIONS

A.      *Discharge of Claims and Termination of Interests.*

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtor), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtor or any of its assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtor before the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim based upon such debt or right is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan. Any default or "event of default" by the Debtor or Affiliates with respect to any Claim or Interest that existed immediately before or on account of the filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring.

B.      *Release of Liens.*

Except as otherwise noted in the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for Other Secured Claims that the Debtor elect to reinstate in accordance with Article III.B.1 hereof, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estate shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtor and its successors and assigns. Any Holder of such Secured Claim (and the applicable agents for such Holder) shall be authorized and directed, at the sole cost and expense of the Reorganized Debtor, to release any collateral or other property of the Debtor (including any cash collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested by the Reorganized Debtor to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases. The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

C.      *Exculpation.*

Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing and related prepetition transactions, the Disclosure Statement, the Plan, or any Restructuring Transaction, contract, instrument, release or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or

any other related agreement, except for claims related to any act or omission that constitutes actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to its duties and responsibilities pursuant to the Plan. The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan. Nothing in the Plan shall be construed to limit, impair or exculpate any member of the Committee in connection with or in any way related to the Debtor's Claims or Causes of Action in the North Carolina Litigation.

D.      *Injunction.*

*Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities that have held, hold, or may hold claims or interests that have been released pursuant to the Plan, shall be discharged pursuant to the Plan, or are subject to exculpation pursuant to the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtor, the Reorganized Debtor, or the Released Parties: (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims or interests; (iii) creating, perfecting, or enforcing any lien or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such claims or interests; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such claims or interests unless such Entity has timely asserted such setoff right in a document filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a claim or interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (v) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests released or settled pursuant to the Plan.*

E.      *Protections Against Discriminatory Treatment.*

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtor or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtor, or another Entity with whom the Reorganized Debtor has been associated, solely because the Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtor are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

F.      *Document Retention.*

On and after the Effective Date, the Reorganized Debtor may maintain documents in accordance with its standard document retention policy, as may be altered, amended, modified, or supplemented by the Reorganized Debtor.

G.      *Reimbursement or Contribution.*

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date: (1) such Claim has been adjudicated as non-contingent or (2) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

# ARTICLE XI.
### BINDING NATURE OF PLAN

THIS PLAN SHALL BIND ALL HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS AND INTERCOMPANY INTERESTS IN THE DEBTOR TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, NOTWITHSTANDING WHETHER OR NOT SUCH HOLDER (I) WILL RECEIVE OR RETAIN ANY PROPERTY OR INTEREST IN PROPERTY UNDER THE PLAN, (II) HAS FILED A PROOF OF CLAIM OR INTEREST IN THE CHAPTER 11 CASES OR (III) FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN OR VOTED TO REJECT THE PLAN.

# ARTICLE XII.

### RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall, after the Effective Date, retain such jurisdiction over the Chapter 11 Case and all Entities with respect to all matters related to the Chapter 11 Cases, the Debtor and the Plan as legally permissible, including, without limitation, jurisdiction to:

1.    allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Equity Interest, including, without limitation, the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the allowance or priority of any Claim or Equity Interest;

2.    grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan, for periods ending on or before the Confirmation Date;

3.    resolve any matters related to the assumption, assignment or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor or Reorganized Debtor may be liable and to adjudicate and, if necessary, liquidate, any Claims arising therefrom, including, without limitation, those matters related to any amendment to the Plan after the Effective Date to add Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed;

4.    resolve any issues related to any matters adjudicated in the Chapter 11 Cases;

5.    ensure that distributions to Holders of Allowed Claims and Equity Interests are accomplished pursuant to the provisions of the Plan;

6.    decide or resolve any motions, adversary proceedings, contested or litigated matters and any other Causes of Action that are pending as of the Effective Date or that may be commenced in the future, and grant or deny any applications involving a Debtor that may be pending on the Effective Date or instituted by the Reorganized Debtor after the Effective Date, *provided* that the Reorganized Debtor shall reserve the right to commence actions in all appropriate forums and jurisdictions;

7.    enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all other contracts, instruments, releases, indentures and other agreements or documents adopted in connection with the Plan, the Plan Supplement or the Disclosure Statement;

8.    resolve any cases, controversies, suits or disputes that may arise in connection with the Consummation, interpretation or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

9.    hear and determine all Causes of Action that are pending as of the Effective Date or that may be commenced in the future;

10.  issue injunctions and enforce them, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan, except as otherwise provided in the Plan;

11.  enforce the terms of the Plan;

12.  enter and implement such orders or take such other actions as may be necessary or appropriate if the Confirmation Order is modified, stayed, reversed, revoked or vacated;

13.  resolve any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document adopted in connection with the Plan or the Disclosure Statement; and

14.  enter an order concluding the Chapter 11 Cases.

# ARTICLE XIII.

## MISCELLANEOUS PROVISIONS

A.    *Payment of Statutory Fees*

All fees payable pursuant to section 1930 of title 28 of the United States Code after the Effective Date shall be paid prior to the closing of the Chapter 11 Case when due or as soon thereafter as practicable.

B.    *Modification of Plan*

Effective as of the date hereof and subject to the limitations and rights contained in the Plan: (a) the Debtor reserves the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan prior to the entry of the Confirmation Order; and (b) after the entry of the Confirmation Order, the Debtor or the Reorganized Debtor, as applicable, may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan.

C.    *Revocation of Plan*

The Debtor reserves the right to revoke or withdraw the Plan prior to the Confirmation Date and to File subsequent chapter 11 plans.  If the Debtor revokes or withdraws the Plan, or if Confirmation or Consummation does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan, assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan and any document or agreement executed pursuant hereto shall be deemed null and void except as may be set forth in a separate order entered by the Bankruptcy Court; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims by or against, or any Equity Interests in, such Debtor or any other Entity; (b) prejudice in any manner the rights of the Debtor or any other Entity; or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by the Debtor or any other Entity.

D.    *Successors and Assigns*

The rights, benefits and obligations of any Entity named or referred to herein shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such Entity.

E.    *Reservation of Rights*

Except as expressly set forth herein, the Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order.  Neither the filing of the Plan, any statement or provision contained herein, nor the taking of any action by a Debtor or any other Entity with respect to the Plan shall be or shall be deemed to be an

admission or waiver of any rights of: (1) any Debtor with respect to the Holders of Claims or Equity Interests or other Entity; or (2) any Holder of a Claim or an Equity Interest or other Entity prior to the Effective Date.

F.    *Further Assurances*

The Debtor or the Reorganized Debtor, as applicable, all Holders of Claims receiving distributions hereunder and all other Entities shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan or the Confirmation Order.

G.    *Severability*

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision then will be applicable as altered or interpreted, *provided* that the Debtor, the Reorganized Debtor or any affected Entity (as applicable) may seek an expedited hearing before the Bankruptcy Court to address any objection to any such alteration or interpretation of the foregoing. Notwithstanding any such order by the Bankruptcy Court, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

H.    *Service of Documents*

Any pleading, notice or other document required by the Plan to be served on or delivered to the Debtor shall be sent by overnight mail to:

> Schwartz Law, PLLC
> Attn: Samuel A Schwartz
> 601 East Bridger Avenue
> Las Vegas, Nevada 89101

I.    *Filing of Additional Documents*

On or before the Effective Date, the Debtor may File with the Bankruptcy Court all agreements and other documents that may be necessary or appropriate to effectuate and further evidence the terms and conditions hereof.

J.    *Default*

Upon the Effective Date of the Plan, in the event the Debtor fails to timely perform any of the obligations set forth in the Plan, the applicable creditor or party-in-interest shall notify the Debtor and Debtors' counsel of the default in writing in accordance with the notice provisions herein, after which the Debtor shall have: (i) thirty (30) calendar days from the date of the written notification to cure the default; or (ii) if the cure requires more than thirty (30) days, so long as the Debtor initiates steps to cure the default within thirty (30) days and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.  If the Debtor fails to timely cure the default as provided above, the applicable creditor shall be free to pursue any and all rights it may have under the contract(s) between the parties and/or applicable state law, without further court order or proceeding being necessary.

Dated: December __, 2020

Respectfully submitted,

Islet Sciences, Inc.  a Nevada Corporation


By:      /s/ John Steel, IV
Title:     Chief Executive Officer

# Exhibit B

# Exhibit C

**<u>Exhibit C</u>**

**Liquidation Analysis**

LIQUIDATION ANALYSIS
*Islet Sciences, Inc.*

**I.      Introduction**

All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Disclosure Statement.

Under the "best interests" of creditors test set forth by section 1129(a)(7) of the Bankruptcy Code, the Bankruptcy Court may not confirm a plan of reorganization unless the plan provides each holder of a claim or interest who does not otherwise vote in favor of the plan with property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code. Accordingly, to demonstrate that the proposed plan as described in the Disclosure Statement satisfies the "best interests" of creditors test, the Debtors with assistance of their advisors, have prepared the following hypothetical liquidation analysis presenting recoveries available to holders of claims and interests, assuming a hypothetical liquidation of the Debtors (the "Liquidation Analysis"). The Liquidation Analysis is based upon certain assumptions detailed in the Disclosure Statement, this Liquidation Analysis and in the accompanying notes to the Liquidation Analysis.

**Statement of Limitations**

The determination of the costs of, and proceeds from, the hypothetical liquidation of the Debtors' assets in a Chapter 7 case is an uncertain process involving the extensive use of estimates and assumptions that, although considered reasonable by the Debtors based upon their business judgment and input from their advisors, are inherently subject to significant business, economic, and competitive uncertainties and contingencies beyond the control of the Debtors, their management and their advisors. Inevitably, some assumptions in the Liquidation Analysis may not materialize in an actual Chapter 7 liquidation, and unanticipated events and circumstances could materially affect the ultimate results in an actual Chapter 7 liquidation.

NEITHER THE DEBTORS NOR THEIR ADVISORS MAKE ANY REPRESENTATION OR WARRANTY THAT THE ACTUAL RESULTS WOULD OR WOULD NOT APPROXIMATE THE ESTIMATES AND ASSUMPTIONS REPRESENTED IN THE LIQUIDATION ANALYSIS. ACTUAL RESULTS COULD VARY MATERIALLY.

THE LIQUIDATION ANALYSIS IS A HYPOTHETICAL EXERCISE THAT HAS BEEN PREPARED FOR THE SOLE PURPOSE OF PRESENTING A REASONABLE GOOD FAITH ESTIMATE OF THE PROCEEDS THAT WOULD BE REALIZED IF THE DEBTORS WERE LIQUIDATED IN ACCORDANCE WITH CHAPTER 7 OF THE BANKRUPTCY CODE AS OF THE PLAN EFFECTIVE DATE. THE LIQUIDATION ANALYSIS IS NOT INTENDED AND SHOULD NOT BE USED FOR ANY OTHER PURPOSE. THE UNDERLYING FINANCIAL INFORMATION IN THE LIQUIDATION ANALYSIS WAS NOT COMPILED OR EXAMINED BY INDEPENDENT ACCOUNTANTS IN ACCORDANCE WITH STANDARDS PROMULGATED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS.   THE LIQUIDATION ANALYSIS DOES NOT PURPORT TO BE A VALUATION OF THE DEBTORS' ASSETS AS A GOING CONCERN, AND THERE MAY BE A SIGNIFICANT DIFFERENCE BETWEEN THE LIQUIDATION ANALYSIS AND THE VALUES THAT MAY BE REALIZED OR CLAIMS GENERATED IN AN ACTUAL LIQUIDATION.

NOTHING CONTAINED IN THE LIQUIDATION ANALYSIS IS INTENDED TO BE, OR CONSTITUTES, A CONCESSION, ADMISSION, OR ALLOWANCE OF ANY CLAIM BY THE DEBTORS. THE ACTUAL AMOUNT OR PRIORITY OF ALLOWED CLAIMS IN THE CHAPTER 11 CASES COULD MATERIALLY DIFFER FROM THE ESTIMATED AMOUNTS SET FORTH AND USED IN THE LIQUIDATION ANALYSIS. THE DEBTORS RESERVE ALL RIGHTS TO SUPPLEMENT, MODIFY, OR AMEND THE ANALYSIS SET FORTH HEREIN.

**Basis of Presentation**

The Liquidation Analysis is based on the internal, unaudited financial statements of the Debtors as of September 30, 2020 (unless otherwise indicated), and excludes any recoveries resulting in potential causes of action which is assumed to have zero value for purposes of this analysis. The actual assets available to the Debtors' estates and claims arising in the event of an actual liquidation may differ from the assets assumed to be available pursuant to the Liquidation Analysis.

The Debtors have neither fully evaluated claims filed or adjudicated any claims that have been or may be asserted against the Debtors before the Bankruptcy Court. Accordingly, the amount of the final Allowed Claims against the Debtors' estates may differ materially from the claim amounts used in the Liquidation Analysis.

**Conversion Date and Appointment of a Chapter 7 Trustee**

The Liquidation Analysis has been prepared assuming that the Debtors converted their cases from Chapter 11 to Chapter 7 on or about March 31, 2020 ("Conversion Date"). On the Conversion Date, it is assumed that the Bankruptcy Court would appoint a Chapter 7 trustee ("Trustee") to oversee the liquidation of the Debtors' estates.

**Global Notes and Assumptions**

The Liquidation Analysis should be read in conjunction with the following global notes and assumptions.

1. *Significant dependence on unaudited financial statements.* The Liquidation Analysis contains numerous estimates. Proceeds available for distribution are based upon the unaudited financial statements of the Debtors as September 30, 2020 and are assumed to be substantially the same as of the Conversion Date, unless otherwise noted.

2. *Chapter 7 liquidation costs and length of liquidation process.* The Liquidation Analysis assumes that liquidation would occur during a three month period post Conversion Date ("Liquidation Period") in order to pursue an orderly sale of substantially all Debtors' assets, as well as to arrange distributions and otherwise administer and wind-down the estates. In an actual liquidation, the wind-down process and Liquidation Period could vary significantly, thereby impacting distributions and recoveries. For example, the potential for priority, contingent, and other claims, litigation and rejection costs, and delays in the final determination of Allowed Claims could substantially impact both the timing and amount of distributions and recoveries. Additionally, in light of recent market instability and the pandemic risk of COVID-19, it is possible that the Liquidation Period would be materially extended. Accordingly, there can be no assurance that the values reflected in the Liquidation Analysis would be realized if the Debtors were, in fact, to undergo such a liquidation.

3. *Distribution of liquidation proceeds.* Chapter 7 and Chapter 11 Administrative Claims, Priority Claims, professional and trustee fees, and other Claims that may arise in a liquidation scenario would be paid in full from the liquidation proceeds before the balance of any proceeds will be made available to pay any secured and General Unsecured Claims. Under the absolute priority rule, no junior creditor at a given entity would receive any distribution until all senior creditors are paid in full at such entity, and no equity holder at such entity would receive any distribution until all creditors at such entity are paid in full. The assumed distributions to creditors as reflected in the Liquidation Analysis are estimated in accordance with the absolute priority rule.

**Liquidation Analysis for the Debtors**

The schedule shown below presents the net liquidation proceeds available for distribution in a hypothetical Chapter 7 case. The Liquidation Analysis estimates the high and low asset recoveries, which are based on the asset book value as of September 30, 2020, except as otherwise indicated.

**Liquidation Analysis - Consolidated Debtors Liquidation ($ in Thousands)**

| | | | Estimated Recovery | | | |
|---|---|---|---|---|---|---|
| | Notes | Estimated Value at Confirmation | Low % | Low $ | High % | High $ |
| **Current Assets** | | | | | | |
| Cash and Cash Equivalents | 1 | $          300 | 100.0% | $       300 | 100.0% | $       300 |
| **Total Current Assets** | | $          300 | 100.0% | $       300 | 100.0% | $       300 |
| **Non-Current Assets** | | | | | | |
| Intangible Assets, Net | 2 | 442,398 | 10.0% | 44,240 | 50.0% | 221,199 |
| **Total Non-Current Assets** | | $      442,398 | 10.0% | $   44,240 | 50.0% | $ 221,199 |
| **Total Distributable Value Before Liquidation Costs** | 3 | $      442,698 | 10.1% | $   44,540 | 50.0% | $ 221,499 |
| **Less: Liquidation Costs** | | | | | | |
| Chapter 11 Professional Fees | 4 | - | -% | - | -% | - |
| Chapter 7 Professional Fees | 5 | - | 2.5% | 1,106 | 2.5% | 5,530 |
| Trustee Fees | 6 | - | 1.5% | 664 | 1.5% | 3,318 |
| **Total Liquidation Costs** | | $            - | 4.0% | $    1,770 | 4.0% | $    8,848 |
| **Net Liquidation Proceeds Available for Distribution** | 7 | $      442,698 | | $   42,770 | | $ 212,651 |

| | | | Claims Recovery Estimate | | | |
|---|---|---|---|---|---|---|
| Claims | | Claim Amount | Low % | Low $ | High % | High $ |
| **Superpriority Claim - DIP Revolving Credit Facility** | 8 | $        2,000 | 100% | $    2,000 | 100% | $    2,000 |
| *Remaining Liquidation Proceeds Available for Distribution* | | | | 40,770 | - | 210,651 |
| **General Unsecured Claims** | 9 | $        8,900 | 100% | $    8,900 | 100% | $    8,900 |
| *Remaining Liquidation Proceeds Available for Distribution* | | | | 31,870 | - | 201,751 |

**Footnotes to Liquidation Analysis**

1. **Cash and Cash Equivalents**

The Debtors' cash and cash equivalents balance was estimated to be $300,000 as of the Conversion Date. The Liquidation Analysis assumes cash will be used to pay Chapter 11 operating costs and professional fees in the period prior to conversion to Chapter 7.

2. **Intangible Assets, Net**

The Debtors' intangible assets consist of value attributable to Islet's portfolio of five diabetes treatments. The Liquidation Analysis assumes between a 10% and 50% recovery of these assets in an orderly liquidation of the Debtors' assets. The reduction in value reflects the need to monetize the assets over a short time period without the institutional knowledge and deal making ability of the current Chief Executive Officer. As of the estimated confirmation date, the net book value of intangible assets is $0.

Two of the treatments were the subject of a valuation report prepared on August 30, 2020. These treatments include Lisofylline combination therapy with GLP-1 ("Combo") and Beta Cell Death Diagnostic Test ("β-Cell Test"). The valuation was adjusted for the following factors could adversely impact the net proceeds from the sale of the license rights in a liquidation: (a) short time period for trustee to sell the licenses; (b) valuation assumes product has a stated degree of efficacy which a buyer would likely need to apply an additional discount to the purchase to reflect additional risk; (c) the buyer would have limited diligence which would likely affect purchase price; (d) the potential for incremental professional fees related to the successful sale of the product rights, among others; and (e) the loss of institutional

knowledge and deal making ability of the current Chief Executive Officer.  After the adjustment, the estimated value is between $44,240,000 and $221,199,000.

The remaining three assets were not valued as part of the liquidation analysis, consistent with their exclusion from the Valuation included in the Disclosure Statement.  In the event these assets are monetizable, the value received in a liquidation analysis would likely not exceed the value received in a sale during standard market conditions.  For purposes of meeting the Best Interest of Creditors Test, these assets would be net neutral at best. Further detail on the treatments not valued is included below:

- Islet replacement after kidney transplant.  This therapy will initially be deployed for persons with end stage renal disease receiving kidney transplants
  — The rational is that it would be protective of the new kidney by eliminating the concurrent diabetes. It is known that islet replacement therapy concurrent with persons receiving kidney transplants due to diabetes live longer than persons on dialysis or with a kidney transplant alone
- Fatty Kidney Disease ("FKD") Identification and Treatment, U.S. Patent Application No. 62/842,292.  "Fatty Kidney" was first coined in the literature in 1883
  — A century later, Moorhead's lipid nephrotoxicity hypothesis suggested that hyperlipidemia causes renal lipid accumulation and nephrotoxicity. Subsequently, numerous publications have reviewed the interactions of lipids and renal disease, which include obesity, metabolic syndrome, type 2 diabetes, hypertension, and chronic kidney disease
  — This intellectual property pertaining to diagnostics and therapy use FDA approved methodologies to reduce FKD.  The technology described in the patent filing was overviewed in a publication by Islet's scientific adviser in Endocrine Practice, August 2019, Vol. 25, No. 8, pp. 854-858
- Remogliflozin, in dispute, Islet Sciences, Inc. v. Avolynt, Inc., et al. (E.D.NC 2:19-cv-0145) (including at least Remogliflozin and world-wide bi-phasic formulation patents)

3. **Total Distributable Value Before Liquidation Costs**
   Represents the gross value generated through the sale / disposition of the Debtors' assets prior to liquidation related expenses.

4. **Chapter 11 Professional Fees**
   Chapter 11 Professional Fees represent professional fees incurred and remaining unpaid upon the conversion date. These unpaid costs are estimated to be $0 as of the conversion date.

5. **Chapter 7 Professional Fees**
   Includes an estimate for certain professionals that would be retained by the Trustee during the Liquidation Period, including financial advisors and legal counsel. Estimated to be 2.5% of Total Distributable Value Before Liquidation Costs less cash.

6. **Trustee Fees**
   Trustee fees required to facilitate the sale of the Debtors' assets, assumed to be 1.5% of Total Distributable Value less cash. These fees are assumed to be used for marketing and administrative costs of the Trustee during the Liquidation Period. Although section 326 of the Bankruptcy Code provides for statutory Trustee fees of 3.0% for liquidation proceeds in excess of $1,000,000, the Debtors assumed that the Bankruptcy Court would authorize Trustee fees equal to only 1.5% of the gross asset proceeds (excluding cash).

7. **Net Liquidation Proceeds Available for Distribution**
   Represents the net value available for distribution to the Debtors' Chapter 11 claims.

8. **Superpriority Claim – DIP Revolving Credit Facility**

Estimated balance outstanding under the Debtors' Term Loan and Revolving Credit as of the Conversion Date. It is assumed that the Senior Debt Facilities, which previously accounted for $100,000, have been rolled into the Superpriority Claim – DIP Revolving Credit Facility and that the Revolving Credit Facility is fully drawn without paid-in-kind interest.

9.  **General Unsecured Claims**
    Total estimated general unsecured claims are based on the Debtors bankruptcy schedules filed October 14, 2019.

**CONCLUSION**

Based on a comparison of recoveries under this Liquidation Analysis to the implied reorganization value and recoveries provided under the Debtors' proposed Plan, the Plan satisfies the requirements of section 1129(a)(7) of the Bankruptcy Code.

# Exhibit D

**Islet Sciences, Inc.**
Cash Flow Projection
As of December 2020

| | | Projected | Projected | Projected | Projected | Projected | Actual |
|---|---|---|---|---|---|---|---|
| | Beginning | Mar-21 | Apr-21 | May-21 | Jun-21 | Jul-21 | Total |
| 1 Cash on hand (beginning of month) | 300,000 | 300,000 | 276,196 | 252,392 | 213,588 | 169,284 | |
| 2 | | | | | | | |
| 3 **DEPOSITS** | | | | | | | |
| 4 | | - | - | - | - | - | - |
| 5 | | - | - | - | - | - | - |
| 6 | | - | - | - | - | - | - |
| 7 | | - | - | - | - | - | - |
| 8 | | - | - | - | - | - | - |
| 9 | | - | - | - | - | - | - |
| 10 TOTAL RECEIPTS | | | | | | | |
| 11 **Total available** | 300,000 | 300,000 | 276,196 | 252,392 | 213,588 | 169,284 | |
| 12 | | | | | | | |
| 13 **CASH PAID OUT** | | | | | | | |
| 14 Business Development and Meals | | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 10,000 |
| 15 Miscellaneous Business Expense | | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 7,500 |
| 16 Bank Charges | | 300 | 300 | 300 | 300 | 300 | 1,500 |
| 17 **Legal and Professional** | | | | | | | |
| 18 Shepard Mullin: IP Counsel | | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 25,000 |
| 19 JPF Securities Law Firm | | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 10,000 |
| 20 Licenses and Permits | | - | - | - | - | - | - |
| 21 Payroll: Manager | | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 60,000 |
| 22 Postage / Mail | | 50 | 50 | 50 | 50 | 50 | 250 |
| 23 Quest | | - | - | - | - | 25,000 | 25,000 |
| 24 **Royalties** | | | | | | | |
| 25 UCI | | - | - | - | - | 20,000 | 20,000 |
| 26 UVA | | - | - | - | - | 20,000 | 20,000 |
| 27 YALE | | - | - | - | - | 20,000 | 20,000 |
| 28 Storage | | 204 | 204 | 204 | 204 | 204 | 1,020 |
| 29 Telephone | | 250 | 250 | 250 | 250 | 250 | 1,250 |
| 30 Xeris | | - | - | - | - | 25,000 | 25,000 |
| 31 Payroll: Employees | | | | 15,000 | 15,000 | 15,000 | 45,000 |
| 32 Payroll: Directors and Officers | | | | | 3,000 | 3,000 | 6,000 |
| 33 Rent | | | | | 2,500 | 2,500 | 5,000 |
| 34 **TOTAL CASH PAID OUT** | | 23,804 | 23,804 | 38,804 | 44,304 | 154,304 | 285,020 |
| 35 **Cash on hand (end of month)** | 300,000 | 276,196 | 252,392 | 213,588 | 169,284 | 14,980 | |
| 36 | | | | | | | |
| 37 | | | | | | | |
| 38 | | | | | | | |
| 39 | | | | | | | |
| 40 | | | | | | | |
| 41 | | | | | | | |
| 42 | | | | | | | |
| 43 | | | | | | | |
| 44 | | | | | | | |